## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FEDERAL TRADE COMMISSION,
　　　　　　　Plaintiff,

　　　　　　v.

BRONSON PARTNERS, LLC,
d/b/a **NEW ENGLAND DIET CENTER**,
and **BRONSON DAY SPA**, and

**MARTIN HOWARD,** individually,
as a member of defendant **BRONSON
PARTNERS, LLC,** d/b/a/
**NEW ENGLAND DIET CENTER** and
**BRONSON DAY SPA**,
　　　　　　　**Defendants**, and

**H & H MARKETING**, LLC and **SANDRA
HOWARD**,
　　　　　　　**Relief Defendants.**

**CIVIL NO.** 3:04-CV-01866 SRU

May 5, 2009

## PLAINTIFF FEDERAL TRADE COMMISSION'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respectfully submitted,

**DAVID C. SHONKA**
Acting General Counsel

**LEONARD L. GORDON**
Director, Northeast Region
**FEDERAL TRADE COMMISSION**

**ROBIN E. EICHEN (CT 26398)**
reichen@ftc.gov
**NUR-UL-HAQ (Special Bar No. phv03213)**
nhaq@ftc.gov
Attorneys for Plaintiff
Federal Trade Commission
Northeast Region
1 Bowling Green, Suite 318
New York, NY 10004
Tel:　(212) 607-2803 (Eichen)
　　　(212) 607-2806 (Haq)
Fax:　(212) 607-2822

## TABLE OF CONTENTS

A.    Proposed Findings of Fact.................................................................................1

        Defendants Bronson and Martin Howard are Direct
        Sellers of Chinese Diet Tea and the Bio-Slim Patch, and
        No Middleman Took Deductions from Consumers'
        Payments.........................................................................................................1

        Defendants' Combined Gross Revenues from the
        Challenged Products, Less Refunds, Were  $1,942,325....................................3

        Revenues Derived From All of Defendants' Deceptive
        Advertising for Chinese Diet Tea Should be Included in
        an Award of Equitable Monetary Relief to Plaintiff........................................4

        $1,942,325 is Traceable to Defendants' Advertising for
        the Challenged Products...................................................................................8

        At Least 25.25% of Bronson's Gross Revenue Was
        Derived from Sales of the Challenged Products................................................9

        Relief Defendant H&H Marketing Should Be Liable for
        $1,942,325, or, in the Alternative, at least $359,734.........................................10

        Relief Defendant Sandra Howard Never Performed Any
        Work for H&H and Should Be Liable for the Sum of
        $121,824, Which She Received From Bronson Through
        H&H...............................................................................................................12

        Martin Howard is Not Seeking Indemnification or
        Contribution from Any Person..........................................................................13

B.    Proposed Conclusions of Law.......................................................................13

        The Court Has the Authority to Fashion a Broad
        Equitable Remedy, Including Consumer Redress,
        Disgorgement of Ill-Gotten Gains, and Rescission of
        Contracts........................................................................................................13

        Defendants are Direct Sellers, Liable for Full Restitution
        and Rescission in the Amount of their Gross Sales of the
        Challenged Products Less Refunds...................................................................14

        Net Profits Are *Not* the Proper Measure of Restitution
        to Consumers...................................................................................................15

i

Martin Howard is Jointly and Severally Liable with
Bronson for Consumers' Losses.........................................................................16

Defendants are Jointly and Severally Liable for
$1,879,040 for the Deceptive Claims Regarding Chinese
Diet Tea.........................................................................................................17

Defendants are Jointly and Severally Liable for $63,285
for the Deceptive Claims Regarding the Bio-Slim Patch..................................18

The Court Has the Authority to Grant Monetary Relief
Against H&H and Sandra Howard as Relief Defendants..................................19

Relief Defendant H&H Marketing, LLC Is Part of a
Common Enterprise with Bronson, or Alternatively,
Is an Alter Ego of Martin Howard, and Hence, Should
Be Jointly and Severally Liable for the Full Amount of
Monetary Relief for the Deceptive Advertising of the
Challenged Products........................................................................................19

Alternatively, H&H Is Jointly and Severally Liable up
to the Amounts It Received of Any Monies from the
Sales of the Challenged Products......................................................................21

Sandra Howard is Liable to the Extent She Received
Any Proceeds from the Sale of the Challenged Products..................................23

Defendants Bronson and Martin Howard Should Be
Permanently Enjoined From Making the Types of
Misrepresentations They Made in Connection With
the Challenged Products...................................................................................24

Fencing-in Relief is Appropriate in this Case..................................................24

Provisions to Monitor and Enforce Compliance..............................................24

## PLAINTIFF'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.**   **Proposed Findings of Fact:**

**Defendants Bronson and Martin Howard are Direct Sellers of Chinese Diet Tea and the Bio-Slim Patch, and No Middleman Took Deductions from Consumers' Payments**

1.   Defendant Bronson Partners, LLC ("Bronson") sold Chinese Diet Tea directly to consumers from early 2003 through at least December 2004. *See* Defendants Objections and Responses to Interrogatories dated March 10, 2005 (hereinafter referred to as *Interrogatory Response(s)*)11.

2.   Bronson sold the Bio-Slim Patch directly to consumers in 2003 and 2004. *See Interrogatory Response* 11.

3.   Bronson purchased supplies of Chinese Diet Tea from MegaCare, Inc. *See Interrogatory Response* 2; the Parties Stipulation of Issues of Fact as Stated in their Joint Pre-Trial Memorandum (hereinafter, "Stipulation") No. 4.

4.   Bronson purchased supplies of the Bio-Slim Patch from The Pure Source, also known as, Advanced Nutritional Packaging, Inc. *See Interrogatory Response* 2; Stipulation No. 3.

5.   Bronson maintained an inventory of products that would be shipped directly to consumers. *See* Deposition of Sandra Howard, August 18, 2005, (hereinafter referred to as *S. Howard Dep. Tr.)* at 56, l. 25 to 57, l. 1-2; Document Bates Numbers BR-SUPP00001-BR-SUPP000012.[1]

6.   Consumers would call the toll-free number that appeared on Defendants' advertisements or would send a written order by mail for Chinese Diet Tea and the Bio-Slim Patch (collectively "the Challenged Products"). *See* Answers to Federal Trade Commission's Supplemental Interrogatories as to Defendants and Relief Defendants executed on February 9, 2009, (hereinafter *Supp. Interrogatory Answer(s) Defendants [or Relief Defendants])* 5; Stipulation No. 5.

7.   Bronson utilized the services of a third-party call center, Taction, to handle telephone and fax orders for the Challenged Products. Taction provided a toll-free number, accepted credit card orders, and, at some point in late 2004, provided customer service. *See Supp. Interrogatory Answer Defendants* 5. *See* Stipulation No. 6.

---

[1] Document Bates Numbers were marked on the documents by Defendants and Relief Defendants when they produced such documents to the FTC.

8.  Bronson used third-party fulfillment houses, BMI Fulfillment Services ("BMI") from March 2003 through September 2004, and later William B. Meyer, Inc. ("Meyer"), from October 2004 through the present, to receive mail, process payments and refunds, and ship the Challenged Products to consumers. *See Interrogatory Response* 4; Stipulation No. 8.

9.  Consumers paid for the Challenged Products by check, credit card, or money order. *See Supp. Interrogatory Answer Defendants* 1; Stipulation No. 7.

10. Bronson received the full purchase price from consumers who purchased the Challenged Products. *See Supp. Interrogatory Answer Defendants* 3.

11. BMI and Meyer would deposit monies received from consumers directly into one of two Bronson bank accounts at Hudson United Bank ("Hudson"). Proceeds from credit card transactions were deposited into account #xxxxxx8210, and proceeds from sales made by check or money order were deposited into account #xxxxxx7667. *See Supp. Interrogatory Answer Defendants* 11; Stipulation No. 9.

12. BMI and Meyer processed refunds to consumers for order returns from a third Hudson account owned by Bronson, account #xxxxxx5058. *See Supp. Interrogatory Answer Defendants* 11; Stipulation No. 10.

13. Bronson had a fourth bank account at Hudson, #xxxxxx6450, which was an interest-bearing money market account. Stipulation No. 11.

14. No amounts were deducted as payments for the services of Taction, BMI or Meyer from any funds that were deposited into Bronson's Hudson accounts prior to the depositing of those funds by BMI or Meyer. *See Supp. Interrogatory Answers Defendants* 6,12.

15. Bronson paid BMI, Meyer, and Taction monthly by check from one of its Hudson accounts after these companies performed services for Bronson and sent invoices. BMI and Meyer also received advance payments for postage as did the U.S. Post Office. *See Supp. Interrogatory Answers Defendants* 12-13; Stipulation No. 12.

16. Credit card companies' fees, chargebacks, and bounced check fees were deducted from Bronson's bank accounts after the monies had been deposited in the accounts. Bates Numbers BR-SUPP000690-BR-SUPP000886.

17. Defendants Bronson and Martin Howard and Relief Defendants H&H Marketing, LLC ("H&H") and Sandra Howard cannot identify fulfillment house expenses, chargebacks, bounced checks, bounced check fees, bad credit card charges, or credit card fees attributable specifically to the sale of the Challenged Products. *See Supp. Interrogatory Answer Defendants* 22.

18. Bronson paid the following business expenses *after* consumers' payments for the Challenged Products were deposited into Bronson's bank accounts: fulfillment costs,

2

product costs, credit card fees, advertising costs, bounced check charges, credit card chargebacks, bad credit card charges, and credit card fees. *See Supp. Interrogatory Answer Defendants* 3-4; BR-SUPP000690-BR-SUPP000886.

19.   At all relevant times, Martin Howard has kept the books for Bronson. Deposition of Martin Howard, August 17, 2005 (hereinafter referred to as *M. Howard Dep. Tr.*) at 170, l. 9-22.

**Defendants' Combined Gross Revenues from the**
**Challenged Products, Less Refunds, Were  $1,942,325**

20.   Bronson filled 57,177 orders for Chinese Diet Tea between January 1, 2003 and December 31, 2004. *See Interrogatory Response* 11; Stipulation No. 18.

21.   Consumers paid $24.95 for a box of Chinese Diet Tea, containing a four week supply of tea bags, plus $5 for shipping and handling. *See* BR-SUPP000025; Stipulation No. 19.

22.   Bronson's gross revenue from the sale of Chinese Diet Tea to consumers from January 1, 2003 to December 31, 2004 was $2,001,494. *See Interrogatory Response* 11; Stipulation No. 20.

23.   Bronson paid $122,454 in refunds to consumers who purchased Chinese Diet Tea during the period from January 1, 2003 to December 31, 2004. *See Interrogatory Response* 11; Stipulation No. 21.

24.   Bronson's revenue for the sale of Chinese Diet Tea in 2003 and 2004, less refunds, was $1,879,040. *See Interrogatory Response* 11; Stipulation No. 22.

25.   Bronson filled 1,990 orders for the Bio-Slim Patch between 2003 and 2004, consisting of 2,328 units of product. *See Interrogatory Response* 11; Stipulation No. 13.

26.   Consumers paid $24.95 for a one-month supply of the Bio-Slim Patch (30 patches), plus $5-6 for shipping and handling. *See* Exhibit B to the Amended Complaint; BR-SUPP000985; *see* Stipulation No. 14.

27.   Bronson's gross revenue from sales of the Bio-Slim Patch to consumers from January 1, 2003 to December 31, 2004 was $69,763. *See Interrogatory Response* 11; Stipulation No. 15.

28.   Bronson paid $6,478 in refunds to consumers who purchased the Bio-Slim Patch in 2003 and 2004. *See Interrogatory Response* 11; Stipulation No. 16.

29.   Bronson's revenue for the sale of the Bio-Slim Patch in 2003 and 2004, less refunds, was $63,285. *See Interrogatory Response* 11; Stipulation No. 17.

3

30.   Bronson's combined gross revenue for the Challenged Products in 2003 and 2004, net of refunds, is the sum of $1,879,040 and $63,285 or $1,942,325. *See Interrogatory Response* 11; Stipulation No. 23.

31.   The Federal Trade Commission is entitled to recover equitable monetary relief from Defendants in the sum of $1,942,325.

**Revenues Derived From All of Defendants' Deceptive Advertising for Chinese Diet Tea Should be Included in an Award of Equitable Monetary Relief to Plaintiff**

32.   Bronson advertised Chinese Diet Tea by means of three print advertisements in magazines and other print media, as well as a catalog advertisement and a Web site advertisement. Defendants have marked the three print advertisements as Versions A, B, and C. *See* Stipulation No. 25.

33.   This Court held that the advertisement attached to the Amended Complaint as Exhibit A ("Exhibit A Advertisement") was misleading and deceptive, and held that Defendants were liable for equitable monetary relief under Section 5 of the Federal Trade Commission ("FTC") Act. Defendants subsequently designated this version of the Chinese Diet Tea advertisement as Advertisement Version A, marked as Bates Number BR-SUPP000025.

34.   Defendants' other nationwide print advertisements for Chinese Diet Tea contain nearly all of the same statements that the Court found to be deceptive and misleading in the Exhibit A Advertisement.

35.   The Bronson Day Spa catalog advertisement for Chinese Diet Tea, marked as Bates Number 000918, identified at Martin Howard's deposition as Exhibit 9 (the "catalog advertisement"), is nearly identical to the Exhibit A Advertisement.

36.   Bronson advertised Chinese Diet Tea using Advertisement Version A, the same version as the Exhibit A Advertisement, until at least October 12, 2004. BR-SUPP001572.

37.   Bronson first advertised Chinese Diet Tea in a publication by means of a print advertisement other than the Exhibit A Advertisement on or about April 27, 2004. BR-SUPP001572; Stipulation No. 24.

38.   There were only three basic magazine advertisements for Chinese Diet Tea, and they have been designated by Defendants as Advertisement Versions A, B, and C. Advertisement Version A corresponds to the Exhibit A Advertisement and the catalog advertisement, and is marked as BR-SUPP000025. Advertisement Version B is marked as BR-SUPP000026. Advertisement Version C is marked as BR-SUPP000027. Stipulation No.25.

39.   In addition to the Exhibit A Advertisement, Bronson advertised Chinese Diet Tea by means of only two other print advertisements, which Defendants designated as Advertisement

4

Versions B and C, respectively. BR-SUPP000026 and BR-SUPP000027; *see* Stipulation No. 25.

40.    Bronson's Advertisement Versions A, B, and C were the only Chinese Diet Tea advertisements that appeared in magazines and other print media. *See* BR-SUPP001569 - BR-SUPP001572; *see* Stipulation No. 26.

41.    Advertisement Versions B and C each contain the following statements that are identical to those in the Exhibit A Advertisement, which the Court found to be deceptive and misleading:

   a.    **POWERFUL GREEN DIET TEA   Chinese Diet Tea. SHEDS POUND AFTER POUND OF FAT – FAST!**

   b.    Let this powerful Chinese Green Diet Tea help you to lose those unwanted pounds. Can you imagine losing weight by simply drinking a cup of refreshing tea?  Well, that's all you now have to do to lose weight with one of the 'easiest' and most effective diets ever discovered.

   c.    **4 week course, You'll lose up to 25 lbs, $24.95**

      **8 week course, You'll lose up to 50 lbs, $39.95**
            **Save $16.00**

      **12 week course, You'll lose up to 75 lbs, $49.95**
            **Save $32.90 . . .[2]**

   d.    "I have been on the program 6 weeks and have not religiously followed the schedule of a cup of tea after each meal.  However, I have gone from 240 lbs down to 210 lbs. I feel better." Gerald G.

   e.    "We (my husband and I) have lost 45 lbs. so far.  Send extra order forms for friends." Doris T.

   f.    **WARNING:** Doctors recommend that weight loss must be achieved gradually over an extended 8-12 week period.  We therefore recommend that you do not lose weight too suddenly.  If very rapid weight loss occurs, stop taking Chinese Green Diet Tea for 10-14 days and consult your doctor.

BR-SUPP000026 - BR-SUPP000027.

42.    Advertisement Version B contains the following statements that are similar to statements in the Exhibit A Advertisement, which the Court found to be deceptive and misleading:

---

[2] Advertisement Version C says "You can lose . . ." instead of "You'll lose . . ."

5

a.  **GUARANTEED!  Chinese Green Diet Tea** has been clinically trialed. (sic)  All participants lost weight.  We guarantee to refund your purchase price in full (less sh/h) no questions asked.  **REMEMBER**, the more **Chinese Green Diet Tea** you drink, the more weight you may lose . . . .

b.  **Lose Lots of Weight in 10 Weeks!**  "After 10 weeks my weight was down to 104 lbs.  I lost weight so fast my doctor ordered me to slow down."

c.  **You eat your favorite foods - but STILL lose weight!**

   - **Reduces sugar absorption.**
   - **Helps prevent fat absorption.**
   - **Doubles your metabolic rate to burn calories fast.**
   - **Powerful herbal formula helps you stop snacking.**

d.  **The Chinese Green Diet Tea's secret herbal ingredients act in four ways to help you lose weight.**

   1.  Reduces sugar absorption.  this means you can eat sweet buns and chocolate without putting on so much weight. . . .

   2.  Reduces the absorption of animal fats and dairy products.  This controls the fattening effects of butter, cheese, pate, sausages and fatty meats.

   3.  Speeds the digestion of food in the intestine.  This prevents food laying in your stomach for 24 hours or more and contributing to that "pot belly" look.  The faster digestion of food means fewer calories are absorbed into the body.

   4.  Acts as an effective appetite suppressant to reduce snacking.

e.  Researchers found that those who drank Chinese Diet Green Tea burned additional calories every week with no change in diet or physical activity!

BR-SUPP000026.

43.  Advertisement Version C additionally contains the following statements that are similar to statements in the Exhibit A Advertisement, which the Court found to be deceptive and misleading:

a.  **Lose Lots of Weight in 10 Weeks!**  "After 10 weeks my weight was down to 104 lbs.  I lost weight so fast my doctor ordered me to slow down."

b.  **GUARANTEED!  Chinese Green Diet Tea** has been clinically trialed (sic) on 163 patients.  All participants lost between 18 lbs. and 75 lbs. over the 12 week trial

6

period. If you do not lose similar amounts of weight, we guarantee to refund your purchase price in full (less sh/h). **REMEMBER** the more Chinese Green Diet Tea you drink, the more weight you may lose!

c.   **You eat your favorite foods - but STILL lose weight!**

- **Eliminates an amazing 91% of absorbed sugars**
- **Prevents 83% of fat absorption.**
- **Doubles your metabolic rate to burn calories fast.**
- **Powerful herbal formula helps you stop snacking.**

d.   **The Chinese Greet Diet Tea's secret herbal ingredients act in four ways to help you lose weight.**

1.   Reduces sugar absorption by an amazing 91%. This means that you can eat sweet buns and chocolate without putting on so much weight. . . .

2.   Reduces the absorption of animal fats and dairy products by as much as 83%. This controls the fattening effects of butter, cheese, pate, sausages and fatty meats.

3.   Doubles the digestion of food in the intestine. This prevents food laying in your stomach for 24 hours or more and contributing to that "pot belly" look. The faster digestion of food means fewer calories are absorbed into the body.

4.   Acts as an effective appetite suppressant to reduce snacking.

e.   Researchers found that those who drank Chinese Diet Tea burned an additional 500 calories per week, with no change in diet or physical activity!

BR-SUPP000027.

44.   Bronson's Web site advertisement for Chinese Diet Tea, marked as Bates Number 000488, identified at Martin Howard's deposition as Exhibit 10, contains the following statements that are similar to statements in the Exhibit A Advertisement:

a.   **You Eat Your Favorite Foods – But Still Lose Weight Fast!**

b.   Triple action Chinese Diet Tea helps eliminate the absorption of carbohydrates and helps prevent fat absorption.

c.   It increases the metabolic rate to burn calories . . . .

7

## $1,942,325 is Traceable to Defendants' Advertising for the Challenged Products

45.    Defendants did not contest liability for advertising the Bio-Slim Patch, so all revenues for that product are subject to an award of equitable monetary relief in favor of Plaintiff.

46.    Bronson identifies its print advertisements for Chinese Diet Tea with a publishing identification number starting with the prefix "DGT," and traces advertising revenues from specific advertisements in a document entitled, "DGT Ads Sorted By Advertising Source Code Versions" for sales bearing DGT publication numbers. BR-SUPP00001569-BR-SUPP-001572; Stipulation No. 27.

47.    Bronson's catalog advertisement for Chinese Diet Tea does not bear a DGT publishing identification number which could track sales attributable to the catalog advertisement. *See* Stipulation No. 28.

48.    Defendants state that Bronson's gross revenues from print advertisement Versions A, B, and C (other than the catalog advertisement) are $1,840,344.77. BR-SUPP001572.

49.    DGT numbers 377, 501-505, 507–512, 514-515, 517, 520-521, 523–525, 527-535, 537-545, 547-555, 557-575, 577-585, 587-595, 597-605, 607-610, 612, 614-615, 617-625, 627-635, 637-645, 647-655, 657-664, 667-675, 677-685, 687-695, 702, 705, 707, 803 and 810 correspond to Advertisement Version A, which yielded gross revenues of $1,806,124.66. *See* BR-SUPP00001569-BR-SUPP-001572; Stipulation No. 30.

50.    DGT numbers 698 and 709 correspond to advertisement Version B, which yielded gross revenues of $12,129.60. *See* BR-SUPP001569-BR-SUPP-001572; Stipulation No. 31.

51.    DGT numbers 697, 699, 701, 703, and 704 correspond to advertisement Version C, which yielded gross revenues of $22,090.61. *See* BR-SUPP001569-BR-SUPP-001572; Stipulation No. 32.

52.    The gross revenue figure of $1,840,344.87 for Chinese Diet Tea was realized from at least 162 instances of the publication of Advertisement Versions A, B, or C, in, at a minimum, 46 different publications between January 1, 2003 through December 31, 2004. *See* BR-SUPP001569-BR-SUPP-001572.

53.    The gross revenue figure of $1,840,344.87, which is directly attributable to the sales of Chinese Diet Tea realized from Advertisement Versions A, B, and C, represents at least 91% of Bronson's total gross revenues for Chinese Diet Tea, and does not take into account any revenues derived from the catalog advertisement. *See* BR-SUPP001569-BR-SUPP001572.

54.    Bronson did not accept orders for the Challenged Products over the Internet. *See Supp. Interrogatory Answer Defendants* 9; Stipulation No. 33.

55.    Bronson did not maintain records of revenues obtained from sales to consumers who

purchased the Challenged Products after seeing them on Bronson's Web site. *See Supp. Interrogatory Answer Defendants 9; M. H. Dep. Tr.* at 31, l. 23-25 to 32, l. 1-4.

56. Bronson's print and catalog advertisements for the Challenged Products made no reference to Bronson's Web site. *See* BR-SUPP000025-BR-SUPP-000027 and Bates Number 000488.

57. To the extent consumers purchased Chinese Diet Tea after seeing the product on Bronson's Web site, they would have called Bronson's toll free telephone number, 1-877-779-4488, which is the same manner in which they would have purchased Chinese Diet Tea after seeing the product advertised in publications. *See Supp. Interrogatory Answer Defendants 9; see* Stipulation No. 35.

58. Bronson shipped its Bronson Day Spa catalog, containing Advertisement Version A for Chinese Diet Tea, to consumers purchasing Bronson products in 2003 and 2004 as well as to consumers who bought similar products from other companies. *See* Bronson Partners On-Line Customer Service at Bates Number 000475.

59. Bronson did not maintain records of revenues obtained from sales to consumers who purchased Chinese Diet Tea after seeing the catalog advertisement for the product. *See* BR-SUPP001569-BR-SUPP-001572.

60. To the extent consumers purchased Chinese Diet Tea after seeing the catalog advertisement placed an order using Bronson's toll free telephone number, 1-877-779-4488, or mailing a check or money order to Bronson, in the same manner in which they would have purchased Chinese Diet Tea after seeing the product advertised in publications. *See* Bates Number 000918. *See* Stipulation No. 37.

61. Bronson's revenues for Chinese Diet Tea that are not traceable to particular published advertisements via tracking codes are approximately $161,148. *See Supp. Interrogatory Answer Defendants 9;* Stipulation No. 38.

62. Given the wide and frequent dissemination of the deceptive advertisements for Chinese Diet Tea in 2003 and 2004, especially the catalog advertisement, all of Bronson's revenue for Chinese Diet Tea must be derived from the advertisements designated as Advertisement Versions A, B, and C.

**At Least 25.25% of Bronson's Gross Revenue Was
Derived from Sales of the Challenged Products**

63. Bronson's gross revenue in 2003 was $4,175,082. *See Supp. Interrogatory Answer Defendants 17;* Stipulation No. 39.

64. Bronson's gross revenue in 2004 was $4,021,365. *See Supp. Interrogatory Answer Defendants 17;* Stipulation No. 40.

65. Bronson's gross revenue in 2003 and 2004 was $8,196,447. *See Supp. Interrogatory Answer Defendants 17;* Stipulation No. 41.

66.  At least 24.4% of Bronson's gross revenue in 2003 and 2004 was derived from sales of Chinese Diet Tea. *See Supp. Interrogatory Answer Defendants* 17; Stipulation No. 42.

67.  At least .85% of Bronson's gross revenue in 2003 and 2004 was derived from sales of the Bio-Slim Patch. *See See Interrogatory Response* 11; *Supp. Interrogatory Answers Defendants* 17; Stipulation No. 43.

### Relief Defendant H&H Marketing Should Be Liable for $1,942,325, or, in the Alternative, at least $359,734

68.  H&H was established as a Republic of Texas limited liability company that is 50% owned by Martin Howard and 50% owned by Sandra Howard. *H & H Operating Agreement*; Stipulation No. 44.

69.  Martin and Sandra Howard formed H&H for tax purposes, based upon the advice of their accountant and attorney, in order to pay their personal expenses. H&H is used to pay the Howards' personal expenses. *Supp. Interrogatory Answers Relief Defendants* 9; *M.H. Dep. Tr.* at 34, l. 21-25 to 35, l. 1-3.

70.  H&H did not and does not perform any services for Bronson or any other company at any time. *See Supp. Interrogatory Answers Relief Defendants* 9.

71.  Martin Howard did not receive a salary from Bronson until the FTC began its investigation. Rather, Martin Howard was compensated for his work on behalf of Bronson through H&H. *M.H. Dep. Tr.* at 54, l. 8-16; *Supp. Interrogatory Answers Defendants* 23.

72.  Bronson's transfers of money to H&H are reflected as consulting expenses in Bronson's tax returns. *Supp. Interrogatory Answers Relief Defendants* 9; *See Interrogatory Response* 13; Bronson federal tax returns for 2003 and 2004; Stipulation No. 45.

73.  The only entity to which Bronson paid consulting expenses has been H&H.

74.  Because Bronson and H&H are both equally owned by Martin and Sandra Howard, who file joint income tax returns, the net effect is as though Bronson and H&H were only one company. *Supp. Interrogatory Answers Relief Defendants* 9.

75.  Bronson transferred the proceeds from the sale of its products, including Chinese Diet Tea and the Bio-Slim Patch, less expenses, to H&H. *See Supp. Interrogatory Answers Relief Defendants* 1; *M.H. Dep. Tr.* at 36, l. 1-11

76.  H&H owns just one bank account at Hudson into which transfers from Bronson were made, #xxxxxx1579; Stipulation No. 46.

77.  There is also at least one brokerage account at A.G. Edwards, Inc. in the name of H&H to which transfers from Bronson were made.

78.  Bronson made transfers of monies to H&H from only one of its four bank accounts at Hudson, account #xxxxxx8210.

79.  According to H & H's 2003 federal tax return, H&H's gross receipts for that year totaled $445,845. The gross profits reported on that tax return were identical at $445,845. H&H federal tax return for 2003.

80.  According to H&H's 2003 federal tax return, it made a distribution of $766,893 in cash to Martin and Sandra Howard.

81.  According to H & H's 2004 federal tax return, H&H's gross receipts for that year totaled $370,492. The gross profits reported on that tax return were identical at $370,492. H&H federal tax return for 2004.

82.  According to H&H's 2004 federal tax return, it made a distribution of $492,618 in cash to Martin and Sandra Howard.

83.  Bronson distributed to H&H amounts of $417,454 in 2003 and $370,486 in 2004, for a total of $787,940. *Supp. Interrogatory Answers Defendants* 23; *See Interrogatory Response* 13.

84.  A total of $1,424,689 was deposited into H&H's Hudson account #xxxxxx1579 from January 1, 2003 through October 31, 2004. Defendants have failed to identify any sources other than Bronson for the funds in H&H's account. *See* Bates Numbers 000020-000108.

85.  Bronson did not track the flow of the sales proceeds of the Challenged Products or any other product once it has received payment for those products on a per-product basis. As a result, Bronson did not trace proceeds to any amounts it distributed to H&H. *Supp. Interrogatory Answers Relief Defendants* 2; *see* Stipulation No. 47.

86.  At least 24.4% of the amounts that Bronson transferred to H&H in 2003 and 2004 or at least $347,624 is attributable to Bronson's gross revenues from Chinese Diet Tea. *See Supp. Interrogatory Answers Defendants* 22, 23.

87.  At least .85% of the amounts that Bronson distributed to H&H in 2003 and 2004 or at least $12,110 is attributable to Bronson's gross revenues from the Bio-Slim Patch. *See Supp. Interrogatory Answers Defendants* 23; *Interrogatory Response* 11.

88.  At least 25.25% of Bronson's deposits into H&H from January 1, 2003 through December 2004, or $359,734, are attributable to Bronson's gross revenues from the Challenged Products. *See Supp. Interrogatory Answers Defendants* 22-23; *Interrogatory Response* 11.

89.  H&H did not exchange any consideration for the monies transferred from Bronson, specifically the sum of $1,424,689. *See Interrogatory Response* 13; *Supp. Interrogatory Answers Defendants* 23.

11

90.   At a minimum, H&H received $359,734 from Bronson attributable to the sale of the Challenged Products without providing any consideration. *See Supp. Interrogatory Answers Defendants* 22-23; *Interrogatory Response* 11.

91.   At all relevant times, Martin Howard has kept the books for H&H. *M.H. Dep. Tr.* at 170, l. 9-25.

   **Relief Defendant Sandra Howard Never Performed Any Work for H&H and Should Be Liable for the Sum of $121,824, Which She Received From Bronson Through H&H**

92.   Sandra Howard interacted with Bronson's fulfillment houses and call center, managed inventory, monitored orders, and communicated Bronson's policy regarding refunds, re-ships, back orders and insufficient addresses to Bronson's fulfillment house and call center. *Interrogatory Response* 12; *Supp. Interrogatory Answers Relief Defendants* 5 & Attachment thereto; Stipulation No. 48.

93.   Sandra Howard was paid $680 net of taxes per month for her services to Bronson. *M.H. Dep. Tr.* at 54, l. 8-18; Stipulation No. 49.

94.   Sandra Howard has never performed any work for H&H. *S.H. Dep. Tr.* at 69, l. 23 to 70, l. 2.

95.   At all relevant times, Martin Howard has used H&H as his personal checking account for himself and his wife, Sandra Howard. *M.H. Dep. Tr.* at 34, l. 21-23.

96.   At all relevant times, Martin Howard paid his and his wife's personal living expenses using checks drawn on H&H's checking account # xxxxxx1579 at Hudson United Bank or another account in the name of H&H. *Supp. Interrogatory Answers Defendants* 24; Bates Numbers 000020-000108.

97.   From January 1, 2003 to December 31, 2004, Bronson transferred the following sums to H&H for the benefit of Martin and Sandra Howard: 2003: $417,454 and 2004: $370,486. *Supp. Interrogatory Answers Defendants* 23.

98.   From these funds transferred from Bronson, in the identified years below, H&H paid the following expenses of Martin and Sandra Howard, of which each was a 50% beneficiary:

| Expense | 2003 | 2004 |
|---|---|---|
| Monthly mortgage payments | $65,269 | $43,116 |
| Real estate taxes | $6,063 | $27,541 |
| Income taxes | $102,700 | $220,095 |
| Household expenses | $32,903 | $74,418 |
| Medical expenses | $2,541 | $2,500 |

12

| Retirement account | $60,000 | $79,000 |
|---|---|---|
| Payoff of mortgage | $326,500 | |

*Supp. Interrogatory Answers Defendants* 24; Stipulation No. 50.

99.  In addition to the payment of expenses outlined above in paragraph 95, H&H transferred the following total sums to Martin Howard: $29,081 in 2003 and $10,000 in 2004. *Supp. Interrogatory Answers Defendants* 24; Stipulation No. 51.

100. In addition to the payment of expenses outlined above in paragraph 98, H&H distributed approximately $4,000 per month to Sandra Howard for household expenses incurred by her and Martin Howard, totaling $88,500 from January 1, 2003 through December 31, 2004. *Supp. Interrogatory Answers Defendants* 23; Bates Numbers 000020-000108; *see* Stipulation No. 52.

101. In addition to the sums identified in paragraphs 98 and 100, in 2003 and 2004, H&H made distributions to Martin and Sandra Howard totaling $787,940. *Supp. Interrogatory Answers Defendants* 23.

102. Sandra Howard's 50% share of Bronson's distributions to H&H in 2003 and 2004 was $393,970. *See Supp. Interrogatory Answers Defendants* 23.

103. As a 50% partner in H & H, Sandra Howard received a total of $952,806 (representing 50% of the $940,973 used to pay expenses or $470,336 + $393,970 + $88,500) from H&H in 2003 and 2004. *See Supp. Interrogatory Answers Defendants* 23-24.

104. At least 25.25% of the $940,973 that Sandra Howard received from H&H in 2003 and 2004 or $121,824 is attributable to Bronson's gross revenues from the Challenged Products. *See Supp. Interrogatory Answers Defendants* 22-24; *Interrogatory Response* 11.

## Martin Howard is Not Seeking Indemnification or Contribution from Any Person

105. Martin Howard is not currently seeking indemnification or contribution from any person in connection with this case. Transcript of telephone conference with the Court on February 2, 2009 at 41, l. 19-23; Stipulation No. 53.

## B.   Proposed Conclusions of Law:

### The Court Has the Authority to Fashion a Broad Equitable Remedy, Including Consumer Redress, Disgorgement of Ill-Gotten Gains, and Rescission of Contracts

1.   This Court has broad authority to "grant any ancillary relief necessary to accomplish complete justice" under Section 13(b). *FTC v. H.N. Singer*, 668 F.2d 1107, 1113 (9th Cir. 1982); *FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001); *see also FTC v. Pantron I*, 33 F.3d 1088, 1102 (7th Cir. 1997); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314-15 (8th Cir. 1991). This includes the broad "authority to award monetary relief as an

13

equitable remedy under Section 13(b)." *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 974 (N.D. Ill.2006); *see also FTC v. Natural Solution, Inc.*, 2007-2 Trade Cas. (CCH) ¶ 75,866 (C.D. Cal. Aug. 7, 2007).

2.      "Section 13(b) imposes no limit on a district court's equitable powers, which include 'the power to grant restitution and disgorgement.'" *FTC v. Home Assure, LLC*, 8:09-cv-547-T-23TBM, 2009 WL 1043956 at *2 (M.D. Fla., April 16, 2009), citing *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469-70; *see Security Rare Coin*, 931 F.2d at 1314 ("Nothing in the wording of the statute expressly precludes ancillary equitable relief. Where Congress allows resort to equity for the enforcement of a statute, all the inherent equitable powers of the district court are available for the proper and complete exercise of the court's equitable jurisdiction, unless the statute explicitly, or 'by a necessary and inescapable inference,' limits the scope of that jurisdiction." quoting, *Porter v. Warner Holding Co.*, 328 U.S. 395, 397-98, 66 S.Ct. 1086, 1088-89, 90 L.Ed. 1332 (1946)).

3.      "Because the public interest is involved, a district court's equitable powers in an enforcement action under Section 13(b) 'assume an even broader and more flexible character than when only a private controversy is at stake.'" *Home Assure*, at *2, quoting, *Gem Merch. Corp.*, 87 F.3d at 469.

**Defendants are Direct Sellers, Liable for Full Restitution and Rescission
in the Amount of their Gross Sales of the Challenged Products Less Refunds**

4.      This Court may order that final relief under section 13(b) include the full amount lost by consumers. *See FTC v. Verity Int'l, Ltd.* 443 F.3d 48, 67-68 (2d Cir. 2006) *cert. denied*, 127 S. Ct. 1868 (2007) ("Undeniably, in many cases in which the FTC seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant. Thus, in these cases it is not inaccurate to say that restitution is measured by the consumer's loss.") Hence, the appropriate measure of equitable relief in this case brought by the FTC, in furtherance of the public interest, against a seller and its principal that received consumers' funds directly before then paying any third party is the seller's gross sales less refunds of the products sold by means of false and misleading advertising claims. *Id.*; *see also Gill*, 265 F.3d at 958 (finding that district court properly used amount consumers paid as measure for amount defendants should be ordered to pay for their wrongdoing). *See also FTC v. Kuykendall*, 371 F.3d 745, 766 (10th Cir. 2004) ("allowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out its statutory purpose"); *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (affirming $16.1 million redress judgment – "the full amount lost by consumers"); *FTC v. Publishing Clearing House*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (affirming total amount consumers paid); *Gem Merch. Corp.*, 87 F.3d at 468-70 (affirming an award of equitable monetary relief as calculated by consumers' losses); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606-07 (9th Cir. 1993) (consumers entitled to full refunds); *Security Rare Coin*, 931 F.2d at 1316 (affirming award of monetary equivalent of rescission to return victims to status quo ante); *FTC v. Nat'l Urological Group, Inc.*, No. 1:04-CV-3294-CAP, 2008 WL2414317, at *33-*35 (N.D. Ga. June 4, 2008) (awarding net consumer sales as measure of redress); *QT*, 448 F. Supp. 2d at 974-75 (ordering restitution and disgorgement for full amount of consumer sales). "The appropriate measure for redress

is the aggregate amount paid by consumers, less refunds made by the defendants. . . . Costs incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims." *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999); *see FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 753 (N.D. Ill. 1999) (purchase price less refunds or returns).

5.    Where there is no middleman, as here, there are no offsets to the figure of gross sales. *See Verity,* 443 F.3d at 68 (during the Sprint period, where the defendants received consumers' money through a billing entity that remitted consumers' funds directly to the defendants without deduction, those funds were deemed to be unjustly received by the defendants "without deducting monies paid by the [defendants] to other parties."); *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008) (when "[d]efendants sold directly to consumers and no non-party middleman received any part of the payment, the [d]efendants' 'unjust gains' are equivalent to the consumers' loss," *quoting Verity*, 443 F.3d at 67-68).

### Net Profits Are *Not* the Proper Measure of Restitution to Consumers

6.    Awarding the full amount of consumer injury is appropriate even if that amount exceeds the seller's profits. *See, e.g., Febre*, 128 F.3d at 536 (affirming award of consumer losses, not defendants' profits); *Nat'l Urological Group*, 2008 WL 2414317, at *33 (rejecting defendants' argument that redress should be limited to profits, noting "this argument does not comport with the theory behind restitution"); *SlimAmerica*, 77 F. Supp. 2d at 1276; *FTC v. Windward Mktg.*, Civ.A. No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114 at *44-46 (N.D. Ga. Sept. 30 1997) (specifically rejecting argument that monetary relief should be limited to defendants' profits; awarding $12.7 million as a "restitutionary refund of the full amount paid by consumers"); *Home Assure*, 2009 WL 1043956at *2, *quoting FTC v. Stefanchik,* 559 F.3d 924, 931 (9th Cir. 2009) ("Because the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits.")  As the court noted in *National Urological Group*, "[r]equiring the defendants to return the profits that they received rather than the costs incurred by the injured consumer would be the equivalent of making the consumer bear the defendants' expenses. The court will not make the victimized consumers shoulder such a burden."  *Nat'l Urological Group*, 2008 WL 2414317, at *33.

7.    *Verity* did not authorize deduction of amounts defendants subsequently paid to other parties. The *Verity* court clearly instructed otherwise, stating "the district court should determine the amount of the $1.6 million in total billings that defendants-appellants received from eBillit, *without deducting monies paid by defendants-appellants to other parties.*" 443 F.3d at 52-53 (emphasis added).

8.    Any offset for costs of running the business or fulfilling orders is likewise inappropriate. "Costs incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims." *SlimAmerica,* 77 F. Supp.2d at 1276. Even in the context of securities laws violations, courts have found that operating expenses are not an appropriate offset from equitable monetary relief. *SEC v. McCaskey,* No. 98 Civ. 6153, 2002 WL 850001, at *4 n. 6 (S.D.N.Y. Mar. 26, 2006); *SEC v. Rosenfeld*, No. 97 Civ. 1467, 2001

WL 118612, at *2. (S.D.N.Y. Jan. 9, 2001). Thus, there is no ground to deduct business expenses or operating expenses from the amount of equitable monetary relief.

9.    Equitable monetary relief also should not be reduced on the basis that there were supposedly "satisfied customers" or repeat sales of the product. Repeat purchasers were likewise influenced by the improper ads, and hence, the amount of revenues generated from these types of customers is properly the subject of a restitution remedy, especially where the advertising campaign was widespread and successful. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 326-327 (7th Cir. 1992) (upholding monetary relief of $15 million, rejecting defendant's claim that the amount did not consider sales attributable to other, unchallenged ads); *cf. Gill*, 265 F.3d at 958 ("Defendant Murkey's only complaint about the district court's judgment against him in the amount of $1,335.912.14 is that the district court should have taken into consideration 'the thousands of consumers who have benefitted from his services over the years.' Murkey cites no authority for this proposition, and none exists."). In *Kuykendall*, 371 F.3d at 767, the court allowed defendants to submit evidence of customers satisfied with their purchases to be considered as a possible offset in rebutting the accuracy of the FTC's calculation of actual consumer injury. Here, Defendants point to repeat orders to suggest that some customers were satisfied, but provide no evidence of these satisfied customers, or a dollar figure for them. Thus, any offset for "satisfied customers" is neither legally appropriate here, nor supported by any evidence.

10.   Accordingly, the amount of the Defendants' net profits from their sales of Chinese Diet Tea and the Bio Slim Patch are not, as the Defendants' contend, the measure of the amount of restitution that may be ordered against them. *FTC v. Seismic Entertainment Productions, Inc.*, 441 F. Supp. 2d 349, 353 (D.N.H. 2006).

11.   A defendant's allegation that the deceptive sales of the products at issue were unprofitable is not relevant to the determination of the amount of equitable monetary relief properly awarded. *See SEC v. Druffner*, 517 F. Supp. 2d 502, 511-512 (D. Mass. 2007) ("disgorgement is not reduced if the defendant loses money on the profits he incurred illegally by imprudent investment, lavish spending or any other way"; "[t]o hold otherwise would give incentive to parties to engage in . . . violations with no threat of monetary repercussions so long as the illegally obtained profits are squandered prior to a lawsuit."), *aff'd sub nom SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008).

**Martin Howard is Jointly and Severally**
**Liable with Bronson for Consumers' Losses**

12.   This Court found Defendants, Bronson and Martin Howard, liable for violating Sections 5 and 12 of the FTC Act in connection with the advertising of the Challenged Products. *See FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 136 (2008).

13.   In awarding equitable monetary relief in Section 13(b) cases, courts routinely hold corporate and individual defendants jointly and severally liable where those defendants are directly responsible for the acts and practices violating the FTC Act. *See, e.g., FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *FTC v. Sharp*, 782 F. Supp. 1445, 1449 (D. Nev. 1991); *Gem Merch. Corp.*, 87 F.3d at 470; *SlimAmerica*, 77 F. Supp. 2d at 1276.

14.  In *Bronson Partners*, 564 F. Supp. 2d at 136, this Court ruled that "Martin Howard, who wrote the copy for [Bronson's materially misleading Chinese Diet Tea and Bio-Slim Patch] advertisements without obtaining outside review, and who is a 50% owner and managing member of Bronson, is personally liable." This Court further explained that Martin Howard was "responsible for the text and dissemination of the advertisements, and because he failed to engage in any meaningful investigation of such bold claims, he is personally liable for Bronson's false advertising." *Id.* Because Martin Howard is directly responsible for Bronson's acts and practices in violation of the FTC Act, he is jointly and severally liable with Bronson for deceptively advertising the Challenged Products.

15.  Because Martin Howard is personally liable for Bronson's false advertising, liability for equitable monetary relief for deceptive claims for the Challenged Products should be assessed jointly and severally against Bronson and Martin Howard.

**Defendants are Jointly and Severally Liable for $1,879,040**
**for the Deceptive Claims Regarding Chinese Diet Tea**

16.  In order for the court to determine the amount of equitable monetary relief to award, the FTC must first make a prima facie showing that "its calculations reasonably approximated the amount of consumers' net losses." *QT, Inc.*, 448 F. Supp. 2d at 974 (*citing Febre*, 128 F.3d at 535). Once that showing is made, the burden shifts to defendants to show that the estimate is inaccurate, and what the proper estimate should be. *Id.*; *see also Verity*, 443 F.3d at 68-69 (describing burden-shifting framework and quoting *Febre*, 128 F.3d at 535); *FTC v. Bay Area Bus. Council, Inc.*, No. 02 C 5762, 2004 WL 769388, at *14 (same).

17.  Monetary awards may be properly based on estimates because sometimes that is the only information available, such as when defendants do not keep the data necessary to make an exact determination. *QT*, 512 F.3d at 864. ("A court is entitled to proceed with the best available information.") Moreover, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Febre*, 128 F.3d at 535 (citation omitted); *Verity*, 443 F.3d at 69 (same). "Of course, the reasonableness of an approximation varies with the degree of precision possible." *Verity*, 443 F.3d at 69.

18.  In this case, the FTC relies upon Defendants' own records concerning the gross sales of Chinese Diet Tea and refunds they paid out to consumers as a result of those sales. According to Defendants' own admissions, Bronson filled 57,177 orders for Chinese Diet Tea between January 1, 2003 and December 31, 2004, resulting in gross revenues of $2,001,494 during that time period. During that same period, Bronson paid $122,454 in refunds to consumers who purchased Chinese Diet Tea. At a minimum, based on Defendants' own figures, they are liable for $1,879,040.

19.  Defendants claim that credit card fees, chargebacks, bad charges, bad check fees, and bad checks should be offset from the amount of consumer restitution; however, Defendants fail to support this claim with any legal authority, or factual support showing that any of the above fees and charges are attributable to any sale of Chinese Diet Tea. Indeed, where there is no certainty with respect to these supposed charges and fees, and where "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty,"

*Febre*, 128 F.3d at 535 (citation omitted); *Verity*, 443 F.3d at 69 (same), Defendants are not entitled to any offset for credit card fees, chargebacks, bad charges, bad check fees, and bad checks.

20. To the extent that Bronson claims that the credit card fees or any other fees were deducted from funds it received from consumers before Bronson took possession of those funds, that claim is belied by Bronson's own bank records. Debits to Nova and Discover, payment processors, were made only after funds had been deposited into Bronson's bank account. Hence, Bronson and Martin Howard should be liable for all proceeds of the sales of the products less actual refunds. *See Verity*, 443 F.3d at 68. ("For the Sprint Period, the cascading payment structure flowed differently. The defendants-appellants received consumers' money through eBillit, and they paid Sprint, AT&T U.K./Viatel, Telecom Malagasy, and GIB from those unjustly received consumer funds. Thus, for the Sprint Period, the district court should determine the amount of the $1.6 million in total billings that the defendants-appellants received from eBillit, without deducting monies paid by the defendants-appellants to other parties.")

## Defendants are Jointly and Severally Liable for $63,285 for the Deceptive Claims Regarding the Bio-Slim Patch

21. In this case, the FTC relies upon Defendants' own records concerning the gross sales of the Bio-Slim Patch and refunds they paid out to consumers as a result of those sales. Defendants claim that Bronson filled 1,990 orders for the Bio-Slim Patch between 2003 and 2004, consisting of 2,328 units of product. As a result of those sales, Bronson's gross revenues from the Bio-Slim Patch from January 1, 2003 to December 31, 2004 were $69,763. During that time period, Bronson paid $6,478 in refunds to consumers who purchased the Bio-Slim Patch. Based on Defendants' own figures, they are jointly and severally liable for the full amount of consumer loss of $63,285.

22. Defendants claim that credit card fees, chargebacks, bad charges, bad check fees, and bad checks should be offset from the amount of consumer restitution; however, Defendants fail to support this claim with any legal authority, or factual support showing that any of the above fees and charges are attributable to any sale of the Bio-Slim Patch. Indeed where there is no certainty with respect to these supposed charges and fees, and where "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty," *Febre*, 128 F.3d at 535 (citation omitted); *Verity*, 443 F.3d at 69 (same), Defendants are not entitled to any offset for credit card fees, chargebacks, bad charges, bad check fees, and bad checks.

23. To the extent that Bronson claims that the credit card fees or any other fees were deducted from funds it received from consumers before Bronson took possession of those funds, that claim is belied by Bronson's own bank records. Debits to Nova and Discover, payment processors, were made only after funds had been deposited into Bronson's bank account. Hence, Bronson and Martin Howard should be liable for all proceeds of the sales of the products less actual refunds. *See Verity*, 443 F.3d at 68. ("For the Sprint Period, the cascading payment structure flowed differently. The defendants-appellants received consumers' money through eBillit, and they paid Sprint, AT&T U.K./Viatel, Telecom

Malagasy, and GIB from those unjustly received consumer funds. Thus, for the Sprint Period, the district court should determine the amount of the $1.6 million in total billings that the defendants-appellants received from eBillit, without deducting monies paid by the defendants-appellants to other parties.")

**The Court Has the Authority to Grant Monetary Relief**
**Against H&H and Sandra Howard as Relief Defendants**

24.    Principles of equity empower a court to grant relief against an individual "relief defendant" who has not committed any wrongdoing if he or she (1) possesses ill-gotten gains derived from the unlawful acts or practices of liability defendants and (2) has no legitimate claim to the property. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1020 (N.D. Ill. 2000) (*citing SEC v. Cherif*, 933 F.2d 403, 414 n.11 (7th Cir. 1991); *SEC v. Egan*, 856 F. Supp. 401, 402 (N.D. Ill. 1993); *SEC v. Cross Fin. Serv., Inc.*, 908 F. Supp. 718, 730-32 (C.D. Cal. 1995); *SEC v. Antar*, 831 F. Supp. 380, 398-99 (D.N.J. 1993)). "Section 13(b) of the FTC Act invests the Court with equitable powers over [relief defendants] in order to accomplish such relief as repayment, restitution, rescission or disgorgement of any unjust enrichment." *FTC v. AmeriDebt, Inc.,* 343 F. Supp. 2d 451, 464 (D. Md. 2004). Further, "[a]s between the [relief] defendant . . . and the victims of fraud, equity dictates that the rights of the victims should control." *Think Achievement Corp.*, 144 F. Supp. 2d at 1020, *quoting SEC v. Antar,* 831 F. Supp. 380, 402-403 (D.N.J.1993) (alteration in original).

25.    The imposition of a constructive trust, or disgorgement of ill-gotten gains, is an appropriate remedy for a relief defendant. *See AmeriDebt*, 343 F. Supp. at 464 (allowing FTC to proceed against defendant's wife to the extent that she received any of the funds wrongfully obtained by defendant); *Think Achievement Corp.*, 144 F. Supp.2d at 1021-22 (relief defendant, the principal defendant's wife, ordered to disgorge profits received from the principal defendant's deceptive business practices that were held by her, either singly or jointly with husband although relief defendant was not accused of any law violations; ("equity and good conscience will not permit her to keep any monetary benefit she received from the fraudulent enterprise.").

26.    The Court should hold Relief Defendants H&H and Sandra Howard liable for the proceeds from sales of the Challenged Products between January 1, 2003 through December 31, 2004. The evidence shows that these funds were ill-gotten gains derived from unlawful acts or practices – specifically, revenues from sales of the Bio-Slim Patch and Chinese Diet Tea generated by the deceptive print advertisements, which Martin Howard created. Neither H&H nor Sandra Howard has any legitimate claim to the funds.

**Relief Defendant H&H Marketing, LLC Is Part of a Common Enterprise**
**with Bronson, or Alternatively, Is an Alter Ego of Martin Howard, and**
**Hence, Should Be Jointly and Severally Liable for the Full Amount of**
**Monetary Relief for the Deceptive Advertising of the Challenged Products**

27.    H&H is engaged in a common enterprise with Bronson with respect to the deceptive advertising of the Challenged Products. While in general, courts may be reluctant to disregard the corporate form, "where the public interest is involved, as it is in the

enforcement of Section 5 of the Federal Trade Commission Act, a strict adherence to common law principles is not required . . . where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970). "Thus, in situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with 'a clear mechanism for avoiding the terms of the order,' courts have been willing to find the existence of a common enterprise. *Nat'l Urological*, 2008 WL 2414317, at *6, quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964). "When corporations act as a common enterprise, each may be held liable for the deceptive acts and practices of the other." *Id.,* citing *CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S. D. Tex. 2008) ("Companies participating in a common enterprise are jointly and severally liable for the injuries caused by their conduct.")

28. "When determining whether a common enterprise exists, courts look at a variety of factors, including: common control, sharing of office space and officers, whether business is transacted through a 'maze of interrelated companies,' the commingling of corporate funds, unified advertising, and any other evidence revealing that no real distinction existed between the corporate defendants." *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S. D. Cal. 2008) *citing cases*; *see also Kennedy*, 574 F. Supp. 2d at 722; *Nat'l Urological*, 2008 WL 2414317, at *6. "It is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an 'unholy' alliance." *Kennedy*, 574 F. Supp. 2d at 722, *citing FTC v. AmeriDebt, Inc.*, 343 F. Supp.2d 451, 462 (D. Md. 2004).

29. The relationship between H&H and Bronson establishes that they are a common enterprise. H&H, like Bronson, is owned in equal 50% shares by Martin Howard and Sandra Howard, thus having complete identity of ownership. There is no formal agreement between Bronson and H&H, though Bronson pays H&H "consulting" fees, as evidenced in Bronson's balance sheets and tax returns, and H&H's tax returns. H&H does not do any work for any entity except Bronson. In fact, H&H does not do any work at all. To the extent that it does work, that is the work that Martin Howard and Sandra Howard perform for Bronson. Defendants state in their answers to interrogatories that Martin Howard and Sandra Howard "worked full-time for Bronson Partners and H&H and these payments [from H&H] were for such work." *Answer to FTC's Supplemental Interrogatory to Defendants No. 23.* Martin Howard received no salary from Bronson until the FTC started its investigation. Thus, functionally, Bronson paid H&H for Martin Howard's work as though Martin Howard was acting on behalf of H&H when he performed work for Bronson's benefit. The Court has already found that Martin Howard wrote the copy for the deceptive advertisements for the Challenged Products, and was responsible for their dissemination, and hence was personally liable. Thus, H&H, as the entity that was compensating Martin Howard for his work on Bronson's behalf should be held equally liable as Martin Howard and Bronson.

30. Bronson and H&H are intimately intertwined. Not only are they commonly owned, but the work that H&H is supposedly compensated for is the deceptive conduct for which Bronson as already been found liable. Moreover, the only "proceeds" that H&H receives are funds from Bronson, which include the proceeds of the false advertising of the Challenged

Products. For all intents and purposes, Bronson and H&H are a single entity. In fact, Defendants themselves admit this fact, stating in their answers to interrogatories, "Since both entities were equally owned and since Mr. or Ms. Howard file joint income tax returns, the net effect is as though there was only one company." The fact that they are two separate legal entities, and that they file separate taxes is immaterial, because as the Howards admit, the companies are essentially a single entity. Accordingly common enterprise liability is appropriate in this instance, and H&H should be found jointly and severally liable with Bronson and H&H for the full amount of monetary relief of $1,942,325.

31.    Even if H&H is not a common enterprise with Bronson, it is Martin Howard's alter ego, and, as such, jointly and severally liable for the full amount of equitable monetary relief of $1,942,325. According to H&H's Operating Agreement, it is to be construed according to Texas law. Under Texas law, "[t]he applicability of alter ego doctrine is not limited to business entities which are registered as corporations; it is also possible to 'pierce the corporate veil' of a limited liability company. *Gonzalez v. Lehtinen*, No. 13-06-441-CV 2008 WL 668600, at *4 n. 6 (Tex.App.-Corpus Christi, 2008), citing *McCarthy v. Want Venture, A.S.*, No. 01-04-00921-CV, 2007 WL 1845088 at *40-41 (Tex.App.-Houston [1st Dist.] 2007). "Alter ego is a basis in law for disregarding the corporate fiction when there is such unity between a corporation and an individual that the separateness of the corporation has ceased and holding only the corporation liable would result in an injustice." *Leon Ltd. v. Albuquerque Commons Partnership*, 862 S.W.2d 693, 707 (Tex.App.-El Paso 1993), citing, *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986). "Alter ego 'is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.'" *Id.*, quoting *Castleberry*, 721 S.W.2d at 272.

32.    Necessary corporate formalities were ignored with respect to H&H. Defendants admit that H&H was set up to pay the personal expenses of the Howards, so that "the Bronson books would not be cluttered up with non-business items." Indeed, H&H directly paid the Howards' monthly mortgage payments, household expenses, medical expenses, and other personal expenses. Martin Howard referred to H&H as his personal checking account. Further, the fact that H&H essentially did not do any work bolsters the conclusion that it and Martin Howard are merely alter egos. Consequently, where Martin Howard is liable for the deceptive advertising of the Challenged Products, H&H should be held jointly and severally liable for the full amount of equitable monetary relief of $1,942,325.

### Alternatively, H&H Is Jointly and Severally Liable up to the Amounts It Received of Any Monies from the Sales of the Challenged Products

33.    Even if H&H was neither a member of a common enterprise with Bronson or an alter ego for Martin Howard, it is still jointly and severally liable, at a minimum, for the ill-gotten gains it has received as a result of the sales of the Challenged Products. Defendants and Relief Defendants did not track the sums attributable to the sale of the Challenged Products. Because Bronson cannot trace the revenues of the Challenged Products to the amounts that it distributed to H&H, the Relief Defendants should bear the risk of Bronson's and their own

21

poor record-keeping. Where Relief Defendants create uncertainty as to the identity of ill-gotten monies (for example, by commingling funds), they bear the risk of that uncertainty, requiring them, as recipients of ill-gotten gains, to distinguish the amount that is legitimately theirs from monies derived from fraudulent activity. *See SEC v. Breed,* No. 01-Civ-7798, 2004 WL 909170, at *5 (S.D.N.Y. Apr. 24, 2004), *adopted by district court,* 2004 WL 1171241, at *2 (S.D.N.Y. May 26, 2004). The FTC is not obligated to trace, dollar-for-dollar, the ill-gotten gains from the proceeds of the fraudulent enterprise to the possession or control of the Relief Defendants, in order for the relief defendants to be liable. *See SEC v. Glauberman,* No. 90 Civ. 5205, 1992 WL 175270, at *2 (S.D.N.Y. July 16, 1992), *cited with approval in Antar,* 831 F. Supp. at 400-401. An inability to allocate funds due to confusing, incompetent, or suspect record- keeping among Defendants and Relief Defendants should be construed against them. *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir. 1997) ("Although in some cases, a court may be able easily to identify the recipient of ill-gotten profits and apportionment is practical, that is not usually the case. Generally, apportionment is difficult or even practically impossible because defendants have engaged in complex and heavily disguised transactions.* * * Hence, 'the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.' [*SEC v.*] *First City Financial Corp.,* 890 F.2d [1215,] 1232 [(D.C. Cir. 1989.")

34.   Since Defendants and Relief Defendants did not track the proceeds of the Challenged Products, H&H is liable for a reasonable estimate of what it received from Bronson that is attributable to the sale of those products. At least 24.4% of Bronson's combined gross revenues for 2003 and 2004 are attributable to the sale of Chinese Diet Tea, and at least .85% of it's combined gross revenue for those years is attributable to the Bio-Slim Patch, resulting in 25.25% of Bronson's combined gross revenue for 2003 and 2004 that is attributable to both products. Where H&H did not perform any work for Bronson, and hence, provided no consideration for any sums of money received from Bronson, H&H is jointly and severally liable, at a minimum, for 25.25% of the total funds Bronson transferred to it. Accordingly, H&H is jointly and severally liable with Bronson to the extent of at least $359,734.

35.   It does not matter "whether the relief defendant no longer possesses all or some of the ill-gotten gains when the [FTC] files its suit." *SEC v. Shaoulian,* 2003 U.S. Dist. LEXIS 16279, at *14; Fed. Sec. L. Rep. (CCH) ¶ 92,421 (C.D. Cal. May 12, 2003) (where funds in relief defendant's bank account were used for further trading, business expenses, and personal expenses, court could impose disgorgement order); *see also SEC v. Colello,* 139 F.3d at 674, 678-79 (affirming disgorgement order against relief defendant who claimed the only monies he retained were for his own services). Ultimately, "[a]s between the [relief] defendant . . . and the victims of fraud, equity dictates that the rights of the victims should control." *Think Achievement Corp.* 144 F. Supp. 2d at 1020 (*citing Antar,* 831 F. Supp. at 402-03). Accordingly, Sandra Howard and H&H are each jointly and severally liable with Defendants for the full amount that they each received from Bronson attributable to Bronson's sale of the Challenged Products, even if some of those funds are commingled with funds legitimately obtained. *See id.* (Defendant held jointly and severally liable with relief defendant for all sums defendant transferred into relief defendant's trust accounts, even though the trust accounts contained legitimately obtained funds as well as ill-gotten gains).

36.    It is immaterial whether H&H commingled the funds attributable to the sale of the
       Challenged Products with any other funds legitimately obtained. The extent of its liability is
       the same.

**Sandra Howard is Liable to the Extent She Received Any
Proceeds from the Sale of the Challenged Products**

37.    Sandra Howard likewise is liable jointly and severally to the extent she received any funds
       that are attributable to the sale of the Challenged Products. The duties that she performed for
       Bronson, including interacting with Bronson's fulfillment houses and call center, managing
       inventory, monitoring orders, and communicating Bronson's policy regarding refunds, re-
       ships, back orders and insufficient addresses to Bronson's fulfillment house and call center,
       were compensated at a rate of $680 a month net of taxes. She performed no work for H&H,
       however. Nevertheless, funds that were transferred from Bronson to H&H were paid to her
       in the form of cash payments of approximately $4,000 a month, totaling $88,500 from
       January 1, 2003 through December 31, 2004. H&H also directly paid significant personal
       expenses of the Howards, of which Sandra Howard was a 50% beneficiary, totaling $940,973
       for 2003 and 2004 combined. These payments from H&H were without consideration, and
       hence, Sandra Howard has no rightful claim over them.

38.    In addition, in 2003 and 2004, H&H made distributions to Martin and Sandra Howard
       totaling $787,940 in the form of partnership distributions. As a 50% partner in H&H, Sandra
       Howard received a total of $952,806 (representing 50% of the $940,973 used to pay
       expenses or $470,336 + $393,970 + $88,500) from H&H in 2003 and 2004.

39.    Sandra Howard should be jointly and severally liable to the extent of any monies she
       received that are a reasonable estimate of the amounts paid to H&H that are attributable to
       the sale of the Challenged Products.

40.    If H&H was engaged in a common enterprise with Bronson or was acting as an alter ego to
       Martin Howard, it should be jointly and severally liable for the full sum of the revenues less
       refunds attributable to the sale of the Challenged Products or $1,942,325. Sandra Howard
       would be jointly and severally liable only in the amount of $121,824, representing 25.25%
       of the of the monies she received from H&H attributable to the sale of the Challenged
       Products in 2003 and 2004.

41.    Alternatively, if H&H is only liable for 25.25% of the funds it received from Bronson as a
       reasonable estimate of the amounts H&H received that are attributable to the sale of the
       Challenged Products, then Sandra Howard is still jointly and severally only in the amount of
       $121,824, representing 25.25% of the of the monies she received from H&H attributable to
       the sale of the Challenged Products in 2003 and 2004.

**Defendants Bronson and Martin Howard Should Be Permanently
Enjoined From Making the Types of Misrepresentations
They Made in Connection With the Challenged Products**

42.   Unsubstantiated health claims such as the Court found here are a violation of Sections 5 and
      12 of the FTC Act and should be enjoined. *QT*, 448 F. Supp. 2d at 975-76 (finding that
      defendants lacked a reasonable basis for health claims, and that the FTC was entitled to
      injunction); *Nat'l Urological Group*, 2008 WL 2414317, at *24, *31; *FTC v. Cal Pac.
      Research, Inc.*, No. CV-N-88-602BRT, 1991 WL 208470, at *5-6 (D. Nev. Aug. 27,
      1991)(finding the studies proffered by defendants were unreliable to support claims that
      product cured baldness, and enjoining defendants from representing that any of the products
      will reduce excessive or abnormal hair loss or promote new hair growth).

43.   Thus, Defendants should be enjoined from making the types of claims that the Court found to
      be deceptive as to the Challenged Products, in connection with other weight loss products.

**Fencing-in Relief is Appropriate in this Case**

44.   Under the FTC Act, courts have discretion to issue multi-product injunctions (known as
      "fencing-in" orders) that extend beyond the challenged violations to prevent violators from
      engaging in similar deceptive practices in the future. *See Kraft*, 970 F.2d at 326. *See also
      FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to
      prohibiting the illegal practices in the precise form in which it is found to have existed in the
      past. Having been caught violating the [FTC] Act, respondents 'must expect some fencing
      in.'")(citations omitted); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132
      (1969)("A federal court has broad power to restrain acts which are of the same type or class
      as unlawful acts which the court has found to have been committed or whose commission in
      the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the
      past." (quotations omitted).

45.   Accordingly, Defendants should be enjoined from making health-related or performance-
      based efficacy claims for any product, service or program, dietary supplement, food, drug, or
      device that purportedly promotes health benefits, including weight loss.

46.   In addition, Defendants should be enjoined from misrepresenting, in any manner, expressly
      or by implication, the existence, contents, validity, results, conclusions, or interpretations of
      any test or study in connection with any product, service or program, dietary supplement,
      food, drug, or device that purportedly promotes health benefits, including weight loss.

**Provisions to Monitor and Enforce Compliance**

47.   Courts routinely include monitoring and related provisions in final orders in FTC cases, to
      ensure compliance with permanent injunctions. *See, e.g., FTC v. Wallace*, No. 1:98-CV-
      1404, 2000 U.S. Dist. LEXIS 10506, at *9-17 (N.D. Ga. May 25, 2000); *SlimAmerica*, 77 F.
      Supp. 2d at 1276-77; *Sharp*, 782 F. Supp. at 1456-57 (judgment included monitoring
      provisions); *Think Achievement Corp.*, 144 F. Supp. 2d at 1018 (ordering record retention,
      notification of changed employment or residence, access to premises, and monitoring); *U.S.*

*Sales Corp.*, 785 F. Supp. at 753-54 (recognizing need for monitoring by the FTC to ensure adequate compliance).

48.     Monitoring provisions are both reasonable and necessary to ensure that Defendants take responsibility to ensure that the order is followed by themselves and their associates, and that the Commission has the ability to monitor compliance with the order and prevent further illegal conduct.

Respectfully submitted,

**DAVID C. SHONKA**
Acting General Counsel
**LEONARD L. GORDON**
Director, Northeast Region

**ROBIN E. EICHEN (CT 26398)**
reichen@ftc.gov
**NUR-UL-HAQ (Special Bar No. phv03213)**
nhaq@ftc.gov
Attorneys for Plaintiff
Federal Trade Commission
Northeast Region
1 Bowling Green, Suite 318
New York, NY 10004
Tel:     (212) 607-2803 (Eichen)
         (212) 607-2806 (Haq)
Fax:     (212) 607-2822

## CERTIFICATION

This shall certify that true copies of the foregoing was served via the Court's electronic filing system and also by Federal Express on May 5, 2009 as follows:

Sheldon S. Lustigman, Esq.
Scott A. Shaffer, Esq.
The Lustigman Firm, P.C.
149 Madison Avenue, Suite 805
New York, NY 10016
Attorneys for Defendants
shelly@lustigmanfirm.com
shelly@vzw.blackberry.net
scott@lustigmanfirm.com

Robin E. Eichen