UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

FEDERAL TRADE COMMISSION          :  No. 3:04CV-1866 (SRU)
                                  :  915 Lafayette Boulevard
          vs.                     :  Bridgeport, Connecticut
                                  :
                                  :  June 2, 2009
BRONSON PARTNERS, LLC, ET AL      :

- - - - - - - - - - - - - - - - x


DAMAGES HEARING


B E F O R E :

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S :

    FOR THE PLAINTIFF:

        FEDERAL TRADE COMMISSION
            Northeast Region
            1 Bowling Green, Suite 318
            New York, New York  10004
        BY:  NUR-UL-HAQ, ESQ.
             ROBIN E. EICHEN, ESQ.

    FOR THE DEFENDANT:

        THE LUSTIGMAN FIRM, PC
            149 Madison Avenue, Suite 805
            New York, N. Y.  10016-6713
        BY:  SHELDON S. LUSTIGMAN, ESQ.
             SCOTT SHAFFER, ESQ.



            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917)703-0761

I N D E X

WITNESSES:

SANDRA HOWARD
Direct Examination by Mr. Haq.....................9
Redirect Examination...........................105
Cross Examination by Mr. Lustigman...............61
Recross Examination............................111

ALBERT KUTZIN
Direct Examination by Lustigman.................113
Redirect Examination...........................140
Cross Examination by Mr. Haq...................131

CLOSING ARGUMENTS:

MS. EICHEN .................................... 146
MR. SHAFFER ................................... 168

EXHIBITS:

Plaintiff's
        Exhibit 1 – 15......(Full) 4

Defendant's
        Exhibit A, D, E, F, G, I, J, M, N, O, P, Q,
R, S, T, U......(Full) 4
        Exhibit K, L......(Full) 7
        Exhibit W......(ID) 86
        Exhibit X......(Full) 125

```
 1                    (9:35 O'CLOCK, A. M.)

 2            THE COURT:  Good morning.

 3            Let me begin by making sure that any witnesses

 4    other than party witnesses are outside the courtroom.

 5            (Pause)

 6            THE COURT:  Do the parties have a list of

 7    exhibits that can be admitted by stipulation?

 8            MR. HAQ:  Your Honor, we have submitted two

 9    binders of exhibits to the court.  They are labeled A

10    through V at this point, and 1 through 15.  All but --

11    well, the defendants -- we've agreed to stipulate to

12    certain facts which will allow the defendants to withdraw

13    certain of those exhibits to which the FTC has objected.

14    And, in addition, there are only two exhibits that remain

15    to which the FTC has an objection.  Everything else we

16    have stipulated to in terms of admission and authenticity.

17            THE COURT:  Okay.  So why don't we just put on

18    the record what it is being admitted by stipulation.  It

19    appears to me that it would be the following list.

20    Correct me if I'm wrong, these would be admitted as full

21    exhibits by stipulation.  Exhibits A --

22            MR. HAQ:  Yes, Your Honor.

23            THE COURT:  -- D, E, F, G, I, J, M as in Mary, N

24    as in Nancy, O, P, Q, R, S, T, U and 1 through 15.

25            MR. HAQ:  Yes, Your Honor.
```

```
1              THE COURT:  Everybody agree to that?

2              MR. LUSTIGMAN:  Yes, Judge.  There was an

3    additional Exhibit V which was added this morning.

4    Basically it was a revised Exhibit C but that's being

5    withdrawn.

6              THE COURT:  All right, fine.  Thank you.  The

7    exhibits that I just read are admitted as full exhibits.

8              MR. HAQ:  Thank you, Your Honor.

9              (Whereupon the abovementioned exhibits were

10      marked full.)

11             MR. HAQ:  Your Honor, we also have additional

12   factual stipulations we'd like to place on the record.

13             THE COURT:  Please.

14             MR. HAQ:  So, do we know what the sequence of

15   the number would be?  Or should I just take them out?

16             THE COURT:  Doesn't matter.

17             MR. HAQ:  First one we agreed to this morning is

18   that the deposits that were made into the bank account for

19   H&H Marketing, LLC, the relief defendant, is $1,421,915.

20   And that's for the time period 2003 through 2004.

21             Any --

22             MR. SHAFFER:  I do have a question.

23             MR. HAQ:  Sure.

24             MR. SHAFFER:  Does that mean you can withdraw

25   one of your exhibits since that's H&H, that stipulation
```

1    replaces an exhibit?

2          MR. HAQ:  Which exhibit are you referring to?

3          MR. SHAFFER:  Isn't that one of your exhibits?

4    So you don't repeat --

5          MS. EICHEN:  Our Exhibit 10.

6          MR. HAQ:  I don't think there was a dispute.

7          THE COURT:  Well, there's now harm in having

8    both the exhibit and the stipulation.

9          MR. SHAFFER:  I think they are off by a slight

10   amount, Your Honor.

11         MR. HAQ:  The exhibit is a bank statement.

12         MS. EICHEN:  Yes, it's not a summary.

13         MR. HAQ:  It's the underlying documentation.

14         MR. SHAFFER:  Okay.

15         MS. EICHEN:  So that's not a problem.

16         MR. HAQ:  The next thing we stipulate to, Your

17   Honor, is that the total amount of bounced checks for the

18   entire of Bronson Partners LLC in 2003 and 2004, amounts

19   to $49,589; 25.25 percent of which is $12,521.

20         And then the last item that we stipulated to --

21   well, actually two parts.  The total amount of chargebacks

22   for all of Bronson Partners LLC in 2003 and 2004 amounted

23   to $42,489.  And the total amount of credit card fees

24   charged to all of Bronson Partners LLC in 2003 and 2004 is

25   176,615.

1           THE COURT:  Okay.

2           MR. LUSTIGMAN:  Of those numbers, 25.25 percent

3  allocable to the chargebacks would be $10,728.  And

4  25.25 percent allocable to the credit card fees would be

5  $44,595.

6           THE COURT:  Are you using 25.25 or 25.5?

7           MR. LUSTIGMAN:  Twenty-five-two-five.

8  Twenty-five and-a-quarter.

9           MR. SHAFFER:  Percent.

10          THE COURT:  All right.  I understood from the

11  trial memo it was 25.5.  Am I mistaken about that?

12          MR. HAQ:  Your Honor, the plaintiff's position

13  is that it should be 25.25 percent.

14          MR. LUSTIGMAN:  There's no objection.

15          THE COURT:  That's fine.  Okay.

16          MR. LUSTIGMAN:  And the -- the final item of

17  stipulation, the parties have stipulated that the cost to

18  Bronson of the diet green tea inventory for the years 2003

19  and 2004 was $205,489.

20          THE COURT:  Okay.  Very good.

21          MR. LUSTIGMAN:  And so we can withdraw exhibits

22  B and C and V, and I guess plaintiff will withdraw their

23  motion --

24          MR. HAQ:  We'll withdraw our objection to the

25  exhibits.

```
1              MR. LUSTIGMAN:  -- objection to those exhibits.

2              THE COURT:  Very good.  All right.  So, B C and

3    V are not being offered?

4              MR. LUSTIGMAN:  Correct.

5              THE COURT:  Very good.  All right.

6         Let me take up the issue of the closing letters.

7    I take it the only objection there in effect is an

8    objection to relevancy; these are Exhibits K and L?

9              MR. HAQ:  Yes, Your Honor.

10             MS. EICHEN:  Yes, Your Honor.

11             THE COURT:  This is a bench trial.  You know, no

12   jury is going to be affected by the admission of arguably

13   relevant, irrelevant evidence.  It seems to me it goes to

14   the weight, not admissibility.  If it turns out that I

15   accept a legal position that makes those letters

16   meaningless, then they are going to be ignored.  If I take

17   a, or adopt a legal position that they are meaningful,

18   then they are in the record, or if the Court of Appeals

19   does, they are in the record.  We can avoid any problem.

20   So, my intention is to admit those two exhibits if the

21   only objection is relevance.

22             MR. HAQ:  Yes, Your Honor.

23             THE COURT:  So, K and L are also full.

24             (Whereupon Defendant's Exhibit K and L were

25        marked full.)
```

 1                MR. HAQ:  We preserve our objection, Your Honor,

 2      for purposes of appeal?

 3                THE COURT:  Yes, you have, you have.

 4                MR. HAQ:  Thank you.

 5                THE COURT:  All right.  Are we prepared to begin

 6      testimony?

 7                MR. HAQ:  I believe we are, Your Honor.

 8                THE COURT:  Very good.  Call your first witness.

 9                MR. HAQ:  Okay.  May I use the lecturn or should

10      I stand here?

11                THE COURT:  Wherever you feel comfortable.

12                MR. HAQ:  I think I'll stand here actually.

13                THE COURT:  That's fine.

14                MR. HAQ:  The plaintiff calls Sandra Howard to

15      the stand.

16                MR. SHAFFER:  Your Honor, one small application?

17                THE COURT:  Sure.

18                MR. SHAFFER:  Ms. Howard informs me that she

19      needs some notes in her book of exhibits, so I ask that

20      she be allowed to take the book up.  She would like to be

21      able to refer to her notes in the book of exhibits.

22                MR. HAQ:  Your Honor, we have not seen any

23      notes.

24                THE COURT:  Here's the story.  She can have the

25      book with her.  It should remain closed.  She should

```
 1    answer questions to the best of her knowledge.  If she is
 2    unable to recall an answer to a question, her recollection
 3    can be refreshed and at that point she can read something,
 4    put it away, and if her recollection has been refreshed,
 5    she can testify from a refreshed recollection.
 6              MR. SHAFFER:  So she can bring the notebook and
 7    keep them closed?
 8              THE COURT:  She can have them up there and keep
 9    them closed, unless she indicates she needs to do so, in
10    which case we'll allow her to refresh her recollection.
11              MR. SHAFFER:  Thank you, Your Honor.
12              MR. HAQ:  Your Honor, is a copy of the exhibits
13    available at the stand for the witness to review in the
14    event we'd like her to look at something?
15              THE COURT:  I believe we do have an extra copy.
16    Yes, we can put those up there.
17              MR. HAQ:  Very good.  Thank you, Your Honor.
18              THE COURT:  Ma'am, please remain standing and
19    raise your right hand.
20    S A N D R A      H O W A R D,     called as a witness on
21    behalf of the Plaintiff, having been duly sworn by the
22    Clerk, testified as follows:
23              THE COURT:  Very well.  Please be seated.
24
25
```

1    DIRECT EXAMINATION

2    BY MR. HAQ:

3    Q.    Good morning, Ms. Howard or Mrs. Howard?

4    A.    You can call me Sandra.

5    Q.    Okay.

6          THE COURT:  Actually before we get started, let

7    me just make sure one thing.  The courts are very careful

8    not to have social security numbers, bank account numbers,

9    et cetera, put in the record unnecessarily because if the

10   transcript is ordered, it will be electronically filed and

11   available, in effect, to the world on the internet, so I'm

12   going to ask counsel in their examinations today if you

13   need to get in social security numbers or bank account

14   numbers, to use the last four or five digits rather than

15   the entire number.

16         MR. HAQ:  Sure, Your Honor.

17         THE COURT:  That way we won't need to go back

18   and redact the transcript.

19         MR. HAQ:  Actually, if we can go back to a

20   housekeeping matter, there are some exhibits that we

21   believe may not be fully redacted, with bank account

22   information in them.

23         THE COURT:  The exhibits are not going to be

24   electronically filed.

25         MR. HAQ:  Okay.

1          THE COURT:  The exhibits are used for the court

2     and then eventually the original will be returned to the

3     parties for use on appeal, if necessary.  You're going to

4     probably need to redact them before you submit an

5     appellate joint appendix because that will be a public

6     record, but if anybody asks to see them during this

7     proceeding, then I'll take it up with counsel and we'll

8     try and get those redacted.

9          MR. HAQ:  Thank you.

10          THE COURT:  Sure.

11     BY MR. HAQ:

12     Q.   Good morning.  My name is Nur-ul-Haq.  I'm an

13     attorney for the Federal Trade Commission.  You are here

14     to testify in the matter of the FTC v. Bronson Partners

15     LLC, is that correct?

16     A.   That's right.

17     Q.   And could you state your full name for the record,

18     please?

19     A.   Sandra Sue Howard.

20     Q.   What is your address?

21     A.   I have --

22          THE COURT:  Actually just give us a business

23     address.

24     Q.   Your business address?

25     A.   I have two business addresses.  I have 13737

1    Primavera Drive in Corpus Christi, Texas, and I have 1400

2    Post Road East in Westport, Connecticut.

3    Q.   Thank you.  You are familiar with Bronson Partners

4    LLC, are you not?

5    A.   Yes.

6    Q.   And you are a 50 percent owner of Bronson Partners

7    LLC, is that correct?

8    A.   Yes.

9    Q.   And you are also the Director of Operations, correct?

10   A.   Right.

11   Q.   And you can testify on behalf of Bronson Partners as

12   a 50 percent owner, correct?

13   A.   Right.

14   Q.   Are you familiar with the product offerings of

15   Bronson Partners LLC?

16   A.   Yes.

17   Q.   In the years 2003 and 2004?

18   A.   Yes, I am.

19            THE COURT:  Ma'am, I'm going to ask you to move

20   that mic around so your voice gets picked up a little

21   better.  Thank you.

22   BY MR. HAQ:

23   Q.   Two of those products were Chinese Diet Tea and the

24   Bio-Slim Patch, correct?

25   A.   Yes, they were.

1    Q.    And the time period that Bronson sold Chinese Diet

2    Tea began in, beginning of 2003, correct?

3    A.    Right.

4    Q.    And continued to have been sold through 2005?

5    A.    I think it was mostly sold through 2004.  There may

6    have been a few reorders that were ordered in 2005.

7    Q.    But there were products that were shipped out to

8    consumers in 2005?

9    A.    There was a bit.

10   Q.    And the time period that Bronson began marketing the

11   Bio-Slim Patch was the beginning of 2003 as well, correct?

12   A.    Yes.

13   Q.    And it ceased selling the Bio-Slim Patch at the end

14   of 2004?

15   A.    Yes.

16   Q.    I want to start out by asking you a few questions

17   about how Chinese Diet Tea and the Bio-Slim Patch were

18   sold.  Bronson marketed those products for consumer use,

19   correct?

20   A.    Yes.

21   Q.    And individual consumers, i.e. the general purchasing

22   public, were the ones who purchased those products,

23   correct?

24   A.    Yes, they did.

25   Q.    And Bronson didn't sell product to other retailers,

1    did it?

2    A.   We did some products but not that product.  Not those

3    products.

4    Q.   Specifically the Bio-Slim Patch was not sold to

5    retailers?

6    A.   No.

7    Q.   And Chinese Diet Tea was not sold to retailers, was

8    it?

9    A.   No.

10   Q.   Chinese Diet Tea wasn't sold to wholesalers either,

11   was it?

12   A.   No.

13   Q.   And the Bio-Slim Patch also was not sold to

14   wholesalers?

15   A.   No.

16   Q.   So, just to summarize, there was no middleman between

17   Bronson and consumers in terms of the sale of the product?

18   A.   Right.

19   Q.   Are you familiar with how the product was actually

20   distributed to consumers?

21   A.   Yes.

22   Q.   Bronson used fulfillment houses to actually process

23   the orders and ship them to consumers, is that correct?

24   A.   In the very beginning when those products were sold,

25   that work was was done inhouse in Bronson's offices.

1    Q.   And Bronson did the fulfillment for the first part of

2    2003 only?

3    A.   Right.

4    Q.   And after 2003, up until mid-2004, Bronson used the

5    services of BMI fulfillment services?

6    A.   Yes.

7    Q.   And after BMI, Bronson used the services of William

8    B. Meyer for fulfillment services?

9    A.   Right.

10   Q.   Are you familiar with the functions and

11   responsibilities of the fulfillment houses?

12   A.   Oh, sure.

13   Q.   The fulfillment houses kept physical inventory of the

14   products, isn't that correct?

15   A.   That is correct.

16   Q.   But the inventory was actually monitored by you,

17   correct?

18   A.   I kept track of the levels, the stock levels of the

19   inventory, yes.

20   Q.   So you knew what was happening in terms of the stores

21   of products in the warehouses?

22   A.   Right.

23   Q.   And this was true for Chinese Diet Tea and Bio-Slim

24   Patch?

25   A.   Right.

1    Q.   I think for the most part I'm not really interested

2    in the other products that Bronson sold unless I

3    specifically mention it, so if I say "the products," I

4    think you can assume that that I'm referring to Chinese

5    Diet Tea or Bio-Slim Patch, and if you don't understand,

6    please, I can clarify.

7    A.   Okay.

8    Q.   You are familiar with the suppliers of Chinese Diet

9    Tea and the Bio-Slim Patch as well?

10   A.   Yes

11   Q.   Bio-Slim Patch was purchased from a company called

12   Pure Source, correct?

13   A.   Yes.

14   Q.   And Chinese Diet Tea was purchased from a company

15   called Mega Care, correct?

16   A.   Right.

17   Q.   Now, going back to fulfillment houses, aside from

18   keeping physical inventory, BMI and Meyer also received

19   customer orders by mail, correct?

20   A.   Right.

21   Q.   And the mail orders would contain checks, money

22   orders, credit card information for Chinese Diet Tea and

23   Bio-Slim Patch, correct?

24   A.   Right.

25   Q.   Bronson also employed a call center, correct?

1    A.    Yes.

2    Q.    Are you familiar with the functions and

3    responsibilities of the call center?

4    A.    Yes, I am.  I'm -- I am.

5    Q.    And the call center was called Taction, wasn't it?

6    A.    Yes.

7    Q.    Could you spell it for us, please, Ms. Howard?

8    A.    T-A-C-T-I-O-N.

9    Q.    Thank you.  Taction received incoming telephone and

10   fax orders, correct?

11   A.    That is right.

12   Q.    And you are familiar with how the orders were

13   processed by Taction, correct?

14   A.    Yes.

15   Q.    Are you familiar with the flow of funds from

16   customer orders; in other words, what happened to the

17   customer money once the order came in?

18   A.    Yes.

19   Q.    So when customers called for faxed Taction, they

20   would provide credit card information, wouldn't they?

21   A.    Yes, they would.

22   Q.    And then Taction would forward the information to

23   Bronson, BMI and Meyer, correct?  I mean in terms of time

24   period, first it was Bronson who was doing fulfillment,

25   then it was BMI and then it was Myers.  So whoever was

1    doing fulfillment at the time, that's who Taction would

2    forward the credit card information to?

3    A.   The credit card company information got forwarded to

4    the people that were processing the credit cards.

5    Q.   But ultimately the funds were handled by whoever was

6    handling fulfillment at the time?

7    A.   Right.

8    Q.   And the ultimate -- I'm sorry, strike that.

9         Bronson had four bank accounts at Hudson United Bank,

10   is that correct?

11   A.   Yes.

12   Q.   And one of those accounts was specifically devoted to

13   purchases made by credit card, correct?

14   A.   Yes.

15   Q.   And one of those accounts was strictly devoted to

16   purchases made by check or money order, correct?

17   A.   Right.

18   Q.   And BMI or Meyer, whoever was doing the fulfillment

19   at the time, deposited checks and money orders into the

20   account at Hudson that was responsible, that was devoted

21   to checks and money orders, correct?

22   A.   Right.

23   Q.   And whoever was doing fulfillment at the time was

24   responsible for depositing money from credit card orders

25   into the credit card account?

1    A.    That's true.

2    Q.    Correct?  All right.  For shorthand purposes so we

3    don't have to use account numbers, I'll refer to that as

4    the credit card account and the other one as the check

5    account, is that's fair?

6    A.    All right.

7    Q.    So, when BMI deposited money into either the credit

8    card account or the check account, it did not deduct any

9    money for its own fees, did it?

10   A.    No, it didn't.

11   Q.    And the same is true with Meyer; when it deposited

12   money into the credit card or check account, it did not

13   deduct any fees, did it?

14   A.    No, it didn't.

15   Q.    And when Bronson was performing its own fulfillment

16   function, it did not take out any money from the amounts

17   that were deposited into these checking accounts to pay

18   for fulfillment costs?

19   A.    No.  The only money that William B. Meyer and BMI

20   took out was postage money.

21         MR. HAQ:  Your Honor, move to strike.  That was

22   not in answer to the question.

23         THE COURT:  I'll allow it.

24   BY MR. HAQ:

25   Q.    In fact, BMI and Meyer invoiced Bronson after they

1    provided services to Bronson, isn't that correct?

2    A.   They invoiced for the storage and the shipping,

3    right.

4    Q.   The fulfillment costs?

5    A.   The fulfillment costs -- there were two separate

6    invoices.  One was for the fulfillment cost, one was for

7    the postage and the postage was paid upfront.

8    Q.   But the postage was escrowed with --

9    A.   Yes.

10   Q.   -- with the fulfillment companies?

11   A.   Yes.

12   Q.   So, in essence, even though it was paid, it was not

13   utilized until after the fact?

14              MR. LUSTIGMAN:  Objection.

15              THE COURT:  What's the objection?

16              MR. LUSTIGMAN:  It's argumentative.  The

17   question is when was it paid.

18              THE COURT:  No.

19              MR. HAQ:  Your Honor, I was asking questions as

20   to what happened with the postage money.

21              THE COURT:  Overruled.

22   BY MR. HAQ:

23   Q.   Taction was not paid by BMI or Meyer prior to the

24   depositing of the money in Bronson's bank account,

25   correct?

1  A.    No.

2  Q.    And Taction didn't take any money for itself prior to

3  the money being deposited into Bronson's bank accounts?

4  A.    No.

5  Q.    So, the amount that was deposited into Bronson's bank

6  accounts was the full purchase price of the products,

7  correct?

8  A.    Correct.

9  Q.    Bronson sold several products during the 2003, 2004

10  timeframe, correct?

11  A.    About 64 different products.

12  Q.    And so Chinese Diet Tea and the Bio-Slim Patch were

13  only two of 64 products, correct?

14  A.    Right.

15  Q.    And those other products were sold in a similar

16  fashion where customers would place orders by mail, fax,

17  or by telephone with Taction or whoever was doing

18  fulfillment at the time, correct?

19  A.    Right.

20  Q.    And the proceeds from those sales of those products

21  were also deposited in the same bank accounts that

22  proceeds from the sale of Chinese Diet Tea and the

23  Bio-Slim Patch were deposited, correct?

24  A.    That's right.

25  Q.    And Bronson didn't maintain separate banking records

1    to identify the -- which proceeds pertained to which

2    deposit?

3    A.   Right.

4    Q.   I'm sorry, strike that.

5         Bronson did not maintain records pertaining to which

6    proceeds related to which product?

7    A.   Product, right.

8    Q.   So, if there were banking fees charged by the bank,

9    you would not know which product those fees pertained to?

10   A.   It applied across products.

11   Q.   So it applied to all the products?

12   A.   Right.

13   Q.   Did Bronson track which bounced checks pertained to

14   which product?

15   A.   No.

16   Q.   So you don't have any records to show that any checks

17   for Chinese Diet Tea bounced?

18   A.   I don't have specific checks that bounced for Chinese

19   Diet Tea, but a certain percentage of all of our sales

20   have bounced checks.

21   Q.   You don't know specifically which checks bounced for

22   Chinese Diet Tea?

23   A.   No, I don't.

24   Q.   And you don't know specifically which checks for

25   Bio-Slim Patch would have bounced?

1   A.   No, I don't.

2   Q.   BMI and Meyer also processed refunds from a third

3   Bronson bank account, isn't that correct?

4   A.   That's right.

5   Q.   And in that third account, we'll call it refund

6   account just for shorthand, BMI and Meyer were able to

7   keep track of what products they paid refunds for and to

8   which consumers, correct?

9   A.   No, we didn't.

10   Q.   BMI and Meyer did not keep track of that information?

11   A.   Well, it wasn't on a regular basis.  If that

12   information needed to be gotten, it had to be run by a

13   special report.

14   Q.   But BMI and Meyer did process refunds, correct?

15   A.   They did process refunds.

16   Q.   They did send the money back to the consumer,

17   correct?

18   A.   Yes, they did send money back, check or credit card.

19   Q.   They have some record to show that they sent money

20   back to consumers?

21        MR. HAQ:  Your Honor, we've already stipulated

22   to the refund, amount of refund for the products.  I'm not

23   going to go into that.

24   BY MR. HAQ:

25   Q.   So, you're familiar with what a chargeback is, right,

1     a credit card chargeback?

2     A.   Yes.

3     Q.   And it's when a consumer reverses a charge on his

4     credit card by going to the credit card company, correct?

5     A.   Right.

6     Q.   You don't have any records showing which chargebacks

7     are attributable to Chinese Diet Tea, do you?

8     A.   No, I don't.

9     Q.   And you don't have any records to show which

10    chargebacks were attributable to the Bio-Slim Patch, do

11    you?

12    A.   No.

13    Q.   Do your payment processers charge any fees for credit

14    card transactions?

15    A.   Yes, they do.

16    Q.   Yes, they do?  And Taction did not keep track of

17    which products credit card fees pertain to, did it?

18    A.   No.

19    Q.   And BMI did not keep track of which credit card fees

20    or which products the credit card fees pertained to, did

21    it?

22    A.   No.

23    Q.   So you don't know which credit card fees pertain to

24    Chinese Diet Tea?

25    A.   No, but the fees were based on a level of activity

1   and the level of activity of the products, we know the

2   sales of the green tea and Bio-Slim Patch was

3   25.25 percent.

4   Q.   But you don't have any records to indicate

5   specifically which fees were attributable to which

6   product?

7   A.   No, they didn't charge by product.  It's a blanket

8   fee.

9   Q.   In any event, all fees, regardless of what they were

10  for, were deducted from Bronson's Hudson Bank account,

11  correct?

12  A.   Yes.

13  Q.   So the money was in Hudson's bank account once the

14  fees were deducted, isn't that correct?

15  A.   After the fees were deducted, the money was in there.

16  Q.   Yes, but --

17  A.   I don't understand your question.

18  Q.   -- the money was there and then the fees were

19  deducted?

20  A.   Right.

21  Q.   Okay, thank you.

22  A.   They took the money out without any notice or

23  intervention by us.

24  Q.   But the fees were in the bank, the bank's -- I'm

25  sorry, strike that.

1          The bank statements reflect the money was in the bank
2     account and then it was withdrawn?
3     A.    Right.
4     Q.    Are you familiar with fulfillment center payments?  I
5     know we covered a little bit of this before.
6     A.    Fulfillment center --
7     Q.    The payments that were made to fulfillment centers.
8     A.    Oh, yes.
9     Q.    Did you pay the invoices for the fulfillment
10    services?
11    A.    I didn't pay the invoices.  I okayed the invoices.
12    Q.    But you're familiar with the invoices?
13    A.    Right.
14    Q.    Okay.  The invoices didn't indicate which product
15    Bronson was being billed for.
16    A.    No.
17    Q.    So you don't know which fulfillment expenses are
18    specifically applicable to Chinese Diet Tea?
19    A.    Only by the percentage of the Chinese Diet Tea volume
20    of business.
21    Q.    But you don't know specifically which fulfillment
22    services in any given invoice were applicable to whatever
23    cost?
24    A.    No.
25    Q.    For those -- and the same is true for the Bio-Slim

1    Patch?

2    A.    Right.

3    Q.    I would like to turn to the advertisements for the

4    products.  Are you familiar with the advertisements for

5    Chinese Diet Tea?

6    A.    Yes, I am.

7    Q.    Okay.  But you didn't create them, did you?

8    A.    No.

9    Q.    I want to show you a document that's already been

10   marked as evidence, it's Plaintiff's Exhibit 4.  Do you

11   recognize that document?

12   A.    Should I turn in my book?

13   Q.    No, there's a book of exhibits in front of you.

14   A.    Is it in One?

15   Q.    It's in Book Two.

16   A.    And what tab?

17   Q.    Exhibit 4.  There are letters at the front and the

18   numbers are at the back?

19   A.    I see.  Yes.

20   Q.    Do you have that in front of you?

21   A.    I do.

22   Q.    Okay, and it's fair to say that that's been marked as

23   Version A of the ad by your counsel?

24   A.    Yes.

25   Q.    Okay.  Just hang onto that for a second.  I want to

1    show you what, another ad which is marked as Plaintiff's

2    Exhibit 7.

3        Thanks.  And that is the catalog ad for Chinese Diet

4    Tea, is it not, that appeared in the Bronson catalog?

5    A.   Yes, it is.

6    Q.   Isn't it fair to say that the catalog ad and the ad

7    that's marked as Version A are the same?

8    A.   They are very similar.

9    Q.   Thank you.  Do you know if the catalog was

10   distributed?

11   A.   It went out with every order.

12   Q.   So the Bronson catalog was distributed to any

13   customer who ordered a Bronson product?

14   A.   Right.

15   Q.   And isn't it true that it also went to purchasers of

16   other similar products from other companies as well?

17   A.   Very few.  There was a test trial done of doing that

18   and it wasn't continued.

19   Q.   But that did occur --

20   A.   It did.

21   Q.   -- for the 2003, 2004 time period?

22   A.   It did occur at one point.

23   Q.   Okay.  Do you recall the time period during which

24   Version A of the Chinese Diet Tea began to run in trade

25   publications?

1    A.    I believe it was in March 2003.

2    Q.    Okay.  And it continued to run through 2004, correct?

3    A.    Right.

4    Q.    Bronson also had a website, didn't it?

5    A.    Yes, we did.

6    Q.    And Bronson advertised Chinese Diet Tea on its

7    website, correct?

8    A.    Yes.

9    Q.    I'd like to show you a document that's also already

10   in evidence as Exhibit U.

11         Do you have that in front of you?

12   A.    I do.

13   Q.    Has the numbers 488 at the bottom?

14   A.    Yes.

15   Q.    Okay.  And that was provided by your counsel to the

16   FTC, correct?

17   A.    Yes.

18   Q.    Okay.  I just need you to answer audibly so it's on

19   the record.  Thank you so much.

20         So this, and this is the advertisement for Chinese

21   Diet Tea, correct?

22   A.    Yes, it is.

23   Q.    And with respect to advertisement, I'd just like to

24   identify a couple statements that are stated in the ad.

25   The first one is "You eat your favorite foods but still

1    lose weight fast."  The advertisement says that, does it

2    not?

3    A.   It does say that.

4    Q.   If you would just flip to, it was Exhibit -- 4.  If

5    you would flip to Exhibit 4 which is Version A of the ad,

6    that also says "You eat your favorite foods but still lose

7    weight," correct?

8    A.   It does.

9    Q.   Okay.  I'm going back to the internet ad, if you look

10   at the paragraph text --

11            THE COURT:  Mr. Haq, because these are in

12   evidence, if you just want to point out to me the

13   statements that you want to focus on, that's permissible.

14            MR. HAQ:  Okay.  Your Honor, the ad also says

15   that "Triple acting Chinese Diet Tea helps eliminate the

16   absorption of carbohydrates and helps to prevent fat

17   absorption" which is similar to the statement on Version A

18   that "Eliminates an amazing 91 percent of absorbed sugars

19   --"  I'm sorry.  "Prevents 83 percent of --"  Strike that.

20   "Eliminates an amazing 91 percent of absorbed sugars and

21   prevents 83 percent of fat absorption."

22            MR. LUSTIGMAN:  That's in Exhibit U?

23            THE COURT:  No, that's Exhibit 4.

24            MR. HAQ:  That's Exhibit 4.

25

1    BY MR. HAQ:

2    Q.   And Exhibit U also says it "increases metabolic rates

3    to burn calories."  And Exhibit 4 says "Doubles your

4    metabolic rate to burn calories fast."

5         And both advertisements have a photo of a woman

6    standing on a scale moving the counterweight on the scale.

7         The catalog and print advertisements didn't reference

8    the internet ad, did they?

9    A.   The catalog --

10   Q.   The catalog ad -- strike the last question.

11        The catalog ad did not have a reference to Bronson's

12   website, did it?

13   A.   I'd have to look at that page.

14   Q.   Feel free.  Exhibit 7.

15   A.   No.

16             MR. LUSTIGMAN:  Objection.  He's saying that's

17   the only place that reference might be?

18             THE COURT:  No.  He's saying that Exhibit 7 does

19   not contain a reference to the website.

20             MR. LUSTIGMAN:  Just that one page.

21             MR. HAQ:  Yes.

22   BY MR. HAQ:

23   Q.   And then if you will turn to Exhibit 4?

24   A.   All right.

25   Q.   That advertisement does not contain any reference to

1    Bronson's website, does it?

2    A.    No.

3    Q.    And if you'll turn to Exhibit 5, there's no reference

4    to Bronson's website on that page, is there?

5    A.    No.

6    Q.    And Exhibit 6, it's the last one, there's no

7    reference to Bronson's website on that page, is there?

8    A.    No.

9    Q.    Thank you.

10         So, now that we're familiar with the ad, I just want

11   to ask you a few additional questions about them.  Each

12   individual ad that was run in a periodic publication was

13   identified with a number with prefix DGT, correct?

14   A.    Yes.

15   Q.    And the DGT numbers corresponded to which magazine

16   and issue the ad appeared in, correct.

17   A.    That is right.

18   Q.    And consumers were asked to identify the DGT numbers

19   when they placed orders, isn't that correct?

20   A.    That is correct.

21   Q.    But identifying a DGT number was not required to

22   place an order, was it?

23   A.    They couldn't release an order without a code.

24   Q.    So consumers could not place an order without a DGT

25   number?

1    A.    You had to, the customer, the agent -- it was a

2    mandatory field that had to be filled in for a code.

3    Q.    So there was no way that you could order the product?

4    A.    Well --

5    Q.    The question is there was no way that you could order

6    the product without a code?

7    A.    Well, there had to be something in the code field;

8    they might be able to put in like "reorder" or "RO" for

9    reorder.

10   Q.    Okay.  But it is possible that customers who placed

11   orders without using a specific DGT number may still have

12   seen the catalog ad, correct?

13   A.    I don't know what they saw.

14   Q.    It's possible though?

15         MR. LUSTIGMAN:  Objection.

16         MR. HAQ:  Your Honor, I'm just asking if it's a

17   possibility.

18         THE COURT:  Well, why don't you rephrase the

19   question.

20         MR. HAQ:  Okay.

21   BY MR. HAQ:

22   Q.    A customer may have seen the catalog ad even though

23   the customer did not refer to a specific DGT number when

24   ordering the product?

25   A.    Well, the agents always ask where did you see our

1   product, did you see it in a catalog or did you see it in

2   a magazine.  So they would have -- that would have been

3   included.

4   Q.   So if a customer said I saw it in a magazine but I

5   don't have a specific number, they wouldn't have been able

6   to put in a specific number, would they have?

7   A.   No.

8   Q.   So, you might have had an entry in that field but it

9   wouldn't necessarily have corresponded with a specific

10  magazine?

11  A.   Rarely.

12  Q.   And there were no DGT numbers for the -- there were

13  no DGT numbers for the catalog, were there?

14  A.   No, there weren't.

15  Q.   And there about no DGT numbers for the internet ad,

16  were there?

17  A.   No.  They would --

18  Q.   And there's no record to indicate if any consumers

19  purchased products as a result of viewing the internet ad?

20  A.   No, there was no reference to that.

21  Q.   Do you know how many different publications or

22  reversions of the advertisement appeared in?

23  A.   A bunch.  I don't know specifically the number but I

24  would say 300 and something, 350 maybe.

25  Q.   350 different appearances -- I'm sorry, I don't

1    understand.  What --

2    A.    Different ads.  I thought you were talking about the

3    numbers of ads.

4    Q.    Well, let's back up for a second and I'll clarify.

5    With respect to Chinese Diet Tea, how many different

6    publications did it appear in?   In other words, how many

7    different specific magazines, newspapers, circulars did it

8    appear in in the timeframe of 2003 and 2004?

9    A.    Okay.  So you, like if I consider Cosmopolitan one

10   publication and --

11   Q.    Yes.

12   A.    -- First for Women another publication, how many

13   separate things, ads were run in those different

14   publications?

15   Q.    How many publications?

16   A.    How many publications.  I think -- I don't know the

17   exact number but I would say there were at least 30 or 40.

18   Q.    Okay.  And now, moving onto the next part of the

19   question that you anticipated; how many ads do you think

20   appeared between 2003 and 2004?

21   A.    Around 300 and something.

22   Q.    300.  And just in terms of just some examples of the

23   publications that the ad appeared in, you already said

24   Cosmopolitan.  Chinese Diet Tea advertisements did appear

25   in Cosmopolitan?

1    A.   If I could look at the list, I can tell you.

2    Q.   If you would like to look at Exhibit E, that's

3    already been marked in evidence.

4    A.   They are all listed there.

5    Q.   Okay, and that's a fair representation of the

6    advertisement history for Chinese Diet Tea, correct?  Once

7    you get to it, I'm sorry.  It's Exhibit E.

8    A.   Correct.  So you just want me to read some of these

9    names?

10   Q.   First, is that an accurate representation of the

11   advertisement history for Chinese Diet Tea, correct?

12   A.   Right.  Those are people that we got invoices from

13   for advertising.

14   Q.   Okay.  And you had mentioned that Cosmopolitan was

15   one of the publications that the Chinese Diet Tea ad

16   appeared in.  I believe that's actually listed on the

17   chart, if you would just verify that.

18   A.   It is.

19   Q.   Okay.  And you also said First for Women, is that

20   another publication that it would have appeared in?

21             THE COURT:  I can read the list.

22             MR. HAQ:  Okay, Your Honor.  Thank you.

23   BY MR. HAQ:

24   Q.   Now, in terms of what consumers actually paid for the

25   products, there was the price of the product but the

1    consumers also paid shipping and handling, is that

2    correct?

3    A.    Right.

4    Q.    And so Bronson essentially passed on the postage

5    cost to consumers, correct?

6    A.    Well, not exactly.

7    Q.    I mean to the extent that Bronson did recoup --

8    A.    The product, like if the product was 24.95 and then

9    postage was $5.00, then $29.95 was the total cost of the

10   sale that went to be part of our gross sales number for

11   the year.  So the postage and the product -- and handling

12   were part of the gross sales number.

13   Q.    But you didn't refund shipping and handling, did you?

14   A.    We did not refund shipping and handling.

15   Q.    That was not part of Bronson's refund policy?

16   A.    No, the shipping and handling had been paid to the

17   post office.

18   Q.    But consumers --

19   A.    Which reduced our gross sales.

20   Q.    But consumers did not get that money back?

21   A.    They did not get that money back.

22   Q.    All right.  I think I'm done with those areas for the

23   moment.  I'd like to turn your attention to H&H Marketing

24   which has been named as a relief defendant in this case.

25   You're familiar with H&H Marketing, are you not?

1    A.    Yes.

2    Q.    In fact, you're a 50 percent owner of H&H Marketing,

3    correct?

4    A.    Yes.

5    Q.    And so you can testify on behalf of H&H as a

6    50 percent owner?

7    A.    Yes.

8    Q.    H&H was created as a Texas LLC, wasn't it?

9    A.    Yes.  I believe that was in 1998.

10   Q.    Okay.  And it was created for tax purposes, was it

11   not?

12   A.    Not -- I don't know that it was created for tax

13   purposes.

14   Q.    But it was created to segregate out personal expenses

15   from Bronson?

16   A.    Well, it was created before Bronson was created

17   and --

18   Q.    I would like you to turn to Exhibit 2, please.  Two.

19         (Pause)

20         Do you have Exhibit 2 in front of you?

21   A.    I do.

22   Q.    Do you recall the Federal Trade Commission propounded

23   a second set of interrogatories earlier this year --

24   A.    Yes.

25   Q.    -- upon defendants and the relief defendants?

```
 1    A.    Yes.
 2    Q.    And if you will turn to page -- if you look, there's
 3    a fax number at the top of the page.  If you turn to page
 4    21 of the fax number?
 5    A.    Uh huh.  (Affirmative.)
 6    Q.    There are two signatures in the middle of the page,
 7    do you recognize those?
 8    A.    Yes.
 9    Q.    Okay.  And that's your signature on the right, is it
10    not?
11    A.    Right.
12    Q.    Okay.  Now, if you'll turn to Response Number 9 for
13    the relief defendants, which is on page -- under those fax
14    page numbers, it begins on page 17 and moves to page 18.
15    There's a large paragraph in the middle of the page, of
16    page 18.  Do you see that?
17    A.    In the middle of page 18?
18    Q.    Page 18.  If you look at the top, there's that fax
19    number.  That's what I'm going by, not the page number at
20    the bottom.
21    A.    Okay.
22    Q.    And in the middle of that paragraph, you state that
23    "Bronson is the operating company making sales, placing
24    advertising, paying all business expenses, et cetera.  H&H
25    is basically used to pay the personal expenses of the
```

1   Partners.  The reason for H&H's existence is so that the

2   Bronson books will not be cluttered up with non-business

3   items."  That is what you said, is it not?

4   A.   I don't know that I personally wrote that or said

5   that --

6   Q.   But you signed these interrogatories and verified its

7   accuracy?

8   A.   I --

9           THE COURT:  You've got to go one at time.  So

10  ask a question.

11          MR. HAQ:  Sure.

12          THE COURT:  Wait until he's done, give your

13  answer.  Wait until she's done, ask the next question.

14          MR. HAQ:  Sure thing.

15          THE COURT:  Thanks.

16  BY MR. HAQ:

17  Q.   So you signed --

18  A.   There was one -- I thought -- I'm sorry.

19  Q.   So --

20          THE COURT:  Let's start again.  We'll get a

21  question.

22          MR. HAQ:  Okay.

23  BY MR. HAQ:

24  Q.   You signed the interrogatories verifying this answer

25  as accurate, correct?

```
1    A.   The answer is, what is written there is accurate.

2    Q.   Okay, thank you.

3    A.   There's additional things that H&H did though.

4    Q.   There's no question pending.

5              MR. HAQ:  Move to strike, Your Honor?

6              THE COURT:  Your lawyer will have a chance to

7    bring out your side of things.

8              THE WITNESS:  Okay.

9    BY MR. HAQ:

10   Q.   H&H Marketing doesn't do any business on its own

11   though, does it?

12   A.   Yes, it does.

13   Q.   I'd like to put before you a deposition transcript.

14   Do you recall you were deposed in this case in 2005,

15   August of 2005, correct?

16   A.   Right.

17             MR. HAQ:  Your Honor, may I approach?

18             THE COURT:  Sure.  Are you confronting or are

19   you --

20             MR. HAQ:  I'm bringing her her deposition

21   transcript.

22             THE COURT:  Fair enough.

23   BY MR. HAQ:

24   Q.   (Hands witness.)

25   A.   Thank you.
```

```
 1    Q.   Now, what I've just handed you is the deposition

 2    transcript or -- I'm sorry, is the transcript from your

 3    deposition that was taken August of 2005, correct?

 4    A.   Right.

 5    Q.   If you will turn to page 35 of that transcript?  At

 6    line 16, the question is:  "Do you know what kind of

 7    business H&H Marketing is in?  Let me rephrase it.  Do you

 8    know what H&H Marketing does?"

 9         And your answer was:  "H&H Marketing doesn't do any

10    business that I know of."

11         That was your answer, correct?

12    A.   That was my answer.

13    Q.   Okay.

14    A.   That was --

15    Q.   The question has been answered.  Thank you.

16         To the extent that H&H has a principal place of

17    business, that location is wherever you happen to be,

18    isn't it?  In other words, if you are in Connecticut, H&H

19    is in Connecticut; if you're in Texas, H&H is in Texas,

20    correct?

21    A.   It is now that I work from home rather than in the

22    office that we had.

23    Q.   But in 2003 and 2004?

24    A.   Prior to 2003, I was always working in the office.

25    Q.   Which office?
```

1   A.   In Southport, where we had our warehouse and our

2   shipping facilities.

3   Q.   But it's wherever you happen to be correct, be?

4   A.   Right.

5   Q.   Isn't it true that for all intents and purposes,

6   Bronson and H&H are one company?

7   A.   I don't know how to answer that.

8   Q.   I will refer you back to your Interrogatory Response

9   Number 9 that you looked at earlier.  Exhibit 2 of the

10  exhibits, not of the deposition.  I'm sorry.  If you look

11  back at Exhibit 2.

12       Near the bottom of that paragraph that we looked at

13  earlier, you stated "Since both entities were equally

14  owned and since Mr. or Ms. Howard filed joint income tax

15  returns, the net effect, it's as though they were only one

16  company."  That was accurate, correct?

17  A.   That is there.

18  Q.   And that is what you signed, the interrogatory --

19  A.   That's what I signed.

20  Q.   Thank you.  Are you familiar with the finances of

21  both Bronson and H&H?

22  A.   Now that I've spent about three or four years going

23  through banking statements and invoices and everything to

24  prepare documents, I'm pretty familiar with them now.  I

25  wasn't back then.

1    Q.   Okay.  So it's true that Bronson transferred money to

2    H&H, correct?

3    A.   That's true.

4    Q.   And are you familiar with the flow of money between

5    Bronson and H&H?

6    A.   Yes.

7    Q.   Okay.  And isn't it true that one of the

8    justifications that Bronson used to transfer money to H&H

9    was that the money constituted, quote/unquote, consulting

10   fees?

11   A.   Yes, it was consulting fees paid for work that was

12   done on behalf of Bronson.

13   Q.   Okay.  Is there any contractual arrangement between

14   Bronson and H&H for their consulting fees?

15   A.   I don't know.

16   Q.   Is there a contract at all?

17   A.   I haven't seen one.

18   Q.   Is there any formalized agreement by which H&H

19   charges Bronson consulting fees?

20   A.   A formalized agreement?

21   Q.   Uh huh.  (Affirmative.)

22   A.   In the fact that it's the practice, it's the

23   formalized practice.

24   Q.   But are there any terms and conditions by which H&H

25   earns consulting fees?

1    A.    I don't know.

2    Q.    Is there an hourly rate that you charge for

3    consulting fees?

4    A.    I don't know.

5    Q.    Is there any sort of job performance evaluation that

6    Bronson would conduct of H&H to determine whether or not

7    it was entitled to consulting fees?

8    A.    I don't know that.

9    Q.    Isn't it true that, that H&H paid your expenses?

10   A.    They paid me a salary.

11   Q.    But isn't it true that H&H also paid expenses for you

12   and Mr. Howard?

13   A.    They paid -- well, it paid me a salary every month.

14   I don't know -- I don't know how to answer this.

15   Q.    H&H directly paid your mortgage?

16   A.    Yes.

17   Q.    And H&H directly paid some medical expenses?

18   A.    Yes.

19   Q.    And H&H directly paid -- just a moment, if you'll

20   bear with me.  Actually paid off a mortgage in 2003, is

21   that correct?

22   A.    Yes.

23   Q.    And H&H paid household expenses?

24   A.    Yes, yes, that is correct.

25   Q.    And H&H also paid you $4,000 a month?

1   A.   Yes.

2   Q.   And you pretty much were able to take money from H&H

3   when you needed it, isn't that correct?

4   A.   Other than my $4,000 a month salary, I rarely took

5   extra money, but once in a while I did.

6   Q.   But you were able to take out money whenever you

7   needed it?

8   A.   I could have.

9   Q.   Isn't it true that you received a salary from Bronson

10  Partners?

11  A.   I received $680 a month from Bronson Partners to

12  qualify for the health insurance plan --

13  Q.   But that was your salary for Bronson Partners -- oh,

14  I'm sorry to interrupt.

15  A.   -- that we offered to our employees.  And the money

16  to pay for that had to come from Bronson Partners for the

17  employees to be covered.  So, yes, I received that but my

18  lowest shipping clerk received more than $680 a month

19  salary.

20  Q.   But you received --

21  A.   I received 680.

22  Q.   And that was your salary per month?

23  A.   That was my salary from Bronson to qualify the

24  company for medical coverage.

25  Q.   But that was your salary?

1    A.   That was my salary.

2    Q.   So, just going back for a moment to H&H paying

3    expenses, isn't it true that H&H was, for all intents and

4    purposes, treated like your personal checking account?

5    A.   I took 4,000 -- my personal checking account?  I took

6    $4,000 a month --

7    Q.   You --

8    A.   -- as salary for the work I did for Bronson, and that

9    was my personal checking account.

10          MR. HAQ:  Move to strike, Your Honor.  Not

11   responsive.

12          THE COURT:  Well, it's not especially responsive

13   but I'll allow it.  You can ask another question.

14   BY MR. HAQ:

15   Q.   But you and your husband did pay personal --

16   A.   We did --

17          THE COURT:  Just one at a time.  One at a time.

18   Slow down.  The court reporter's not going to able to get

19   this down if you're talking over each other, so let's let

20   him ask the question.  You can't answer it unless you know

21   what the question is.

22          THE WITNESS:  You're right.  I'm sorry.

23          THE COURT:  Go ahead.

24   BY MR. HAQ:

25   Q.   But you and your husband did pay personal expenses

1   out of the H&H bank account?

2   A.   Yes.

3   Q.   Do you know how much Bronson paid in consulting fees

4   in 2003?

5   A.   I don't know what that means.

6   Q.   Well, you said earlier that Bronson paid H&H

7   consulting fees, is that correct?

8   A.   Yes.

9   Q.   Do you know how much that was in 2003?

10  A.   No.

11  Q.   Let me direct you to Bronson's federal tax return

12  which is at Exhibit -- 2003's at Exhibit P.  I'm sorry,

13  strike that.  It is at Exhibit -- S.

14  A.   Exhibit S?

15  Q.   Yes.

16  Q.   Can you verify that's Bronson's 2003 tax return?

17  A.   Yes, I do.

18  Q.   Okay.  About nine pages in -- just let me know when

19  you're there.

20  A.   Okay.

21  Q.   All right.  We see, nine pages in, there's a list of

22  itemized deductions?

23  A.   I must have counted it wrong.  I have like withheld

24  taxes or something.  Oh, here it is.

25  Q.   Yes, it's nine pages.  The top of the page says Form

1    1065, line itemized deductions?

2    A.   I have it now.

3    Q.   You see at the top of the page there's a list of

4    itemized deductions, correct?

5    A.   Yes.

6    Q.   And of those itemized deductions, there is an item

7    for consulting, correct?

8    A.   Yes.

9    Q.   And that consulting expense is $447,495, correct?

10   A.   Right.

11   Q.   And that would have been consulting expenses of

12   Bronson Partners, correct?

13   A.   I believe so.

14   Q.   And Bronson Partners would have paid that consulting

15   to H&H, correct?

16           MR. LUSTIGMAN:  Objection.  Speculation.

17           THE COURT:  Well, if she knows.  She can answer

18   if she knows.

19   BY THE WITNESS:

20   A.   I really never got involved in preparing the taxes

21   and stuff, so I'm not sure what all that covers, but --

22   Q.   But it's fair to say --

23   A.   -- it says consulting.

24   Q.   But it's fair to say that to the extent that Bronson

25   paid H&H consulting fees, if Bronson stated that it paid

```
 1    $447,495 in consulting fees in its tax return, that that

 2    was what it paid H&H?

 3              MR. LUSTIGMAN:  Objection.

 4    A.   There might have been other consultants.

 5              THE COURT:  Just a moment.  What's the

 6    objection?

 7              MR. LUSTIGMAN:  No, withdrawn.

 8              THE COURT:  All right.

 9    BY THE WITNESS:

10    A.   I don't know that only -- I don't know that, I don't

11    know if there were other consultants or not.

12    Q.   So you don't know if there were any other

13    consultants?

14    A.   I don't.

15    Q.   There may not have been any?

16    A.   I don't know if there were or weren't.

17    Q.   Okay.  Let's -- I'd like to direct you to the tax

18    return for H&H for 2003, which is at Exhibit P.

19         (Pause)

20         Are you at Exhibit P?

21    A.   Yes.  Yes, I have P.

22    Q.   And at the top of Exhibit P where it says Gross

23    Receipts for Sales, Item 1 A under Income, it says

24    445,845, is that correct?

25    A.    Right.
```

```
 1    Q.   And that's consistent with what was listed on the
 2    Bronson tax return for consulting, isn't it?
 3              MR. LUSTIGMAN:  Objection.
 4              THE COURT:  Well, I have the numbers.
 5    BY MR. HAQ:
 6    Q.   If we can go back to your interrogatories, number
 7    nine, that's Exhibit 2.  It's on that page 18 again.
 8              THE COURT:  Yes, I see it.  On the tax returns
 9    Bronson would have an expense called Consulting Fees and
10    H&H would have income for the same amount.
11              MR. HAQ:  Yes.
12              THE COURT:  Thank you.
13              MR. HAQ:  Your Honor, if you have the documents
14    in front of you, I won't go through the testimony of
15    putting in what's written on the tax returns, is that your
16    preference?
17              THE COURT:  I just think it's faster to point
18    things out.  You don't need to get a concession of the
19    witness through testimony because the exhibits are in.
20    You can simply say tax return, line one.
21              MR. HAQ:  Okay.
22    BY MR. HAQ:
23    Q.   If we could go to the 2004 tax return of Bronson
24    Partners which is at Exhibit R, the ninth page in?
25    A.   Exhibit R?
```

```
 1    Q.   R.

 2              THE COURT:  I see it, Consulting.

 3              MR. HAQ:  Also an itemized number for

 4    consulting.

 5              THE COURT:  400,279.

 6              MR. HAQ:  Yes.

 7    BY MR. HAQ:

 8    Q.   And on H&H's tax return for 2004 which is at Exhibit

 9    Q, Item 1 A, gross receipts, 307,492.

10              MR. HAQ:  If I could just have a moment, Your

11    Honor?

12              THE COURT:  Sure.

13              (Pause)

14    BY MR. HAQ:

15    Q.   So you had testified already that you received a

16    salary of $4,000 from H&H?

17    A.   Right.

18    Q.   For services that were performed for Bronson?

19    A.   Right.

20    Q.   There was no business of H&H that you performed; H&H

21    didn't have any independent business, did it?

22    A.   H&H did some wholesale business with some other

23    people.

24    Q.   In 2003 and 2004?

25    A.   Uh huh.  (Affirmative.)
```

```
 1   Q.   But the services that you provided for H&H were for
 2   Bronson, correct?
 3   A.   Most generally.
 4   Q.   And you -- you and your husband were the only
 5   employees of H&H, correct?
 6   A.   Correct.
 7   Q.   Bronson did not keep track of what monies that were
 8   transferred to H&H related to Chinese Diet Tea or the
 9   Bio-Slim Patch, did it?
10   A.   No.
11   Q.   And aside from what's simply listed on the tax
12   returns as what H&H received, it did receive deposits in
13   its bank account, did it not?
14   A.   Could you rephrase that?
15   Q.   Strike that question.
16        H&H did receive deposits of money into its bank
17   account, correct?
18   A.   Yes.
19   Q.   And some of that money was directly from Bronson?
20   A.   Some of it was.
21   Q.   Right?
22           MR. HAQ:  We've already stipulated, Your Honor,
23   to the amount that was deposited into H&H.
24   BY MR. HAQ:
25   Q.   Now, Bronson filed tax returns, correct?
```

1    A.    Yes.

2    Q.    But it doesn't actually pay any taxes, correct?

3    A.    It doesn't --

4    Q.    Are you familiar with --

5    A.    I'm not, I was never involved in the tax returns or

6    the accounting or anything like that.  I can't really say

7    yes or no to a question like that.

8    Q.    Okay, fair enough.  But you and your husband both

9    filed personal tax returns, correct?

10   A.    Yes.

11   Q.    And because you are both 50 percent owners of Bronson

12   and H&H, it really doesn't matter where the money is,

13   whether it's Bronson's money or H&H's money; it's still

14   your money, correct?

15   A.    Yes.

16   Q.    And I just want to focus on little more on your role.

17   You had performed various duties for Bronson in 2003 and

18   2004, correct?

19   A.    Right.

20   Q.    Such as communicating with Taction and the

21   fulfillment houses, monitoring inventory, monitoring

22   orders, communicating the policy regarding refund,

23   reships, back orders and insufficient addresses, is that

24   correct?

25   A.    That is correct.

1    Q.   But those were not H&H's functions, were they?  Those

2    were Bronson's functions?

3    A.   Those were Bronson's functions.

4    Q.   So you didn't have any personal duties for H&H beyond

5    what you performed for Bronson?

6    A.   No.

7              MR. HAQ:  Just a moment, Your Honor?

8              (Pause)

9              THE WITNESS:  There was some wholesaling done.

10             MR. HAQ:  There's no question pending.

11             THE WITNESS:  Okay.  I was continuing from the

12   last question though.

13             MR. HAQ:  Your Honor, we request that the

14   witness.  Her counsel --

15             MR. LUSTIGMAN:  Let her finish her answer to the

16   question.

17             MR. HAQ:  Her counsel will be able to examine

18   her after I'm done.

19             THE COURT:  Well, there was a significant pause,

20   it's not reflected on the record, between the end of the

21   answer and the continuation.  It's something that can be

22   brought out on cross.

23             MR. HAQ:  Your Honor, if I could just point out

24   some more figures on the tax returns.

25             THE COURT:  Fine.

1    BY MR. HAQ:

2    Q.   On H&H's 2003 tax return, which is Exhibit P, you

3    turn to page four.  At the bottom it says Distributions,

4    and that is distributions -- Schedule M to the Partners'

5    capital account of 766,893.  And then if you move to page

6    13, which is Sandra Howard's personal K-1 --

7              THE COURT:  Exhibit 13?

8              MR. HAQ:  No, I'm sorry, it's still Exhibit P.

9    It's page 13 of Exhibit P.

10   BY MR. HAQ:

11   Q.   That states that Sandra Howard's distributions of

12   money in terms of cash and marketable security was

13   383,447.  And then if you turn to Exhibit Q --

14             THE COURT:  All right, just a minute, just a

15   minute.

16             (Pause)

17             THE COURT:  I don't see the number you're

18   referencing for Sandra Howard -- I got it, I got it.

19             MR. HAQ:  You found it?

20             THE COURT:  Yes, okay.

21   BY MR. HAQ:

22   Q.   And then if you go to Exhibit Q, which is the 2004

23   tax return.  Schedule M 2 which is about four pages in, at

24   the bottom, states distributions of 492,618.

25             MR. HAQ:  You see that, Your Honor?

```
1              THE COURT:  Yes.

2              MR. HAQ:  And then on her personal K-1 for that

3    tax year, Table N, it's about 13 pages in.

4              THE COURT:  Okay.

5              MR. HAQ:  It states that her withdrawals and

6    distributions equaled 246,309.

7              THE COURT:  Okay.

8              MR. HAQ:  I just have a couple more questions

9    and then if I could have a moment to confer with my

10   colleague?

11             THE COURT:  Sure.

12   BY MR. HAQ:

13   Q.   Are you familiar with whether any other state or

14   federal agencies have investigated Bronson for any

15   products it has sold?

16             MR. LUSTIGMAN:  Objection.

17             MR. HAQ:  Your Honor, we're seeking a permanent

18   injunction in this case.  It's fair to go into whether

19   there's been any past investigations on past misconduct or

20   any predecessor that the defendants or relief defendants

21   were party to.

22             MR. LUSTIGMAN:  I thought the purpose of today

23   was a damage hearing.

24             THE COURT:  Well, there they are also seeking an

25   injunction but it's not clear to me that that's
```

1    appropriate.

2         MR. HAQ:  Your Honor, the point being that

3    they've, the standard for FTC cases, I don't know them off

4    the top of my head unfortunately, state that if there has

5    been a history of past misconduct, that is sufficient for

6    the imposition of a permanent injunction as final relief.

7    In this case we feel that in light of not only the conduct

8    with respect to Bronson Partners with Chinese Diet Tea and

9    the Bio-Slim Patch, other state authorities have also

10   investigated Bronson Partners.  In one instance there was

11   a consent order entered into in one state, and we feel

12   that that is probative as to whether or not permanent

13   injunction should issue in this case against the company

14   and the defendants.

15        THE COURT:  It's with respect -- you're

16   proffering that's with respect to these same products?

17        MR. HAQ:  No, Your Honor, but just generally

18   speaking, we, in our orders we usually seek broad fencing

19   in relief as --

20        THE COURT:  I understand.

21        MR. HAQ:  -- that's pretty standard.

22        THE COURT:  I understand.

23        MR. HAQ:  So it would be with respect to any

24   sort of misrepresentations in the marketing and sale of

25   any products.

```
 1              THE COURT:  And you're suggesting there was a

 2   consent decree?

 3              MR. HAQ:  Yes.

 4              THE COURT:  Which admits liability or doesn't

 5   admit liability?

 6              MR. HAQ:  Do we have that?

 7              MS. EICHEN:  It was, Your Honor, it was annexed

 8   to our motion, the plaintiff's motion for a preliminary

 9   injunction in this case, and is part of the overall record

10   in this case.

11              THE COURT:  Well, all right, let's do this.  You

12   don't need it through this witness.  It's a matter of

13   which I can take judicial notice, if it's appropriate.

14   Why don't you simply put on the record, if it is already

15   in the record, what it is you believe exists and if and

16   when I decide that that's appropriate, I'll look it up and

17   take judicial notice of a public document.

18              MR. HAQ:  Okay.  Thank you, Your Honor.

19              If I may have a moment to confer with my

20   colleague?

21              (Pause)

22              MR. HAQ:  We're done for this witness, Your

23   Honor.  We'll have an opportunity for rebuttal, correct?

24              THE COURT:  Yes.

25              MR. HAQ:  Okay.
```

```
 1                  THE COURT:  I'm going to ask a couple questions
 2        before we get into cross.
 3                  Ms. Howard, what did you do by way of
 4        consulting, what did H&H do by way of consulting for
 5        Bronson?
 6                  THE WITNESS:  I basically ran the Bronson --
 7        operations for Bronson through H&H.
 8                  THE COURT:  All right.  Did you submit formal
 9        consulting reports of any kind or you were simply taking
10        over the operations?
11                  THE WITNESS:  I was just basically taking over
12        the operations.
13                  THE COURT:  All right.  And with respect to H&H,
14        did the -- are you and your husband the only, I'll call
15        them "members" of H&H?
16                  THE WITNESS:  Yes.
17                  THE COURT:  And did you have formal, did H&H
18        have formal membership meetings?
19                  THE WITNESS:  We would have meetings to talk
20        about things but I don't know what formal means.
21                  THE COURT:  You and your husband would talk
22        about those things?
23                  THE WITNESS:  Uh huh.  (Affirmative.)
24                  THE COURT:  Did you, did you ever have minutes
25        taken of those meetings?
```

1          THE WITNESS:  No, not that I remember.

2          THE COURT:  Okay.  Why don't we take our morning

3    break and take about 15 minutes.  Come back here about

4    11:00 o'clock.  We'll stand in recess until then.

5          (Whereupon a recess was taken from 10:45

6       o'clock, a. m. to 11:00 o'clock, a. m.)

7          THE COURT:  Cross?

8    CROSS EXAMINATION

9    BY MR. LUSTIGMAN:

10   Q.   Good morning, Mrs. Howard.

11   A.   Good morning.

12   Q.   I'd like to touch upon a little bit your prior

13   employment background before you came to Bronson.  Could

14   you tell us just briefly what your employment background

15   was?

16   A.   Initially from graduating from college I was a

17   teacher.

18   Q.   Would you move over that microphone a little bit?

19   A.   This way?

20   Q.   Yes.

21   A.   I was a teacher at secondary level.  And I spent a

22   year at Claire, Oklahoma, and a year in Tulsa and then a

23   year, two years in Jennings, Oklahoma school system.  And

24   then my husband, my ex-husband decided to go to art

25   school, and we moved to Los Angeles where I couldn't find

1    a teaching position, so I began work for Aluminum Company

2    of America in their Los Angeles sales office.  And then I

3    was doing customer service work supporting sales reps,

4    kind of in between, between major aluminum distributors

5    and the plant and the sales rep.

6         Then in about 1985, we moved to Connecticut where he

7    was going to be doing some post graduate work and I got a

8    transfer into New York sales office in what was then the

9    PanAm Building, and I worked there for about nine years.

10   No, I only worked there for three years.

11        Then I left to form a handbag company with a friend

12   of mine and that didn't go so well.  So I then started

13   working for a group of illustrators who held an

14   illustrators workshop and I was the administrative

15   assistant that planned all of the logistics and registered

16   all the people and did all the banking and everything.

17        I did that for a while and then Alcoa had closed

18   their New York City sales office and opened a branch

19   office in New Canaan and they called me to see if I was

20   interested in coming back to work.  So I went back to work

21   for Alcoa in the New Canaan sales office.

22        And then two years after that, they offered me a

23   promotion and transfer out to Vernon, California, to be

24   the administrative manager of the sales office out there

25   for an extrusion plant.  And I was a single, I was single

1    then and a single parent, and it was very difficult out

2    there so I made a decision to move back to Connecticut

3    where I started working for James River Corporation down

4    in Norwalk, Connecticut, in the River Park Building.  And

5    I stayed there for about nine years.  And I was started

6    off as manager of the retail customer service group.  I

7    managed about 30 customer service agents.  We interfaced

8    between the mills and the sales force and the customers

9    that, who were retailers like IGA and Safeway and Wal-Mart

10   and people like that.

11       At some point during that, we, James River decided to

12   do a big reorganization and go into the team concept and

13   there was a need for corporate trainers, and with my

14   education background I moved into that area and started

15   helping to -- started leading a team that helped develop

16   training for a new SAP system, it was like leading edge

17   enterprise-wide software out there in the market place.

18   And so my team and I developed the SAP training to roll

19   out to all the mills and the sales offices and the

20   administrative offices across the country.

21   Q.   And what was your salary at that time?

22   A.   I brought home a little over $4,000 a month, and I

23   had profit sharing, I had retirement plan and I had a

24   bonus.  I'm not sure what it all added up to.  I tried to

25   look for some of my old records but I couldn't find them.

1    But it was a, you know, it was a salary that I could

2    support myself and my son on.

3    Q.    And did you then start to work with Bronson?

4    A.    Yes.  In about 1999, I left my -- Marty asked me to

5    come help him with his company because he couldn't do it

6    all and I told him that -- you know, it was a second

7    marriage.  I was used to having my own salary, my own pay,

8    my independence and I said I would need to -- if I worked

9    for him, I would need to make the same compensation that I

10   made at my job with James River.

11   Q.    And was that agreed to?

12   A.    And that was agreed to.

13   Q.    Now, are you aware of when Bronson Partners was

14   formed?

15   A.    I think it was in 2000, around there, 2000, 2001,

16   2002 -- I don't know.  Well, maybe 1999.  I wasn't

17   involved in a lot of -- I mean I was part of it, I was

18   part owner, I had to sign papers, but I don't know the

19   date.

20   Q.    Okay.  Do you know when H&H was formed?

21   A.    It was formed in 19 -- it was formed before I went to

22   work for Bronson.  I think it was 1998.

23   Q.    So to the best of your knowledge was H&H already in

24   existence by the time Bronson was formed?

25   A.    Yes.

1    Q.   And at that time, were you aware of any activities

2    that H&H was involved in beside work for Bronson?

3    A.   H&H did some wholesaling to different people.   Any

4    time that -- Marty also did some freelance advertising

5    writing and that was a part of the H&H.   It was all the

6    activities that were not Bronson specific.   There were

7    Bronson specific business that was handled at Bronson's,

8    but there was also Bronson and other activities at H&H.

9    Q.   Okay.   Now, what were your duties at Bronson?

10   A.   Basically my duties were to just run, run the

11   operation, make sure that we had the inventory to manage

12   the employees.   When I first started working for Bronson,

13   after working for a big corporation like James River, I

14   was basically horrified at the lack of policies and

15   systems and inventory control.   I mean everything was done

16   like really, like a garage, almost like a garage

17   operation.   So I came in there with my background of

18   corporate reorganization and job design and started

19   implementing a lot of changes, installing a lot of

20   systems.

21       We -- I set up employee job description and then held

22   performance reviews like you would do in a big company.

23   Their compensation was based on that.   I managed their

24   vacation and we actually had a vacation calendar, which

25   had never existed before.

1          One of the biggest things was there was only one
2     computer that was shared among four people.  So if the
3     order entry person was busy entering orders, no one else
4     could use the computer to do refunds or look up order
5     status or anything like that.  So one of the first things
6     I implemented was finding a computer company where I could
7     get computer work stations for each of the people and then
8     selecting an order management software that we could
9     install that everyone could work on the computer at the
10    same time with a server holding all the data.
11         So I found that company, went to the training myself,
12    found a company to install the computers and I trained all
13    of our employees and we were up and running with a
14    networked system where all of our work could get done in a
15    timely manner.
16         I also saw that we didn't have enough time for
17    customer service calls because we were so busy taking
18    order calls.  Everybody in the office, like the phone
19    would just be ringing off the hook all day long taking
20    telephone orders so that the time to enter those orders or
21    the time to do customer service, we just didn't have time
22    to do it all.
23         So I talked to Marty and suggested that we get a call
24    center to take all the call center calls and we did that,
25    which -- and I made a decision that if the call center

1    would handle the order calls, our office would still do

2    the mail order and the customer service.  And the way that

3    would work is the Taction -- well, we had a first call

4    center that didn't work out so then I found Taction later,

5    but I'm just going to talk about Taction because they were

6    the good ones.

7         Taction would take the orders, they'd create a file,

8    it would come to us at night.  In the morning I'd import

9    it into our system, and we could print out, we could

10   charge all the credit cards, print out all the orders and

11   the packing and shipping people could pack and ship them.

12        This system, everytime we got a shipment of

13   inventory, I would put the inventory in the system and if

14   people entered orders, it was deducted from the system.

15   It was set up to work really, really well and it served us

16   very well as far as meeting all of our customer service

17   needs and streamlining our work process.

18        The other thing, we didn't have a way of tracking

19   shipments, so I went to Pitney Bowes and got a Pitney

20   Bowes set-up and trained the shipping guys, trained them

21   on how to scan and enter all of their shipments into the

22   Pitney Bowes system so when somebody called we could go in

23   Pitney Bowes's system and look up their order and tell

24   them where it was.

25        Then when it came time when we made a decision to

```
1    outsource the fulfillment, I worked with the BMI people to
2    document our policies and our procedures and get all that
3    information loaded into their system.  And worked with
4    their people to get them up to speed on how we would like
5    to handle our customers.
6        I developed a training manual that had all of our
7    sales policies and return policies and customer service
8    policies, and then also you know, little bits of
9    information about how to handle certain types of customer
10   service calls.
11       So, I was like probably down at BMI three times a
12   week.  But in the meantime, I got a print-out everyday of
13   every order that had been entered and at the time we were
14   entering about 300 or more orders a day.  I reviewed all
15   those orders to make sure they were in compliance and that
16   shipping addresses were good, that the correct items were
17   priced correctly, different things like that, and I also
18   got a report of all the customer service calls.
19       So, I would monitor all of those and there could be
20   like 100 of those a day, going through to see, you know,
21   what the customer called about, what kind of response was
22   given, and then I would follow up with people if I saw
23   things that needed attention.  They would also contact me
24   if there were customer service issues that were over and
25   beyond our policy and I would make decisions on that.
```

1          I would monitor the returns and the refunds to make

2     sure they were being done promptly.

3          I established an up sale program with the call center

4     where we would have specials on certain products and the

5     agents would, you know, offer that product at a discounted

6     price at the end of a call, and we tracked which agent did

7     very well at that and they got a little commission bonus

8     when they did well.

9          It was full-time.  I spoke with the call center and

10    the fulfillment center several times everyday.

11    Q.    How many hours a week did you work?

12    A.    I worked well over 40.

13    Q.    And did Bronson bill H&H for your work?

14    A.    Yes.

15    Q.    And H&H paid you?

16    A.    H&H paid me.

17    Q.    And you were an owner of H&H?

18    A.    And I was an owner of H&H.

19    Q.    So the money in H&H was really owing to you anyway?

20    A.    Right.

21    Q.    Okay.  Now, did you make any determination as to the

22    percentage of sales --

23          THE COURT:  Could I interrupt just for a second?

24    I don't understand the question and answer, did Bronson

25    bill H&H for your work?  Did Bronson bill H&H or did H&H

1   bill Bronson?  How is this working?  Why would Bronson

2   bill H&H?

3            I'll ask the witness.  How did this work?  You

4   say Bronson billed H&H; what happened?

5            THE WITNESS:  I was working through H&H on

6   behalf of Bronson.  It was very --

7            THE COURT:  So, you were in effect --

8            THE WITNESS:  -- like a consultant.

9            THE COURT:  -- you part of H&H?

10           THE WITNESS:  Part of H&H.  Working --

11           THE COURT:  And H&H billed Bronson for the value

12   that you added to Bronson; not the other way around.

13           THE WITNESS:  Okay.

14           THE COURT:  Is that right?  If you're working

15   for H&H and you're providing services to Bronson, why

16   would Bronson bill H&H?

17           THE WITNESS:  You might have to ask Al that

18   question.  I don't know how exactly how the billing was

19   done.  I just know there was billing.  I mean Al, our

20   accountant, can answer that.

21           MR. HOWARD:  H&H billed Bronson.

22           THE COURT:  Sir, you can't testify yet.  You'll

23   have a chance.  All right, anyway we'll sort it out later.

24   That's my confusion.

25           THE WITNESS:  I wasn't involved in back end

1    accounting type things.

2            THE COURT:  Okay.  Sorry, go ahead.

3    BY MR. LUSTIGMAN:

4    Q.   Ms. Howard, did you make any determination as to the

5    percentage of sales allocable to the diet green tea and

6    the Bio-Slim Patch?

7    A.   Yes, I did.

8    Q.   And I think we stipulated, Judge, as to that number.

9    And did you also, did you also evaluate the various

10    expenses that the company was subject to such as refunds

11    and chargebacks, things of that nature?

12    A.   Yes, I did.

13    Q.   And did you allocate that percentage, the

14    25.25 percent to those refunds and chargebacks and postage

15    and et cetera?

16    A.   Yes, I did.

17    Q.   And --

18            THE COURT:  And we have stipulated numbers on

19    those, don't we?

20            MR. LUSTIGMAN:  We have stipulated numbers,

21    Judge.  I'm trying to establish that that's an appropriate

22    fair estimate.  I think we've agreed on that.

23            THE WITNESS:  It was the percentage of the

24    sales, of that product's sales, so it would be the

25    percentage of the expenses.

1          THE COURT:  Let me just interject there.  What

2     other products did Bronson sell?

3          THE WITNESS:  We had some glycosamine products.

4     We had some hair products, like hair vitamins, hair tonic.

5     We had some face creams and eye creams and chin creams and

6     a whole variety of things.  We, at one time we had bird

7     clocks.  We had little door fans.

8          THE COURT:  And what is the assumption that

9     you're making that suggests that the percentage of postage

10    that the company paid in a year is going to be the same

11    percentage as the receipts for a particular product?  In

12    other words, if you're shipping a liquid product, some

13    sort of facial liquid that's going to be a relatively

14    heavy product and the postage is going to be higher,

15    whether the cost is higher or not is independent of what

16    the postage cost is going to be.

17          THE WITNESS:  Right.

18          THE COURT:  Whereas green tea is tea bags.  It's

19    light.  The postage is low.  So what analysis did you do

20    to compare postage rates to, I suppose, cost versus weight

21    of the product shipped?

22          THE WITNESS:  Actually the green tea was one of

23    our heavier products.  The liquids were small liquids and

24    they could go for less, one bottle of those could go for

25    less than priority mail.  The green tea was three big foil

1    pouches, 28 pouches each, in a heavy foil deal and they

2    were bulky.  They went into a priority box which this

3    postage, assigning the 25.25 percent postage to the green

4    tea product is understating the cost of shipping that

5    product because it was so bulky.

6            THE COURT:  Okay.  But the 25.25 is a comparison

7    of receipts for the products at issue in this case versus

8    total receipts.  What analysis have you done in terms of

9    numbers of shipments, weights of shipments versus receipts

10   for products?  In other words, it's completely random,

11   isn't it, if the postage happens to hit anything close to

12   25.25 of the postal expense.  For all I know, you had

13   15 million shipments of face cream and 300,000 shipments

14   of green tea.  For all I know, the shipments of face cream

15   were more expensive than the shipments of green tea,

16   although you're suggesting otherwise today.  For all I

17   know, the price of the face cream is $600 per fluid ounce,

18   so that the postage cost is a very tiny percentage of the

19   receipts from that product.  You see what I'm saying?

20           THE WITNESS:  (Nodding in the affirmative)

21           THE COURT:  What basis do I have, in other

22   words, to assume that postage costs are going to reflect

23   the same -- postage costs for these products are going to

24   be the same percentage as receipts for these products

25   versus total receipts.

```
 1              THE WITNESS:  Okay.  I don't know how to explain

 2      that other than like some of our bottles were this big

 3      with like 30 tablets in them and they cost very little to

 4      ship.

 5              THE COURT:  Right, but how many -- let's say

 6      they cost three dollars and the tea cost six dollars.  Did

 7      you ship more or less of those?  What did they cost?  If

 8      you ship -- if it costs three dollars to ship but it costs

 9      $300 to buy, then that's a very different percentage than

10      25.25 of 25 percent.

11              THE WITNESS:  Of the postage?

12              THE COURT:  Right.  The 25.25, as I understand

13      it, is a comparison between total receipts and receipts

14      for these two products.  Right?

15              THE WITNESS:  Right.

16              THE COURT:  The only way that that would be an

17      appropriate percentage for postage would be if there's the

18      same ratio between receipts and postage costs for the

19      other three-quarters of Bronson's business.

20              THE WITNESS:  Okay.

21              THE COURT:  So, the receipts number is going to

22      depend on numbers of orders, cost per order, et cetera.

23      And the postage cost is going to depend upon principally,

24      I suppose, the weight of the products.  Has any analysis

25      been done whether 25.25 percent makes any sense when
```

```
1    you're looking at what it probably cost to mail the green

2    tea and Bio-Slim Patch products versus other products?

3              THE WITNESS:  The only analysis that was done

4    was just the experience of being in the shipping

5    department when things were being shipped and knowing that

6    some of our bottles with 30 tablets only cost maybe a

7    $1.95 each to ship and the green tea had to go in a box

8    that cost $3.60 -- 65 cents to ship.

9              THE COURT:  Okay, but what did that bottle cost?

10             THE WITNESS:  All of our products were basically

11   the same price points.  We had things ranging from 19.95

12   each to probably 32.95 each.  And if it was one unit, it

13   all got -- as long as it was -- the shipping and handling

14   was done by number of units, so if it was one of Bottle A,

15   it was $5.00 to ship it.  If it was one of Bottle B, it

16   was the $5.00 shipping charge.  What the customer paid was

17   the same.  So there was not, like we didn't have these

18   products that some of them were 4.99 and then at the other

19   end, shipping $50 or $150 products.  The range of the

20   pricing in our products was just not that great.

21             THE COURT:  And what happens if somebody buys

22   three bottles of the tablets?

23             THE WITNESS:  Then it's a higher postage for

24   three bottles.

25             THE COURT:  Right.
```

1          THE WITNESS:  Right.  And if they buy three

2    units of green tea, it's a higher postage.  And we had,

3    you know, multiple levels of buying of all of the

4    products --

5          THE COURT:  Right.

6          THE WITNESS:  -- for, you know, every product

7    that we sold.  Some people would order one, some would

8    order two, some would order three, some would order four,

9    some would order a six month supply at a time.

10          THE COURT:  Okay, but I'm right --

11          THE WITNESS:  It all kind of averaged -- I mean,

12    I don't know that there was one product that we only got

13    one unit bottles for -- you know, one unit orders for and

14    the other one we'd always got six unit orders for.  I do

15    know that the green tea was one of our more costly

16    products to ship.  That's all I can say.

17          THE COURT:  Okay.  But you haven't done any

18    analysis, I take it, to figure out whether 25.25 percent

19    of the total postage costs for the company reasonably

20    estimated the postage costs for these two products?

21          THE WITNESS:  The only analysis we did was

22    whether to go with this 25.25 percent, which was actually

23    a lower cost than the way we had figured it at each order

24    of green tea minimally shipping at a priority mail rate.

25    Because of the bulk and the weight it had to ship priority

1    even when people hadn't paid for priority mail, so -- and

2    then you got into the question, well, some people ordered

3    two units, some people ordered three units, how do -- you

4    know, how do you do all that?  So, rather than going with

5    the 3.65 per order, we thought it was less -- that it was

6    more a simple formula to go with the 25.25.  That would be

7    an average of all of our shipping.

8              THE COURT:  All right.  But when a customer

9    ordered a four week course of green tea, the shipping cost

10   charged to them was $5.00.  When they ordered a 12 week

11   order, the shipping cost was $12.  And an eight week

12   course was $6.  So you were getting different amounts of

13   money in depending on how much was ordered, is that fair?

14             THE WITNESS:  And that was the same across all

15   of our products.  The more units bought, the higher the

16   shipping cost because of the weight of the product.

17             THE COURT:  Okay.  Well, let me just inquire of

18   counsel whether there's a basis in the record for

19   assigning the same percentage to expenses such as postal

20   order expenses that has been calculated based upon an

21   analysis of the receipts for these products versus total

22   receipts.

23             MR. LUSTIGMAN:  I think there is, Judge.  I

24   think it's a fair allocation.  For example, when we, when

25   we did the summary judgment -- the opposition to the

1    summary judgment motion, Defense Exhibit 7 calculated the

2    actual postage expense for the tea based on $3.85 per

3    order for postage and $5.25 for order fulfillment, which

4    came to $512,000 some-odd dollars.  And when we decided

5    that it would make more sense to take this 25.25 percent

6    across the board, that effectively cut this number

7    substantially.  Even though we think that the number

8    that's set forth on Exhibit 7 is probably an accurate

9    number, we took it, we said it makes more sense to take

10   for all expenses, it makes more sense to take that

11   percentage for everything.  For refunds, for postage, for

12   fulfillment, for chargebacks, for advertising, for

13   everything, taxes.

14           And so we thought that that was the fairer way

15   to do it, but if we're limiting it to postage I think we

16   could, we could -- if you look at Exhibit 7 to our

17   opposition, Defense Exhibit 7, it had that higher number.

18           MR. SHAFFER:  Seven -- to our summary judgment?

19           MR. LUSTIGMAN:  To the summary judgment.

20           THE COURT:  I understand.  Are you offering that

21   exhibit?

22           MR. LUSTIGMAN:  Yes, I thought it was in the

23   record but yes, I would offer it.

24           MR. HAQ:  Your Honor, we would actually object

25   to Exhibit 7 being utilized at this stage.

```
 1              MR. LUSTIGMAN:  If we take the, if we take the
 2     percentage of the exhibit, 25.25 percent, it comes to
 3     $246,183.  And if you look at, if you take Exhibit 7 of
 4     the summary judgment --
 5              THE COURT:  Right, which isn't yet in the
 6     record.
 7              MR. LUSTIGMAN:  Right, but -- but that, that
 8     refers to, if you tally it up, it comes out to -- how
 9     much?  It's about --
10              MR. SHAFFER:  It's 120 --
11              MR. LUSTIGMAN:  It's within 120,000.
12              MR. SHAFFER:  It comes to 220,000 or so.
13              THE COURT:  What comes to 220?
14              MR. SHAFFER:  Excuse me?
15              THE COURT:  You just said something comes to
16     220,000; what comes to 220,000?
17              MR. SHAFFER:  Your Honor, we, when -- two
18     and-a-half years ago when we opposed the summary judgment
19     motion, we submitted some figures and we submitted our
20     calculations at the time which, we showed $3.85 postage
21     cost per order of diet green tea, and there were
22     approximately 56,000 orders.  56,000 times 3.85 per order
23     is something over $200,000.  $218,000, okay?
24              We also sold approximately 2,000 orders of the
25     Bio-Slim Patch and, as you suggested, the mailing costs
```

1    were different.  Those were flat patches, they were not

2    bulky as she testified.  So those were 83 cents per order.

3    So that is approximately $2,000 more.  So, on the summary

4    judgment motion, we had postage costs calculated to

5    approximately 220, or somewhere between 220, $225,000.

6            You know, subsequent to that, we, you know, as

7    we were going through this case and trying to stipulate to

8    some of these costs, you know, we thought we'd switch to a

9    more reasonable, a more workable way to analyze those

10   costs.  I mean they seem pretty close to me, so --

11   obviously I can't testify but, you know, to the extent

12   that you were interested in what analysis was performed, I

13   think this is an analysis that was performed early on in

14   this case and it yielded a very close number.

15           THE COURT:  Is off by about ten percent.  In

16   other words, the 25.25 method overstates by about ten

17   percent the postage cost that you think are actually

18   incurred for these two products.

19           MR. SHAFFER:  Preliminarily, I mean -- I'm

20   trying to remember everything we did two years ago.  I

21   think that's a fair statement although it might be an

22   incomplete statement.

23           MR. LUSTIGMAN:  The fulfillment costs are here.

24   I didn't calculate it but it says --

25           THE COURT:  You're offering Exhibit 7?

```
 1              MR. LUSTIGMAN:  Yes.

 2              THE COURT:  My understanding is there's an

 3      objection.  What's the objection?

 4              MR. HAQ:  First of all, Your Honor, the exhibit

 5      is not sworn to and, secondly, there is no back-up

 6      documentation behind Exhibit 7 that's been offered into

 7      the record.

 8              MR. SHAFFER:  This came up in response to your

 9      question was there any analysis performed.

10              THE COURT:  Right.

11              MR. SHAFFER:  So this is an answer to that

12      question.

13              THE COURT:  Okay, but you're now offering the

14      exhibit and we have an objection.  What's your response to

15      the objection?

16              MR. SHAFFER:  The exhibit is being offered to

17      show that an analysis was performed and that the

18      analysis --

19              THE COURT:  Well, I'll accept the fact that an

20      analysis was performed and it's not exactly 25.25 percent.

21              MR. SHAFFER:  Correct.

22              THE COURT:  All right.

23              MR. SHAFFER:  Well, this was, this little

24      colloquy here, this little colloquy here represents,

25      represents why we switched to another analysis.  I mean we
```

```
 1    were attempting to work with the FTC to, you know,

 2    consolidate all these issues and at least not -- you know,

 3    this case boils down to a dispute about, you know, what

 4    number should be credited to certain things --

 5              THE COURT:  I understand.

 6              MR. SHAFFER:  But we tried not to fight about

 7    the numbers themselves.

 8              THE COURT:  I understand that.  Let me find out

 9    if there's a stipulation from the FTC that 25.25 percent

10    of the expenses is a fair representation of the expenses

11    related to these two products.

12              MR. HAQ:  Your Honor, we won't stipulate to

13    that.  Our argument is they are not entitled to any

14    offsets.

15              THE COURT:  That's a different question.

16              MR. HAQ:  Sure, but I don't think that we're

17    willing to stipulate to any percentage.  1 percent is a

18    fair value because there's no, there's no documentation to

19    back up specifically what the costs were with respect to

20    each product.  And without any sort of documentation to

21    support that, it's very hard to come to any sort of

22    stipulation as to what the percentage should be.  It might

23    be more, it might be more but right now I don't have that

24    information in front of me.  I've never had that

25    information.  So I can't come to an agreement as to any
```

1    particular number with respect to any expenses,

2    particularly postage.

3              MR. SHAFFER:  Well, Your Honor, we can't come to

4    an exact agreement down to the penny, but it seems to me

5    that we know, we have documentation for what was paid for

6    postage, and we know that.  That's been stipulated to.  We

7    have -- while it was not tracked per product, we have --

8    when they say there's no evidence, we have our client's

9    testimony here on the stand that, that it was a bulky

10   product.  You know, you can, as a finder of fact you can

11   choose to credit or discredit that testimony.  So I don't

12   mean to characterize it but we do have her testimony to

13   support it.

14             We also have these figures that we submitted in

15   response to summary judgment.  And so I think none of them

16   are, while none of them are down to the penny, none of

17   them are so far apart as to be unreasonable.

18             THE COURT:  Okay, I understand your argument.

19   I'm going to sustain the objection to Exhibit 7 but it's

20   without prejudice if you can get the information in some

21   other way.  Exhibit 7 is not apparently sworn to.  It's

22   not, it's not a summary within the meaning of the federal

23   rules of evidence because it's not summarizing otherwise

24   admitted evidence.  And so I'm going TO exclude Exhibit 7

25   to the summary judgment motion for now.

```
1              MR. HAQ:  Thank you, Your Honor.

2              MR. LUSTIGMAN:  May I show Exhibit 7 to the

3    witness?

4              THE COURT:  For what purpose?

5              MR. LUSTIGMAN:  Ask her to testify about it.

6              THE COURT:  No.  You can ask her questions.

7              MR. LUSTIGMAN:  Well, I'm going to ask her

8    questions about the numbers that are on there.

9              THE COURT:  You have to lay a foundation.  You

10   can't get Exhibit 7 in by having her read Exhibit 7 into

11   the record.

12             MR. LUSTIGMAN:  Okay.

13   BY MR. LUSTIGMAN:

14   Q.   Mrs. Howard, do you recall, there was a form about

15   two years ago when the summary judgment motion was made in

16   this case?

17   A.   Yes, I do.

18   Q.   And do you recall at that time you were asked to

19   gather expense figures and sales figures for the products

20   in this case?

21   A.   Yes.

22   Q.   And did you, in fact, gather those figures?

23   A.   Yes, I did.

24   Q.   And did you compile a list of the gross sales for the

25   company for -- for 2003 and 2004?
```

1    A.    Yes.

2    Q.    And did you compile a list of the gross sales of the

3    diet patch and the tea for those years?

4    A.    Yes.

5    Q.    And did you calculate the postage costs for each of

6    those two products?

7    A.    Yes.

8    Q.    For those years?

9    A.    I did.

10   Q.    And did you also calculate the fulfillment costs for

11   those two products?

12   A.    Yes, I did.

13   Q.    And did you calculate the operating expenses of the

14   company for those years?

15   A.    Yes.

16   Q.    And did you place those figures on, on a document

17   that was given to us for use in opposing the summary

18   judgment motion?

19   A.    Yes, I did.

20             MR. LUSTIGMAN:  May I show her the document?

21             THE COURT:  For purposes of --

22             MR. LUSTIGMAN:  To see if this is the document

23   she prepared.

24             THE COURT:  Okay.

25

1   BY MR. LUSTIGMAN:

2   Q.   Mrs. Howard, I show you a document that's been --

3           MR. HAQ:  Your Honor, may we see a copy of the

4   document first before it's shown to the witness?

5           THE COURT:  Sure.  Why don't we mark it for

6   identification, too.

7           (Hands counsel.)

8           THE COURT:  Should we mark that as Exhibit W?

9           MR. HAQ:  I would like the record to reflect

10  there's no extra copies for us.

11          THE COURT:  All right.

12          (Whereupon Defendant's Exhibit W was marked for

13      identification.)

14  BY MR. LUSTIGMAN:

15  Q.   Mrs. Howard, I show you what's been marked as

16  Defendant's Exhibit W, and ask you to look at that,

17  please, and tell me if you can identify what that two page

18  document is?

19  A.   It's a document that gives the expenses of the

20  overhead for the green tea and the diet patch.

21  Q.   Is that a document that you prepared?

22  A.   Yes.

23          MR. LUSTIGMAN:  Judge, I would offer the

24  exhibit, Exhibit W, into evidence.

25          MR. HAQ:  Objection, Your Honor.  We still don't

1    have the underlying methodology or the consolidation that

2    supports the information contained in the document.

3                THE COURT:  Sustained.

4                (Pause)

5                MR. LUSTIGMAN:  Judge, I can, with your

6    permission I can go into some detail as to how this was

7    performed but we're really offering it not for the

8    accuracy of the information that's there but to show the

9    reasonableness of what numbers we're suggesting, that an

10   analysis was undertaken and that the numbers that we're

11   using, therefore, are reasonable and within the analysis.

12   Not offering it for the accuracy of those specific

13   numbers.

14               MR. HAQ:  Your Honor, I think there's been

15   sufficient argument on that fact.  I don't think we need

16   an exhibit to support that.

17               THE COURT:  Yes, it doesn't seem to me to be an

18   admissible document at this point, and we don't know how

19   she prepared it.  We don't know upon what she prepared it.

20   I'm not sure it's worth the effort to go through all that.

21               MR. LUSTIGMAN:  May I question her on that?

22               THE COURT:  Sure.

23   BY MR. LUSTIGMAN:

24   Q.   Mrs. Howard, could you please explain how you

25   prepared that document and what you used to prepare it?

1    A.    For the postage specifically --

2              THE COURT:  Go ahead.

3    A.    -- I took three packets of the diet green tea, those

4    three pouches, and I put them in a, I tried to put them in

5    an envelope but the envelope -- it needed to go in like a

6    priority box, and so for the lowest number of, like the

7    one unit of green tea that someone would get that was

8    three foil pouches, and I put a piece of paper in there to

9    be like an invoice that they would have gotten with it.  I

10   had an old Bronson catalog in a file, I put that in there.

11   I did all this at the post office.  I had them weigh it

12   and tell me what it would have cost to mail it back in

13   2003 and 2004.

14        So that was the closest I could come to exactly what

15   it would cost, what it cost them.  But that was only for

16   the people that ordered one unit.  People that ordered two

17   units, the cost would have been higher.  If people had

18   ordered three units, the cost would have been higher.  But

19   that, that to me was at least at the minimum we were

20   paying $3.85 per order for the tea.

21   Q.    So, you used the figure $3.85 whether there was one

22   unit, two units or three units?

23   A.    Just for, just for simplicity sake.

24   Q.    Okay.

25   A.    Because it was too convoluted to go back through the

1    reports and get exactly how many orders were of two units

2    and how many were of three units and how many were four

3    units.  I mean at some point those boxes got pretty big

4    when people ordered six units.

5              THE COURT:  Who mailed the product out to

6    customers?

7              THE WITNESS:  When we did it inhouse, our

8    shipping guys took them in the back of the pick-up truck

9    down to the post office.

10             THE COURT:  And after that?

11             THE WITNESS:  After that, at BMI they -- the

12   post office came to them and picked up.  And at William B.

13   Meyer, the same thing.  The postal trucks come -- because

14   they are big shipping facilities, would come and pick up

15   all of the orders that were ready to go out that day.

16             THE COURT:  So you know that the U. S. Post

17   Office as opposed to, for example, UPS was used?

18             THE WITNESS:  We always used United States

19   Postal Service.  We used either First Class or Priority

20   Mail ever since, or Express, since I've been involved in

21   the business.

22             THE COURT:  Okay.

23             THE WITNESS:  We didn't use UPS.

24             THE COURT:  Okay.  All right, thank you.

25

```
 1    BY MR. LUSTIGMAN:
 2    Q.   And so, what did you calculate the postage costs
 3    based on that to be?
 4    A.   3.85.
 5    Q.   For green tea?
 6    A.   3.85.
 7    Q.   And what was the total?
 8         THE COURT:  No, you can't testify from the
 9    document.  Give the document back to counsel, please.
10    Counsel, take the document away.
11         MR. LUSTIGMAN:  All right.
12         (Hands counsel.)
13    BY MR. LUSTIGMAN:
14    Q.   Now, Mrs. Howard, was the postage expense something
15    that was paid before or after Bronson received the
16    customer's orders?
17    A.   Several times a month, it was, it was paid before the
18    customer order was received.  There had to be money in the
19    escrow account prior to the shipment being made.  That was
20    the requirement of the fulfillment centers.
21    Q.   Now, did Bronson wait for the -- when customers paid
22    by check, did Bronson wait for the checks to clear before
23    shipping the order?
24    A.   No.  The order was entered and shipped and the check
25    was deposited that day but it generally takes anywhere
```

1    from a week to ten days for checks to clear, depending on

2    what bank they are drawn on, and if we waited for checks

3    to clear we would have had customer service up the kazoo,

4    so we shipped right away on good faith.

5    Q.   And did you calculate the amount of bounced checks

6    attributable to the diet tea?  Or I think we've got the

7    numbers that were agreed to as to what 25.25 percent would

8    be.

9              THE WITNESS:  Am I being asked a question?

10             THE COURT:  I'm not sure.

11             MR. LUSTIGMAN:  We've stipulated that

12   25.25 percent of bounced checks would be $12,521.

13             MR. HAQ:  Your Honor, we stipulated to the math,

14   not that that was a valid expense.

15             THE COURT:  I understand.

16             MR. LUSTIGMAN:  I didn't say otherwise.

17   BY MR. LUSTIGMAN:

18   Q.   Mrs. Howard, did you make any attempt to calculate

19   whether, what percentage of the bounced checks should be

20   attributable to the sale of the tea and the patch?

21   A.   Yes, I did.

22   Q.   And what did you do?

23   A.   I listed all of the bounced checks items that

24   appeared on the Bronson checking account statements for

25   Account 7667 in the spread sheet.

```
 1                  THE COURT:  Ma'am, what are you looking at?

 2                  THE WITNESS:  This is this book.

 3                  THE COURT:  Which exhibit?  Are you looking --

 4       are you using an exhibit to aid your testimony?

 5                  THE WITNESS:  No, I was just -- I can close it.

 6                  THE COURT:  That's fine, I was trying to figure

 7       out -- I wanted to follow along if you're using an exhibit

 8       to aid your testimony.

 9                  THE WITNESS:  Oh.  I used -- we had the -- where

10       customer checks were deposited was an account that ended

11       in 7667, so I went through all of those 7667 statements

12       and at the very beginning of each month it lists all of

13       the items that are bounced checks that have been debited

14       from our account, and I listed those in an Excel spread

15       sheet.

16       BY MR. LUSTIGMAN:

17       Q.   Mrs. Howard, if I can direct your attention to

18       Exhibit T?

19       A.   Yes.

20       Q.   Is that the account you're referring to that lists

21       the bounced checks?

22       A.   Yes, it is.

23       Q.   Now, Mrs. Howard, did you calculate the fulfillment

24       expenses that Bronson paid beside the postage?

25       A.   Yes, I did.
```

```
1    Q.   And how did you calculate that?

2    A.   From the bank statements, Bronson bank statements

3    from Hudson United Bank for the account that ends in 8210,

4    I listed all of the checks and the dates and the amounts

5    that were paid for fulfillment.

6    Q.   And did you then take 25.25 percent of those, that

7    number?

8    A.   I did.

9              MR. HAQ:  Objection, Your Honor.  That's a

10   leading question.

11             THE COURT:  It doesn't suggest the answer.  It's

12   either yes or no.  I'll allow it.

13   BY MR. LUSTIGMAN:

14   Q.   And so do you know what that number was?

15   A.   I -- of the fulfillment costs, I believe it was 300

16   and something, 24, or 350,000, something like that.

17   Q.   Mrs. Howard, did you --

18             THE COURT:  We have a stipulation on that

19   number, don't we?

20             MR. LUSTIGMAN:  I beg your pardon?

21             THE COURT:  Don't we have a stipulation on the

22   number?

23             MR. LUSTIGMAN:  I thought we did, Judge.

24             MR. HAQ:  I believe we do.

25             THE COURT:  Does anyone disagree that the
```

```
 1    fulfillment costs total for the company were $374,888.69?

 2              MR. HAQ:  No, Your Honor.

 3              THE COURT:  And does anybody dispute that

 4    25.25 percent of that is $94,659.39?

 5              MR. HAQ:  No, Your Honor.

 6              THE COURT:  All right.

 7              MR. LUSTIGMAN:  Okay.

 8    BY MR. LUSTIGMAN:

 9    Q.   Now, Mrs. Howard, did you also calculate the amount

10    that was paid to Taction, the call center?

11    A.   Yes, I did.

12    Q.   And --

13              THE COURT:  We have stipulations on that as

14    well, don't we?

15              MR. LUSTIGMAN:  Yes, I believe that was

16    $770,609, Judge.

17              THE COURT:  Right.

18    BY MR. LUSTIGMAN:

19    Q.   Did you also calculate 25.25 percent?

20    A.   I did.

21    Q.   And that's 194,578.

22         Now, Mrs. Howard, did you also calculate the amount

23    of refunds that Bronson issued?

24    A.   Yes, I did.

25    Q.   And the refunds were issued from Bronson's bank
```

1    account after it made deposits of funds?

2    A.   Right.

3    Q.   Were they not?

4    A.   Right.

5    Q.   And in issuing the refunds, in reviewing the refunds,

6    how did you determine how much should be allocable to the

7    products here?

8    A.   The refund report was generated by William B. Meyer

9    from their database.  It was specific only to the green

10   tea sales.

11   Q.   So, that was a specific one?

12   A.   That was a specific one.  It wasn't a calculated

13   number.  It was a number that came right out of their

14   system as the amount of refunds for the diet green tea.

15   Q.   Okay.  And did you calculate the chargebacks that

16   consumers reversed charges on their credit cards?

17   A.   Yes, I did calculate that one.

18   Q.   And -- would you -- did you allocate the

19   25.25 percent for the chargebacks?

20   A.   Yes, I did.

21        MR. LUSTIGMAN:  And, again, Judge, we stipulate

22   on the math of total chargebacks, and the 25.25 percent

23   was 10,728.

24        THE COURT:  Right.  Let's just get the amount of

25   refunds.

```
 1              MR. LUSTIGMAN:  Refunds --
 2              THE COURT:  Is this number an issue?
 3              MR. HAQ:  It's a stipulation, Your Honor.
 4              THE COURT:  Right.  128,932, is that right?
 5              MR. HAQ:  That sounds correct, Your Honor.
 6              MR. LUSTIGMAN:  That is right.
 7              (Pause)
 8              MR. LUSTIGMAN:  Yes, refunds by check.
 9              THE COURT:  Correct.
10   BY MR. LUSTIGMAN:
11   Q.   And likewise, did you calculate the credit card fees
12   that were deducted by the credit card companies from the
13   bank account?
14   A.   Yes, I did.
15   Q.   Now, when those fees were deducted by the credit card
16   companies, had Bronson received the monies already?
17   A.   The money flowed into the account temporarily and
18   then was -- then flew out when they withdrew it.  There
19   was no billing to us.  We were not involved in it at all.
20   They just drew the money out.
21   Q.   So did Bronson ever have access to those funds that
22   it could use and spend?
23   A.   No.
24   Q.   But the deposit that was made was considered part of
25   the gross sales, was it not?
```

```
1    A.    Yes, all deposits were considered part of the gross

2    sale, whether that gross sale wound up being reduced by a

3    bounced check or a charge back or a credit card deduction.

4    Q.    Okay.

5    A.    A million 200 and something.

6    Q.    Mrs. Howard, did you and Mr. Howard file federal

7    income tax returns for the years 2003 and 2004?

8    A.    Yes.

9    Q.    And did you pay federal income taxes for those years?

10   A.    Yes.

11   Q.    And do you recall how much federal income tax you

12   paid for those years?

13             THE COURT:  It's in the record, isn't it?

14             MR. SHAFFER:  Yes, sir.

15             THE COURT:  Let's just point me to it, please.

16             MR. LUSTIGMAN:  Okay.

17             THE COURT:  Which exhibit?

18             MR. LUSTIGMAN:  I beg your pardon?

19             THE COURT:  Which exhibit?

20             THE WITNESS:  One is O.

21             MR. LUSTIGMAN:  2003 is one, F.

22             THE COURT:  Which exhibit is --

23             MR. LUSTIGMAN:  Exhibit F, I'm sorry.

24             THE WITNESS:  F and O.

25             MR. LUSTIGMAN:  F and O.
```

1          THE COURT:  And O.  Okay.  All right, I have

2     Exhibit F which is the 2003.  What line do you want me to

3     look at?

4          MR. LUSTIGMAN:  That would be line 60, Judge.

5     And --

6          THE COURT:  Exhibit O, line 62?

7          MR. LUSTIGMAN:  Yes, sir.

8          THE COURT:  All right, got it.

9     BY MR. LUSTIGMAN:

10    Q.   Mrs. Howard, did you calculate how much Bronson paid

11    for the cost of advertising the green tea?

12    A.   Yes, I did.

13    Q.   And what -- was that also stipulated to?  I believe

14    the number there also was stipulated to.

15    A.   One million --

16          THE COURT:  $1,217,862.62.

17          MR. LUSTIGMAN:  Yes, sir.

18          THE COURT:  Got it.

19    BY MR. LUSTIGMAN:

20    Q.   Now, Mrs. Howard, you were asked about monies that

21    were deposited in H&H?

22    A.   Right.

23    Q.   Do you recall?

24    A.   Yes.

25    Q.   Okay.  Now, did you know whether H&H deposited monies

1    other than monies received from Bronson?

2    A.    Yes.

3    Q.    And did they, in fact, deposit monies other than what

4    they received from Bronson?

5    A.    H&H received deposits from other people other than

6    Bronson.

7    Q.    Do you know how much for the years 2003 and 2004, H&H

8    received from Bronson?

9    A.    It was $675,000 -- over $675,000.

10   Q.    And directing your attention, Mrs. Howard, to Exhibit

11   M?

12   A.    Yes.

13   Q.    Can you tell me what Exhibit M is?

14   A.    It's a listing of all the transfers from Bronson

15   Partners to H&H Marketing in 2003 and 2004.  I checked all

16   four of the banking accounts and the transfers that I

17   found are listed under the bank account that ends in 8210.

18   Q.    Now, could you tell me --

19           THE COURT:  Let me just note that's an exhibit

20   that needs to be redacted in the event that this exhibit

21   is used later.

22           MR. LUSTIGMAN:  Yes.

23   BY MR. LUSTIGMAN:

24   Q.    Could you read into the record the total monies

25   transferred from Bronson to H&H  for entry --

1            THE COURT:  I see it.

2            MR. LUSTIGMAN:  You see it?  Okay.

3    BY MR. LUSTIGMAN:

4    Q.   Now, Mrs. Howard, directing your attention to the

5    first entry of 4/3/2003 and the second entry of 5/9/2003,

6    each in the amount of $100,000, do you know what those

7    entries were for?

8    A.   Those were money that Bronson was paying back to H&H.

9    H&H had loaned Bronson money at the end of 2002.  H&H

10   loaned Bronson $300,000, and these -- total of $200,000

11   were partial payback of that loan.

12   Q.   Okay, Mrs. Howard, direct your attention, please, to

13   the other volume, the first volume there which is Exhibit

14   A?

15   A.   Uh huh.  (Affirmative.)

16   Q.   I mean Volume 1.  And is Exhibit A there?

17   A.   Okay.

18   Q.   And if you could look at -- pages are numbered at the

19   bottom.

20   A.   Uh huh.  (Affirmative.)

21   Q.   Page 1094.

22   A.   1094?

23   Q.   1094.

24   A.   Yes.

25   Q.   Do you have that?

1    A.    Yes, I do.

2    Q.    Okay.  And if you look at the first check on the

3    upper right hand column, I believe it's check 8919?

4    A.    Yes.

5    Q.    Does that correspond with the first $100,000 check

6    that's listed on the summary?

7    A.    Yes, it does.

8    Q.    Now, if you could turn to page 1110.

9              THE COURT:  Check 9016?

10             MR. LUSTIGMAN:  Yes.

11             THE COURT:  I see it.

12   BY MR. LUSTIGMAN:

13   Q.    Do you see check number 9016?

14   A.    Yes.

15   Q.    Was that the second check?

16   A.    That's the second check.

17   Q.    Was that also for the repayment of the loan?

18   A.    Yes, it was.

19   Q.    Now, Mrs. Howard, directing your attention to Exhibit

20   N, that's in the second book.

21   A.    Okay.

22   Q.    Do you have that?

23   A.    Yes.

24   Q.    Now, on page, first page which is numbered 1696, the

25   bottom check 1848 from H&H Marketing to Bronson.

1    A.    I think it's 1946.

2    Q.    1946?

3    A.    Yes.

4    Q.    Yes.  Can you tell me what that is?

5    A.    That is the first $100,000 that H&H loaned to Bronson

6    Partners.

7    Q.    And when was that?

8    A.    November 25th, '02.

9    Q.    '02.  And if you would turn to the next page, 1697,

10   the second check on the right hand column, it's 1955.

11   A.    Yes.

12   Q.    Tell me what that is, please?

13   A.    That was the second $100,000 loan to Bronson

14   Partners.

15   Q.    That's also in 2002?

16   A.    In 2002.

17   Q.    Now, on page 1698, the next page, the bottom check in

18   the right hand column, check 1971?

19   A.    Yes.

20   Q.    Can you tell me what that is?

21   A.    That was the third $100,000 check loan from H&H to

22   Bronson Partners.

23   Q.    And that was also in 2002?

24   A.    In 2002.

25

1    Q.   Mrs. Howard, I want to direct your attention to your

2    deposition counsel asked you about.

3    A.   Yes.

4    Q.   Do you have that there?

5    A.   No, I gave it back.

6         MR. HAQ:  We can give it back.

7         MR. LUSTIGMAN:  Could we have that, please?

8    Thank you.  Counsel asked you about the question on page

9    35, line 18.

10        (Hands witness.)

11   BY MR. LUSTIGMAN:

12   Q.   Now, can you -- you were asked do you know what H&H

13   Marketing does?  And your answer was it doesn't do any

14   business that I know of, except to take profits from

15   Bronson and hold them.

16        What's the basis for your understanding?  That's what

17   I heard yesterday during your husband's deposition.

18        Next page.  Do you have any independent knowledge?

19   Not really.  I don't know.

20        Now, since that, have you investigated what H&H does

21   and whether they did other things?

22   A.   Yes, I have.  I've learned a lot about areas of the

23   company that I didn't know anything about back then, just

24   going through doing all this research for the trial.

25   Q.   So, would your answer be the same now as it was in

```
1    August 2005?

2    A.    No.

3    Q.    Would not?

4    A.    It would not.

5              MR. LUSTIGMAN:  Just give me one minute, Judge?

6              (Pause)

7              MR. LUSTIGMAN:  Okay.  I have no further

8    questions.  Thank you.

9              THE COURT:  All right.  Redirect?

10             MR. HAQ:  Your Honor, may we have a five minute

11   bathroom break, please?  I will be very short with this

12   witness on redirect.

13             THE COURT:  Okay.

14             (Pause)

15             THE COURT:  I'm going to stay here.

16             MR. HAQ:  Okay, thanks.

17             (Pause)

18             THE WITNESS:  May I step away or not?

19             THE COURT:  Do you need to use the restroom?

20             THE WITNESS:  I could.

21             THE COURT:  All right.  You shouldn't talk to

22   anybody but you can step down.

23             THE WITNESS:  Okay.

24             (Witness leaves.)

25             (Pause)
```

```
 1              MR. HAQ:  Thank you for your indulgence, Your

 2    Honor.

 3              THE COURT:  Sure.

 4              MR. HAQ:  I will be very brief -- as soon as we

 5    get the witness back on the stand.

 6              THE WITNESS:  I'm here, I'm here.

 7              (Witness resumes stand)

 8    REDIRECT EXAMINATION

 9    BY MR. HAQ:

10    Q.    Ms. Howard, you testified that you had spoken with

11    your husband about how much compensation you should

12    receive for working at Bronson, is that correct?

13    A.    Right.

14    Q.    Was there any sort of formal employment agreement?

15    A.    A verbal agreement.

16    Q.    But was there anything formalized?

17    A.    Nothing documented, no.

18    Q.    Okay.  And you said that there were employees that

19    had worked at Bronson for fulfillment, is that correct?

20    A.    That's right.

21    Q.    But that was prior to when Chinese Diet Tea was sold,

22    was it not?

23    A.    No, we shipped Chinese Diet Tea from Bronson inhouse.

24    Q.    Okay.  So -- you also mentioned that there were some

25    bills that were exchanged somewhere between Bronson and
```

1   H&H.  With respect for the consulting you did, did you

2   ever see any copies of those bills?

3   A.   No.

4   Q.   And you and Mr. Howard are the only members of H&H,

5   correct?

6   A.   That is correct.

7   Q.   And you are the only employees of H&H, is that

8   correct?

9   A.   Yes.

10  Q.   You were at your -- at Mr. Howard's deposition in

11  August of 2005, correct?

12  A.   Yes, I was.

13  Q.   And during that deposition you heard him testify as

14  to what H&H did, correct?

15  A.   Uh huh.  (Affirmative.)

16  Q.   And after hearing him testify, you were deposed,

17  correct?

18  A.   Yes.

19  Q.   And he testified -- after hearing his testimony, you

20  still did not know what H&H Marketing did, correct?

21  A.   Not really.

22  Q.   And I also would like to point your attention to

23  Exhibit 2, please.

24  A.   Is that in here?

25  Q.   No, that's in Book Two of the exhibits.  It's in the

1    back.  The numbers come after the letters.  That's your

2    interrogatory answers.  I'm going to go back to page 21, I

3    think it was.  The signature page, that has your signature

4    on it?

5    A.   Uh huh.  (Affirmative.)

6    Q.   What's the date of that?

7    A.   The date of the fax is 2/12/09.

8    Q.   And what is the date of your signature?

9    A.   February 9.

10   Q.   So the description of Bronson and H&H's relationship

11   that you gave in interrogatory response nine was accurate

12   as of February of 2009, when you signed the

13   interrogatories, correct?

14   A.   Yes, the description that was given is accurate.

15   It's not a total description.

16   Q.   Okay, thank you.  And with respect to the personal

17   taxes that you and Mr. Howard paid on your personal tax

18   returns, that was for more than just what you received

19   from Bronson and H&H, correct?

20   A.   (Pause)

21   Q.   Well, strike that.  Let me rephrase the question.

22   You had a rental property --

23   A.   You should ask that to the accountant.

24   Q.   Well, if I may, you had a rental property in Idaho,

25   correct?

1    A.   Yes.

2    Q.   And you received income from that property, correct?

3    A.   Yes.

4    Q.   And you had some stocks that you sold during that

5    time period, correct?

6    A.   Yes.

7    Q.   And you received money from those stocks, correct?

8    A.   Yes.

9    Q.   And you also sold a vehicle during that time period?

10   A.   Yes.

11   Q.   And you received income from that as well, correct?

12   A.   Right.

13              MR. HAQ:  And if I may, Your Honor, there's just

14   a couple items I'd like to point out on the tax returns.

15   BY MR. HAQ:

16   Q.   If you could go to Exhibit P, please, which is H&H's

17   2003 tax return?

18   A.   Exhibit P?

19   Q.   Yes, P.  I'm sorry, just bear with me for a moment.

20        (Pause)

21        About 13 pages in, the top of the page says Form

22   1046, there's a line for deductions.

23   A.   It says what?

24   Q.   It says Form 1065, line 20 under that says Other

25   Deductions.

1   A.   Okay.

2   Q.   Okay?  Midway down the page you'll see Schedule L,

3   line six, Form 1065, Other Current Assets?  Do you see

4   that midway down the page?

5   A.   Yes.

6        MR. HAQ:  Your Honor, I just want to point out

7   on that tax return, H&H's 2003 tax return, from the

8   beginning of the tax year only records $100,000 loan

9   receivable.

10        And then I'd like to return to Bronson's 2003

11  tax return which is at Exhibit S.  On the fourth page in,

12  under Schedule L, line 16, mortgages, notes, bonds payable

13  in less than a year, at the beginning of the tax year has

14  $100,000 listed only.

15  BY MR. HAQ:

16  Q.   With respect to the loan, Ms. Howard, that was paid

17  between Bronson and H&H, was there a formalized loan

18  agreement?

19  A.   I don't know.  I --

20  Q.   Do you know if there were any, if there was an

21  interest payment?

22  A.   I don't know, that would be a question for the

23  accountant.  But I do know that this is the $100,000 that

24  wasn't paid back; that was written off.

25  Q.   Well, that was the beginning of the loan year -- of

1    the tax year, correct?  That's what it says?

2    A.   Right.

3    Q.   Okay.

4    A.   It was written off.

5              MR. HAQ:  Just a moment, please?

6              (Pause)

7    BY MR. HAQ:

8    Q.   I want to refer you back again to your interrogatory

9    responses again, Exhibit 2.  If you look at Response 23 on

10   page 13, the fax number, the fax page.

11        Response 23 says The total amount of money that

12   Bronson transferred to marketing center as of January 1,

13   2003 through December 31, 2005, the following sums which

14   were transferred to H&H for the benefit of both Howards

15   who were partners, 2003, 417,454; 2004, 370,486.

16        Plus -- and then I'm skipping over 2005 because

17   that's not -- we're not contesting 2005 in this case.

18   Plus, H&H transferred an additional $4,000 per month to

19   Sandra Howard for household expenses.

20        And that was accurate at the time that you swore to

21   these interrogatories, correct?

22   A.   Right.

23              MR. HAQ:  One more moment, Your Honor?

24              (Pause)

25              MR. HAQ:  Your Honor, we're done.

1          THE COURT:  Okay.

2          MR. LUSTIGMAN:  Just one minor point.

3    RECROSS EXAMINATION

4    BY MR. LUSTIGMAN:

5    Q.   Mrs. Howard, you have in front of you that

6    interrogatory answer that counsel just asked you about?

7    A.   Yes.

8    Q.   Could you read the next line after when you stopped?

9    A.   "Mr. and Mrs. Howard worked full-time for Bronson

10   Partners and H&H.  These payments were for such work.  See

11   deposition of Martin Howard for fuller description of

12   services and consideration performed."

13   Q.   Thank you.

14          MR. LUSTIGMAN:  No further questions.

15          THE COURT:  Thank you, you're excused.

16          THE WITNESS:  Oh good.  Thank you.

17          (Whereupon the witness was excused.)

18          THE COURT:  Why don't we break for lunch.  Give

19   me some sense of how long the next two witnesses are going

20   to take.

21          MR. HAQ:  One moment, Your Honor?

22          (Pause)

23          MR. HAQ:  Your Honor, we're done.  We're not

24   calling any more witnesses.

25          THE COURT:  Very good.  Give me some sense from

1    the defense point of view how long the next two witnesses

2    are going to take?

3              (Pause)

4              MR. LUSTIGMAN:  An hour.

5              THE COURT:  Okay.  That gives us time for lunch

6    then.  That's a good thing.  Why don't we come back at

7    about 1:45.  Do you need suggestions for lunch places?

8              MS. EICHEN:  Yes, Your Honor.

9              THE COURT:  All right.  If you go out the front

10   of the courthouse to the right, the next building over is

11   Lulu's, is a nice little sandwich shop.  It has nice

12   paninis and wraps.  That would be my clerk's highest

13   recommendation for a sandwich shop.  If you go diagonally

14   across State and Lafayette there's a tall office building

15   called 1000 Lafayette, there's a place called the Grand

16   Deli, has a wide selection of sandwiches and other foods.

17   If you walk down State Street toward downtown Bridgeport,

18   you find sit-down restaurants.  A place called Roberto's

19   which is Italian, very nice.  Take a right on Main and

20   you'll hit Ralph and Rich's, which many people think is

21   the best restaurant in Bridgeport.  Take a left, you've

22   got McDonald's and so forth.  Good luck.  Have a nice

23   lunch.  See you back here at 145.

24              (Whereupon the luncheon recess was taken at 12:35

25   o'clock, p. m.)