```
 1              A F T E R N O O N      S E S S I O N.

 2                   (1:55 O'CLOCK, P. M.)

 3              THE COURT:  I apologize for the delay.  And let

 4     me apologize in advance, I'm going to have to take a very

 5     brief break in a few minutes.  It's a long story but

 6     someone is traveling from out of state to see me briefly,

 7     so once I get word that's happening we'll take a short

 8     recess.  Okay?

 9              So, Mr. Lustigman.

10              MR. LUSTIGMAN:  Albert Kutzin.

11              THE COURT:  Okay.

12     A L B E R T      K U T Z I N,      called as a witness on

13     behalf of the Defendants, having been duly sworn by the

14     Clerk, testified as follows:

15              THE COURT:  Please be seated.  Thank you.  Could

16     you state your name and spell it for the record, please?

17              THE WITNESS:  It's Albert Kutzin.  K-U-T-Z-I-N.

18              THE COURT:  Very good, thank you.

19     DIRECT EXAMINATION

20     BY MR. LUSTIGMAN:

21     Q.   Mr. Kutzin, would you state your business address?

22     A.   My address is 150 Broad Hollow Road, Melville, New

23     York, 11749.

24     Q.   What is your occupation or profession?

25     A.   I'm an accountant.
```

1    Q.   Are you a certified public accountant?

2    A.   Yes, I am.

3    Q.   And have you been the accountant for Bronson

4    Partners?

5    A.   Yes.

6    Q.   And have you been the accountant from its inception?

7    A.   Yes, I have.

8    Q.   And have you been the accountant for H&H?

9    A.   Yes.

10   Q.   And have you been the accountant since its inception?

11   A.   Yes.

12   Q.   And do -- are you also the personal accountant of

13   Mr. and Mrs. Howard?

14   A.   That's true, yes.

15   Q.   Okay.  And are you related to Mr. and Mrs. Howard in

16   any way?

17   A.   Yes.

18   Q.   And what is the relationship?

19   A.   Mr. Howard is my cousin.

20   Q.   Now, Mr. Kutzin, were you involved in any way in the

21   formation of H&H?

22   A.   No, not in the formation.

23   Q.   Were you involved in any way in the decision to form

24   H&H?

25   A.   Yeah, I guess so, yes, yes.

1    Q.    And what was that involvement?

2    A.    Well, this is before there was a Bronson.  Mr. Howard

3    and Mrs. Howard were in business and I suggested that they

4    set up an LLC as a, you know, a legal protection and so

5    on, so their personal assets shouldn't be touched, and

6    that was about the size of it.  They were then and still

7    are, as far as I know, Texas residents.

8    Q.    I'm sorry, I'm having a little trouble hearing you.

9    Would you mind speaking into the microphone?

10              THE COURT:  You can pull that down, sir, if it's

11   easier.

12   BY THE WITNESS:

13   A.    At the time the business was organized in Texas, a

14   Texas limited liability company.

15   Q.    H&H was a Texas limited liability company?

16   A.    That is correct.

17   Q.    I'm sorry, go ahead.

18   A.    And, well, I mean I didn't issue the paperwork or

19   anything like that.  They went to a firm for that.  And

20   from that time on they started doing business.  They had

21   different sorts of business but, as well, I had them do

22   their personal, some of their personal items pass through

23   the H&H checkbook, and the reason for that was, as I do

24   with other accounts, where it's a situation like this

25   where the two principals are husband and wife and

1     essentially one tax entity personally, I find it better if

2     I have the information during the year than having to wait

3     until the end of the year and tell them to get me all this

4     stuff together for their income tax.  So they know that

5     any tax sort of items that they would pay, for instance,

6     if they had medical expense or charities, I'd ask them to

7     pay it through their company.  Since I was reporting all

8     the records for the company, I knew that come April 15th

9     I'd have everything there and I wouldn't have to, you

10    know, dig any further.

11    Q.   And how much years before Bronson was formed was H&H

12    form?

13    A.   About two and-a-half years.

14    Q.   And was H&H to your knowledge doing any business

15    beside -- before, before Bronson was formed, was H&H doing

16    any business activities?

17    A.   Before and since, yes.  They had different ventures.

18    They entered into another company, completely unrelated

19    companies in which they shared the income with these

20    companies.

21    Q.   Are you familiar with the deposits that have been

22    made into the H&H bank accounts for the years 2003 and

23    2004?

24    A.   Yes, I naturally reviewed them.

25    Q.   And are you familiar with the total amount of the

1   deposits that were made in the years 2003 and 2004?

2   A.   I think it was a million three or four.  I don't have

3   the exact number in front of me but I believe that's what

4   it was.

5   Q.   And do you know how much of those funds came from

6   Bronson Partners?

7   A.   Yes.  It was 600, again, 600 some-odd thousand, of

8   which 200,000 was repayment of a loan that H&H had made to

9   Bronson in 2002.

10  Q.   Now, Mr. Kutzin, during the course of this

11  litigation, you were aware, were you not, of Bronson's

12  responsibility to answer certain interrogatories?

13  A.   Yes.  I was contacted from time to time and requested

14  via email to furnish Mrs. Howard with some figures to

15  complete questionnaires that she had to prepare.

16  Q.   Okay.  Would you look at, in that Volume Two, a

17  document that's called Volume Two?

18  A.   Volume -- right.

19  Q.   And look towards the back, you'll see Exhibit Number

20  2.

21  A.   Yes.

22  Q.   And on the top of the page, you'll see a fax number

23  sheet, the top, upper right hand corner?

24  A.   Yes, 233 --

25  Q.   Yes, would you turn to page 213, please?

1    A.    Okay.

2    Q.    Now, Mr. Kutzin, you mention that there was a loan of

3    monies from H&H to Bronson in 2002, is that correct?

4    A.    That is correct.

5    Q.    What was the total amount of the loan?

6    A.    300,000.

7    Q.    Okay.  And how much of that loan was repaid in 2003?

8    A.    200,000.

9    Q.    200,000.  Okay.

10         Now, I direct your attention in the interrogatory

11   answers to Question Number 23.  You see that?  It says

12   State the total amount of money that Bronson transferred

13   to Martin Howard in January 1, 2003, to December 31, 2005.

14   And whether the transfer was net of taxes, et cetera?

15   A.    Yes, I do that.

16   Q.    You see that and you see the response right below

17   that?

18   A.    Yes.

19   Q.    And would you tell how much, if you add those numbers

20   up, 417 -- 417,454, and the 370,486 in 2004, if you add

21   those up, what do they come to?

22   A.    Those two numbers are 787,940.

23   Q.    787,000.  Now, is that inconsistent with the deposits

24   that Bronson gave in the name H&H of 675,000?

25   A.    No, no.

1    Q.    Would you explain why -- and did you help prepare

2    this answer, by the way?

3    A.    Well, I answered the questions, as I indicated

4    before.  You know, I came up with -- I checked my records

5    and came up with those numbers, yes.

6    Q.    So you're the one who supplied those numbers?

7    A.    Yes.

8    Q.    So, why did you say that Bronson transferred to

9    Martin Howard $787,940 --

10    A.    Excuse me, Bronson transferred to H&H.

11    Q.    H&H, right.  Bronson transferred to H&H $787,940,

12    where the deposits shown from Bronson's H&H were only

13    $675,293?

14    A.    Right.

15    Q.    What's the difference?

16    A.    The difference was, as I indicated before, the year

17    before there was $300,000 of loans made from Bronson to

18    H&H -- I'm sorry, from H&H to Bronson.  Bronson was only

19    able to repay 200,000 of it.  The other 100,000 was an

20    accounting entry whereby I showed that the Howards took

21    another 100,000 from H&H and deposited it -- not deposited

22    but an accounting entry into the Bronson books as a

23    capital investment.  So that the net result of the two,

24    there was no difference of income for the year but just to

25    wipe out the loan which was really from, from their other

1    company, from one company to the other.  So that extra

2    100,000 was shown as additional drawings for the

3    Bronsons -- for the Bronsons -- for the Howards, from H&H

4    but you don't see that they put 100,000 into Bronson which

5    is really just a bookkeeping entry on both companies.

6    That's the difference between 600,000 and the 700,000.

7    Q.   Okay.  Now, are you aware of the source of the

8    deposits in H&H that were made from sources other than

9    from Bronson?

10   A.   Yes.

11   Q.   Okay.  Could you tell us what those deposits were

12   from?

13   A.   Well --

14   Q.   The million four?

15   A.   Specifically I can remember some of the big ones.  I

16   know because I just reviewed them.  There was a transfer

17   from their brokerage account of some 383 or $363,000 from

18   a brokerage account into the H&H checking account.  The

19   reason for that was they were going to pay off a mortgage

20   that they had and so they put the money into the

21   Bronson -- into the H&H checking account, I'm sorry, and

22   wrote a check to pay off the mortgage.

23        There was also a $70,000 income tax refund from the

24   year 2002 which was deposited into the H&H checking

25   account.

1      They also had business, regular commercial business

2   with other customers other than Bronson, with a company

3   called Professional Formulation with which they had

4   entered into a joint venture.  There was another one

5   called Nextium (ph).  There a few other people like that

6   where they were getting monthly checks.

7      And then, besides all of those, the Howards had a

8   rental apartment out in Idaho where the rent checks each

9   month came in and were deposited into this account.

10      And, again, I just want to mention it was very

11   helpful to me when I had to prepare their income tax

12   return to have all this information in one place other

13   than the H&H business itself.  But personal items, what

14   went into the account, because they had a record each

15   month of the checks, the deposits, and so I could tell at

16   the end of the year how much rent had come in, what rental

17   expenses they had, what dividend they had and so on, so

18   forth, and medical expenses, because it was all there for

19   me.

20           MR. LUSTIGMAN:  May I mark a document, Judge?

21           THE COURT:  Sure.

22           (Pause)

23           THE COURT:  Exhibit X?

24           MR. LUSTIGMAN:  X, thank you.

25

```
 1    BY MR. LUSTIGMAN:

 2    Q.   Mr. Kutzin, I show you what's been marked as

 3    Defendant's Exhibit X for identification.  Tell me what

 4    that is, sir.

 5    A.   This is a schedule of deposits to H&H for 2003 and

 6    2004.

 7    Q.   And was this something that you had prepared?

 8    A.   I didn't do the typing -- oh maybe I did.  No, I just

 9    furnished them with the information and they prepared this

10    form, yes.

11    Q.   And was that based on your records?

12    A.   That is correct.

13              MR. LUSTIGMAN:  I move it in evidence.

14              THE WITNESS:  I'm sorry?

15              THE COURT:  Is this a spare copy?

16              MR. LUSTIGMAN:  Oh, yes.

17              (Hands Court.)

18              MR. HAQ:  Your Honor, we object to this

19    document.

20              MR. LUSTIGMAN:  FTC has seen this before, by the

21    way.

22              MR. HAQ:  I'm sorry, I thought I heard you say

23    you moved for its admission.

24              THE COURT:  Yes.

25              MR. LUSTIGMAN:  I said you've seen it before.
```

1      MR. HAQ:  This is different from the one we've

2   seen before.

3      MR. LUSTIGMAN:  I don't think so.

4      THE COURT:  Well, whatever.  What's the

5   objection?

6      MR. HAQ:  Nevertheless, Your Honor, we've not

7   seen the background information underlying this document.

8   And this purports to be a summary of particular records.

9   As far as we knew, we've seen checks from the bank

10  accounts and the bank statements but in terms of what

11  those monies were for, we have no idea.  Because if not,

12  we don't have any confirmation as to what the items listed

13  on the left hand side of the chart are.

14     THE COURT:  I'm sorry.  When you say the left

15  hand side of the chart --

16     MR. HAQ:  The source, where it says source.

17     THE COURT:  Okay.

18     MR. HAQ:  And then the same thing under schedule

19  H&H deposits, those items as well.  I mean in terms of

20  bank records that we received, we received the statements

21  and the check going out but not information regarding what

22  was coming in.

23     THE COURT:  Want to respond?

24     MR. HAQ:  Well, the witness is here who kept the

25  books.

1          THE WITNESS:  Can I say this was a

2   contemporaneous record.  I didn't just make these up.  I

3   wrote these down know during the time it happened.  Each

4   month I would get the bank statement and a list of deposit

5   slips and from the deposit slips I would add them.  Once

6   the deposit slip was on the bank statement, you know, it

7   had been accepted by the bank, there was no need to keep

8   the slip itself any longer so long as it was there.

9          But I had the record.  I have, for instance, one

10  of those deposits slips for $76,543.  It's an income tax

11  refund.  I have the income tax form that shows the exact

12  amount.  I don't have the brokerage statement now but I'm

13  sure if we found the AGN you would see they made a

14  withdrawal of that amount.  They sold some property.

15  There must be closing statements somewhere that show the

16  net check.

17         But as far as the others, for instance,

18  Professional Formulation, I have a list, for each one

19  there's a check coming in from them.  It was made up, not

20  now, it was made in 2003.  That's when I recorded these

21  things.  That's where these numbers came from.  They were

22  not reconstructed is what I'm trying to say.

23         MR. HAQ:  We have not had an opportunity to

24  inspect those records, Your Honor.

25         MR. LUSTIGMAN:  They have the bank records,

1    Judge, every bank deposit and check.

2              MR. HAQ:  The bank deposits don't show the

3    source of the deposits necessarily.

4              THE COURT:  Well, I'm going to go ahead and

5    admit Exhibit X.  I think the witness can testify about

6    what's here.  The concern seems to go to weight, not to

7    admissibility.

8              MR. HAQ:  Thank you, Your Honor.

9              (Whereupon Defendant's Exhibit X was marked

10        full.)

11   BY MR. LUSTIGMAN:

12   Q.   Mr. Kutzin, looking at Exhibit X, does this refresh

13   your recollection as to any other sources of deposits --

14             THE COURT:  Well, you don't have to do that now.

15   It's in evidence, so I can read it.

16             MR. LUSTIGMAN:  All right.

17   BY MR. LUSTIGMAN:

18   Q.   Mr. Kutzin, did Bronson pay consulting fees to any

19   entity other than H&H marketing?

20   A.   Yes.  There was, not as much but there were some

21   others.  There was an outfit called Rabbit Hole that did

22   some designing of artwork, and I don't recall the other

23   names but there were other payments other than to H&H.

24   Q.   Now, Mr. Kutzin, did Sandra Howard pay social

25   security taxes on the income that she received from H&H

Marketing?

A.   She did pay social security tax on 50 percent of the earned income of H&H and 50 percent of the earned income of Bronson.

THE COURT:  You say she did or did not?

THE WITNESS:  Did.

BY MR. LUSTIGMAN:

Q.   What is the significance of paying social security taxes?

A.   Well, you don't pay it on unearned income.  You only pay it on earned income that you work for; whether it's a salary if you're working for someone or if you're self employed, as they were, on the net business profits, you paid social security tax, which in their case was a very substantial amount, and for each unit.

Q.   Mr. Kutzin, have you been able to calculate the percentage of revenues that H&H received that were attributable to the sales of the Chinese Diet Tea and the patch?

A.   Well, I tried to make an estimate.  For the two years involved, the total H&H deposits were 1,421,000-some odd.  Of that amount, 675,000 came from Bronson.

THE COURT:  Sir, let me just interrupt you because you can't really testify from your notes.

THE WITNESS:  I'm sorry, okay.

```
1              THE COURT:  If you happen to recall that
2    information, that's fine.  If you don't, then he can
3    refresh your recollection.
4              THE WITNESS:  Okay, I will try to round out the
5    numbers then.
6    BY MR. LUSTIGMAN:
7    Q.   Well, do you have a recollection of this information?
8    A.   Yes, yes.  Okay.  I said it was a million four.
9    Total deposits, there were 675 were from Bronson.  Of that
10   675, 200,000 was a loan repayment.  The other 475, if we
11   use the percentages that I've seen in here of
12   25.25 percent, would represent the money using what I've
13   seen that came from this green tea operation.
14             Now, if you took 25 percent of the 400,000, that's
15   roughly 100,000.  And of the million four, only hundred
16   and whatever, I don't have the exact numbers,
17   hundred-some-odd-thousand of the 1,400,000 that was
18   deposited could be said to be attributable to receipts
19   from the green tea.  And it came to about 8 percent.
20   Q.   Do you remember the precise numbers?
21   A.   Well, it was --
22   Q.   If you don't, that's fine.
23   A.   I don't recall the exact number.
24   Q.   Would you have any notes that would refresh your
25   recollection?
```

1    A.   Yes.

2    Q.   As to the precise numbers that --

3    A.   Yes.

4    Q.   -- calculated?

5    A.   Yes.

6              MR. LUSTIGMAN:  Judge, may I refer to those

7    notes?

8              THE COURT:  Let me just be clear what we're

9    talking about.  What you're testifying is that

10   approximately 8 percent of H&H's income came from green

11   tea?

12             THE WITNESS:  Of the monies that were deposited

13   to H&H from Bronson, approximately 8 percent --

14             THE COURT:  Eight percent of what Bronson

15   deposited in H&H?

16             THE WITNESS:  Correct.

17             THE COURT:  Okay.  So what's the question

18   pending?

19             MR. LUSTIGMAN:  If he could look at his notes

20   for a more exact number.  He's saying approximately

21   8 percent.

22   BY MR. LUSTIGMAN:

23   Q.   Had you calculated this more precisely?

24   A.   Yes.

25             THE COURT:  Well, look at your notes, read them,

1    put them away.  And if your recollection is refreshed, you

2    can testify.

3    BY THE WITNESS:

4    A.   (Pause)

5         Came to 8.44 percent and was $79,000.

6    Q.   Mr. Kutzin, you prepared the tax returns for Mr. and

7    Mrs. Howard, did you not?

8    A.   Yes, I did.

9    Q.   And the tax returns for the years 2003 and 2004 cover

10   income that they earned from Bronson as well as other

11   income, did it not?

12   A.   Bronson, H&H and outside income as well, yes.

13   Q.   Now, were you able to calculate the taxes that would

14   have been paid had it only been the income that they

15   earned from H&H and Bronson?

16   A.   Yes, I did.

17   Q.   And do you have that number?

18   A.   Again, it's in here.  But to the best of my

19   recollection, the taxes would have been something like

20   $80,000 less, I think.  I'm not sure.

21   Q.   Would you be able to refresh your recollection by

22   looking at your notes?

23   A.   Yes, yes.

24   Q.   If you would just --

25   A.   (Pause)

1           I'm sorry.  It was $44,000 less.

2    Q.   Well, what would the total taxes have been for the

3    years 2003 and 2004 had it only been based on income

4    earned from H&H and Bronson?

5    A.   It would have been about 109,000 in income between

6    the two years, if it was only for those two companies.

7    Q.   That would have been federal taxes?

8    A.   And state taxes.

9    Q.   Now, Mr. Kutzin, H&H filed separate tax returns from

10   the Howards and from Bronson, correct?

11   A.   That is correct.

12   Q.   And it also filed annual license reports with the

13   State of Texas?

14   A.   That is correct.

15   Q.   And it had separate bank accounts?

16   A.   Yes.

17           MR. LUSTIGMAN:  Thank you, Mr. Kutzin.

18           THE COURT:  Cross?

19           MR. HAQ:  One moment, Your Honor?

20           (Pause)

21           MR. HAQ:  Your Honor, would it be permissible

22   for us to inspect Mr. Kutzin's notes since he's been

23   referring to them to refresh his recollection throughout

24   the testimony?

25           THE COURT:  Any problem with that?

```
1              MR. LUSTIGMAN:  Until the witness has a problem,
2    I don't.
3              THE WITNESS:  What was the question?  I couldn't
4    hear.
5              THE COURT:  He wants to look at your notes.  Any
6    problem?
7              THE WITNESS:  Oh, yes, sure.
8              MR. LUSTIGMAN:  You want to look at all his
9    notes or whatever he was referring to?
10             MR. HAQ:  Whatever he was referring to during
11   his testimony.
12             MR. LUSTIGMAN:  Okay.
13             THE WITNESS:  This is the list of deposits.
14   2003, the name, whether it's income, whether it's other
15   than this is the derived income.  This is the total at the
16   bottom.
17             MR. HAQ:  Okay, may I take these with me?
18             THE WITNESS:  Sure.
19             (Hands Counsel)
20   CROSS EXAMINATION
21   BY MR. HAQ:
22   Q.   Mr. Kutzin, is this what you were looking at to
23   refresh your recollection during your testimony?
24   A.   Not during the testimony but prior to the testimony.
25   Q.   What did you look at during your testimony?
```

1    A.   I just looked at my calculation of that additional,

2    you know, this -- you can look at that.  Where I came up

3    with the $79,000, and what the income tax for the Howards

4    would have been had they not had, had it only been based

5    on Bronson and H&H and nothing else.  This was actually

6    paid.  Would have been just --

7    Q.   And this you prepared for purposes of your testimony

8    today?

9    A.   I was asked to prepare it.  Yeah, I guess so.

10   Q.   But you didn't prepare this as part of your ordinary

11   activities?

12   A.   No, no, this was just prepared recently.

13            MR. HAQ:  Your Honor, if I may have a moment

14   with these?

15            THE COURT:  Sure.

16            (Pause)

17   BY MR. HAQ:

18   Q.   Thank you, Mr. Kutzin.

19        (Hands witness.)

20        Now, you had testified that Mr. and Mrs. Howard had

21   been in business and you suggested they set up an LLC as

22   legal protection to protect their personal assets,

23   correct?

24   A.   Well, yeah, an LLC, that's right.

25   Q.   And the reason for doing that was so that they would

```
 1    have a source to pay personal expenses without having
 2    third parties be able to reach them, is that --
 3    A.    That's not the reason.  No, no, no.  The reason that
 4    I wanted them to have all their personal items that refer
 5    to their income tax paid through this company was for my
 6    own convenience so I would have all of the fees together.
 7         I don't know anything about legal protection or
 8    anything like that.  I know that many of my clients now
 9    operate as LLCs for the reason, you know, so any liability
10    question relating to business, that they would have some
11    -- their personal assets would be protected.  I think it's
12    a great idea and that's why I suggested it.  Not so they
13    could pay their personal expenses from it or that their
14    personal items would be protected.  Again, the personal
15    items was for my convenience so I'd have all the records.
16    Q.    So, but H&H did contain their own personal assets?
17    A.    No, those assets were all in H&H's names.  If they
18    received rent income, for instance, from their Idaho
19    condo, the condominium, it's true, was their own personal
20    asset and the money for the rent went into the H&H bank
21    accounts so from that point of view you might say it's
22    their personal money.  And it is their personal money.
23    They owned it.  They were sole proprietors.  It's their
24    account.  All of the assets of H&H and Bronson and other
25    things were theirs to do with as they want.
```

1   Q.   Thank you.  And you spoke a little bit about this

2   loan of $300,000 that was made between Bronson --

3   A.   Yes.

4   Q.   -- and H&H?  But you said that part of it was really

5   just an accounting entry?

6   A.   Correct.

7   Q.   The passage of money between Bronson and H&H was

8   really more a matter of accounting than it was money going

9   back and forth, correct?

10  A.   $300,000 went from H&H to Bronson.  $200,000 went

11  from Bronson to H&H.  There was no need, there was no

12  reason to keep that on the books of both companies since

13  it was not going to be repaid.  So, how -- they weren't

14  going to pay it.  They owe themselves money.  Okay.

15  Q.   So basically what you've just testified to was that

16  the money that was in Bronson and then was in H&H belonged

17  to Martin and Sandra Howard?

18  A.   Everything -- they were 50 percent owners of the

19  company.  Everything the company owned was theirs.

20  Q.   So the $200,000 that went from -- I'm sorry.  The

21  $300,000 that went from H&H to Bronson was still Martin

22  Howard and Sandra Howard's money?

23  A.   No.

24  Q.   It was not?

25  A.   No.

1    Q.    But --

2    A.    It was a repayment of a loan.  Well, by the same

3    token, the year before, when Bronson -- when H&H loaned

4    the money to Bronson, that wasn't income to Bronson and it

5    wasn't an expense of H&H.  And when it was repaid it was

6    neither.  It was just a repayment of a loan.

7    Q.    I would turn to the tax return for 2003 for H&H,

8    which is at Exhibit --

9    A.    May I refer Your Honor --

10   Q.    -- Exhibit P?

11              THE COURT:  He's going to refer you to exhibits

12   in the book.

13   BY MR. HAQ:

14   Q.    In the book in front of you, if you turn to Exhibit

15   P?

16   A.    This is Volume Two or One?

17   Q.    Volume Two, please.

18   A.    Turn to what page?

19   Q.    If you just give me a moment --

20              THE COURT:  Exhibit P?

21              MR. HAQ:  Exhibit P, I'm sorry.

22              THE COURT:  P as in Peter.  I'm sorry.

23              THE WITNESS:  Okay.

24   BY MR. HAQ:

25   Q.    On the schedule about 13 pages in, the Form 1065

1    schedules.

2    A.    Yes.

3    Q.    Under Other Current Assets list a loan receivable for

4    the, at the beginning of the tax year?

5    A.    Right.

6    Q.    Of only $100,000?

7    A.    That is correct.

8              MR. LUSTIGMAN:  Could you slow down a second?

9    Please let me find it.

10             MR. HAQ:  Sure.

11             (Pause)

12             THE COURT:  All set?  Go ahead.

13   BY MR. HAQ:

14   Q.    So that's only $100,000 that's listed here as loan

15   receivable?

16   A.    Right.

17   Q.    And if we go to the tax return of Bronson, for that

18   same year, which is Exhibit S?  If you go to the analysis

19   of net income which is about four pages in?

20   A.    Uh huh.  (Affirmative.)

21   Q.    Line 16, that only lists $100,000 in mortgage notes

22   bond?

23   A.    That's the same 100,000.

24             THE COURT:  Is the 100,000 listed under Schedule

25   M 2, line two, where it says capital contributed cash,

1    that's the 100,000 that you say was written off?

2          THE WITNESS:  I'm sorry, Your Honor, I don't see

3    what line you're referring to.

4          THE COURT:  Page four, the bottom, Schedule M 2.

5          THE WITNESS:  Yes.

6          THE COURT:  Line 2-A, cash 100,000, is that the

7    100,000 you're saying was written off that year?

8          THE WITNESS:  No, actually that 100,000 was

9    written off, is in line 6-A in the distributions.

10         THE COURT:  Okay.

11         THE DEFENDANT:  And on the Bronson return, where

12   it says capital contributed cash, line two, that's

13   $100,000.

14         THE COURT:  That's what I'm saying.

15         THE WITNESS:  Oh, I thought you were talking

16   about the H&H return.  I'm sorry.

17         THE COURT:  No, in the Bronson.

18         THE WITNESS:  The Bronson, yes, that 100,000 was

19   the write-off of that liability, correct.

20         THE COURT:  Okay.  And where's the third

21   100,000?

22         THE WITNESS:  This is the same 100,000.  Okay.

23         THE COURT:  There's 100,000 listed at the

24   beginning, on line 16.

25         THE WITNESS:  Correct.

```
 1                  THE COURT:  There's the 100,000 on Schedule M 2,
 2      line 2 A.
 3                  THE WITNESS:  Right.
 4                  THE COURT:  You testified about 300,000.
 5                  THE WITNESS:  Right.  I'll explain what
 6      happened, and this is my fault.  In the year 2002, Bronson
 7      was not doing well.  H&H loaned $300,000 to Bronson.  I
 8      mistakenly thought that that was a refund of money that
 9      Bronson had given H&H.  So I reduced the H&H -- I'm sorry,
10      reduced the Bronson expenses by the 200,000.
11                  The next year when I realized I'd made an error,
12      I reversed it.  I showed it as though it were income on,
13      you know, in other words, I undid the mistake I did the
14      previous year.  So the $200,000 should have been shown in
15      2002 together with this hundred as a loan from H&H to
16      Bronson.  I'm sorry, accounting talk gets confusing.
17                  But instead I didn't show it that way.  I
18      showed, as I said, the 200,000 of the amount, not knowing
19      it was, what it was for, I thought that it was just a
20      return of the money that Bronson had paid H&H so I reduced
21      Bronson's expenses by that 200 -- I reduced H&H's income
22      by the 200,000.
23                  The next year when I saw that it was actually
24      200,000 was being paid back, I showed it the other way.
25      But that's -- I still left hundred that was never paid
```

```
1    back and that was written off, as we just said.
2    BY MR. HAQ:
3    Q.   There was no formal loan agreement for the $300,000?
4    A.   No.
5    Q.   There was no note?
6    A.   No.
7    Q.   Promissory note?
8    A.   No.
9    Q.   In terms of the consulting fees you said were paid to
10   other entities, was there any sort of contract or other
11   agreement evidencing the payment of consulting fees?
12   A.   Not to my knowledge.
13   Q.   Okay.  Was there any sort of formal agreement, formal
14   arrangement for the payment of consulting fees to other
15   third parties?
16   A.   Not to my knowledge.  I just saw the deposits as they
17   came in.
18   Q.   Okay.
19              THE COURT:  Mr. Haq, can you give me some sense
20   how much longer you have with this witness?
21              MR. HAQ:  I won't be too much longer.  Do you
22   need to take a break now?
23              THE COURT:  I think I probably do.
24              MR. HAQ:  I don't think I need more than 10 or
25   15.  I'd like a chance to confer with my colleague so if
```

1    you want to take a break, I can do that now.

2              THE COURT:  We'll take a break, probably 15 or

3    20 minutes, and we'll come back.  All right, stand in

4    recess.

5              (Whereupon a recess was taken from 2:35 o'clock,

6         p. m. to 3:00 o'clock, p. m.)

7              MR. HAQ:  Your Honor, I don't think there's any

8    point to having the witness come back to the stand unless

9    the defendants are going to ask redirect.  We're done.

10             THE COURT:  Okay.  Any redirect?

11             MR. LUSTIGMAN:  Yes.

12             THE COURT:  All right.  Redirect.  Sir, could

13   you resume the stand?.

14             MR. LUSTIGMAN:  Just very briefly, Judge.

15             THE COURT:  Okay.

16   RECROSS EXAMINATION

17   BY MR. LUSTIGMAN:

18   Q.   Mr. Kutzin, was Sandra Howard considered an employee

19   of H&H Marketing?

20   A.   Not an employee, she was a partner.

21   Q.   Did the monies that she received from H&H, were they

22   considered to be salary?

23   A.   They were withdrawings, withdrawings of cash.  Again,

24   I'd like to refer to the tax situation.  In an entity like

25   both of these, we're talking about Bronson and H&H, it

```
1     doesn't matter whether they take money out or don't take
2     money out.  They pay tax on what the entities earn.  And
3     they can take out more than is earned, too.  For instance,
4     at the end of 2002, H&H had about, about $130,000 in the
5     bank.  At the end of 2004, there was only $11,000 in the
6     bank.  That had nothing to do with how much money they
7     made during those two years.  It was a reduction.
8     Remember, they withdrew, you might say, hundreds some-odd
9     thousand dollars over and above what was made.
10         The earnings of a partner can't be considered a
11    salary.  You earn what the company earns and they get
12    their distributors portion of it.  What they take out of
13    the company is up to them.  It's not necessarily directly
14    related to how much is earned.
15    Q.   Okay.  So they didn't get a W-2?
16    A.   No, no, a K-1 it's called, which shows her share of
17    the income from the entity.
18    Q.   And so the $4,000 a month that she took from H&H, how
19    was that characterized?
20    A.   As drawings, drawings of cash.  It had no effect on
21    income or anything like that.
22    Q.   It was not earnings?
23    A.   No.
24              MR. LUSTIGMAN:  Thank you, Mr. Kutzin.
25              THE COURT:  All right.  Anything further?
```

 1          MR. HAQ:  Not for this witness, Your Honor.

 2          THE COURT:  Sir, you're excused.  Thank you.

 3          (Witness excused.)

 4          THE COURT:  Does the defense have further

 5    witnesses?

 6          MR. LUSTIGMAN:  No, Your Honor, we do not.

 7          MR. SHAFFER:  Your Honor, just one housekeeping

 8    matter.  I do have, I noticed on the break that I do have

 9    Defendant's Exhibit W here in my possession.  Perhaps we'd

10    just like to --

11          THE COURT:  That's fine.

12          MR. SHAFFER:  I have the court copy, for

13    whatever it's worth, to have it in the record.

14          THE COURT:  Yes, good idea.

15          MR. SHAFFER:  And I think the court has the only

16    copy of Exhibit H, which was admitted into evidence.

17    Excuse me, Exhibit X.  So --

18          THE COURT:  Well, I have a photocopy.  There is

19    the original.  All right, we can get copies for counsel.

20          MR. HAQ:  We have made a copy, Your Honor.

21          THE COURT:  Very good.

22          MR. HAQ:  It's this one, right?

23          THE COURT:  All right.

24          MR. HAQ:  Your Honor, at this point, if I may,

25    I'd like to make a motion to amend the complaint to

1    conform to the evidence to name H&H Marketing as a full

2    defendant on the grounds that it is either an alter ego or

3    it is engaged in common enterprise with Bronson Partners

4    and Martin Howard.

5              I think the evidence that we've heard today at

6    trial clearly demonstrates that there is no real corporate

7    formality between the companies.  I think Mr. Kutzin's

8    testimony was pretty clear that it really doesn't matter

9    what money comes in and out of any of those entities.  It

10   really just matters what the taxes ultimately are paid by

11   the individual partners.

12             There were -- you asked Ms. Howard if there were

13   ever any membership meetings of H&H and she testified that

14   there really weren't formal membership meetings.  The

15   personal funds that were put into the H&H account and were

16   used to pay personal expenses, for all intents and

17   purposes, the H&H account was Martin and Sandra Howard's

18   personal bank account.

19             And -- I'm sorry -- and the corporation was

20   pretty much located wherever Martin or Sandra Howard

21   happened to be.

22             So I think it's pretty clear that H&H is not

23   really a separate entity onto itself, that it is an alter

24   ego of Martin Howard or that it is engaged in a common

25   enterprise with Martin and Sandra Howard.  Or -- I'm

1    sorry, with Martin Howard and to the extent that Martin

2    Howard has already been found liable for the deceptive

3    advertising at issue in this case, under common enterprise

4    liability, H&H should also be fully liable for the

5    deceptive advertising.

6              We have cited to cases in our requested

7    findings, our requested rulings of law, which indicate

8    what the legal standards are.  If you'd like, I can pull

9    them out and read them off to you, but --

10             THE COURT:  I don't think that's necessary.  I'm

11   not going to rule on that motion at this time.  I'll take

12   it under advisement and make it part of the decision in

13   this case.

14             I take it what you're trying to accomplish is to

15   make H&H liable jointly and severally for the full amount

16   of damages rather than only the amounts found to have been

17   received by H&H.

18             MR. HAQ:  Yes, Your Honor, that is correct.

19             THE COURT:  All right.  Any opposition to the

20   motion?

21             MR. SHAFFER:  I would like to just put my

22   opposition on the record.  I understand that Your Honor's

23   not going to rule on it right now.  First of all, I think

24   this argument is not properly, has not been properly

25   brought before the court.  This should have been raised at

1    the closest, included in the summary judgment motion.  It

2    was not.  So to the extent that, you know, we're here

3    following summary judgment, this is not the proper form

4    for it.

5         But aside from that, even accepting that this

6    argument is properly before the court, which I don't

7    agree, I would dispute Mr. Haq's interpretation of the

8    evidence.  The evidence that we introduced here today

9    shows that, the only evidence shows that H&H and Bronson

10   had different creation dates, that H&H was created earlier

11   than Bronson, that the corporations consistently filed

12   different tax returns.  The corporations consistently

13   maintained separate bank accounts.  And when one company

14   loaned money to the other company -- excuse me.  They are

15   LLCs, they are not corporations.  I apologize for not

16   stating that.

17        But in addition to the different formation and

18   the tax returns, you see that bank accounts, and when a

19   loan was made, it was paid from the other company.  So I

20   think, you know, to the extent that you're going to

21   consider this argument at all, the evidence clearly shows

22   they have not met the standard to disregard corporate

23   structure.

24             THE COURT:  Okay.

25             MR. HAQ:  And, your Honor, and if I may be heard

```
 1    on the procedural argument, I move the FTC allows for
 2    amendment of a pleading we could not have addressed, first
 3    of all.  And, secondly, it allows for amendment of the
 4    pleadings of an issue that's been tried by consent.  In
 5    this case the case was tried by consent where evidence was
 6    put in with no objection on the alter ego defense -- I'm
 7    sorry, alter ego argument and common enterprise argument
 8    by the FTC, so it is properly before the court at this
 9    time.
10            MR. SHAFFER:  There is no consent.
11            THE COURT:  I understand.  Okay.
12            What I'd like to do, assuming everyone is ready,
13    willing and able, is hear short argument from you.  It
14    seems to me the real guts of this case involve legal
15    questions more than factual issues, and I'd like to have
16    some argument.  So, is everybody ready to do that?
17            MS. EICHEN:  Yes, Your Honor.
18            THE COURT:  Do you need a short break before we
19    start in?
20            MR. LUSTIGMAN:  No.
21            MS. EICHEN:  No, Your Honor.
22            THE COURT:  Okay.  Okay, Ms. Eichen.
23            MS. EICHEN:  Yes, Your Honor.
24            Your Honor, Chinese Diet Tea and the Bio-Slim
25    Patch were marketed and advertised solely as weight loss
```

```
 1   products.  Defendants attempted to mask them with magical

 2   weight loss properties without scientific or other factual

 3   support, leaving consumers with nothing but empty promises

 4   and tea bags on the one hand, and a worthless patch on the

 5   other.  Defendant Bronson Partners LLC should be held

 6   liable for $1.9 million, consumers' losses in purchasing

 7   these products.

 8         And defendant Martin Howard should also be held

 9   liable for $1.9 million.  Relief defendant H&H Marketing

10   should be held liable for $1.9 million as the alter ego of

11   Martin Howard and relief defendant Sandra Howard should be

12   held liable for $121,000 which is the portion of the money

13   she received from H&H that's attributable to the two

14   challenged products.

15         This is a restitutionary remedy designed to

16   reimburse the defrauded consumers for their losses.  It's

17   to return the consumers to their position prior to the

18   fraud.  Defendants have tried to introduce evidence that

19   they should be liable for a lesser amount and that the

20   relief defendant should be liable for a lesser amount or

21   no amount.  The law and the facts do not support their

22   contentions.

23         The court has already found Bronson and Martin

24   Howard liable for deceptively advertising Chinese Diet Tea

25   and the Bio-Slim Patch for weight loss.
```

```
 1              THE COURT:  Let me just jump in because I really
 2    want you to focus in on the standards set by FTC v. Verity
 3    International, and you've used already, I think twice, the
 4    phrase "losses to consumers."
 5              MS. EICHEN:  Yes, Your Honor.
 6              THE COURT:  The 2nd Circuit held that in Verity
 7    the district court measured the appropriate amount of
 8    restitution as, quote, "the full amount lost by
 9    consumers," unquote.  This was error.  Why should I award
10    the full amount lost by consumers in this case?
11              MS. EICHEN:  In Verity the Circuit Court of
12    Appeals focused on two separate time periods in which
13    different entities collected consumer funds.  During the
14    AT&T period, AT&T collected consumers' money, paid itself,
15    and then paid UK entity who then paid the defendants.
16              During the second time period, the spring
17    period, the defendants used another entity called eBillit
18    that physically sent out bills, collected payment and
19    handled complaints all on behalf of the defendants.  The
20    defendants then paid Sprint, the UK entity, and all of the
21    other in the chain from what it received from E-billing.
22              In this case, much like eBillit, the defendant's
23    fulfillment houses took consumers' orders for the
24    challenged product, collected consumers' money and
25    transferred that money to Bronson by sending it directly
```

1   Bronson's bank account.

2          THE COURT:  Right, but nothing about either the

3   AT&T period or the Sprint period suggests that the measure

4   of restitution is the amount lost.  What those, what the

5   distinction between those two periods suggests is that the

6   measure is arguably the amounts wrongly received by the

7   defendant.  Right?

8          In other words, during the AT&T period, the

9   court held, didn't it, that the amount of restitution was

10  the amount that the defendants received after each of the

11  deductions had been made by the middleman, if you will,

12  and then during the Sprint period, the amount received was

13  the amount received from eBillit.

14         MS. EICHEN:  Well, Your Honor, Verity held, and

15  I have it somewhere here, that in a direct seller case

16  where the money went directly into Bronson's bank accounts

17  from the consumer sales, the amount that consumers lost

18  and the amounts that defendants received were one and the

19  same.

20         THE COURT:  Right, but don't you get yourself in

21  trouble when you advocate for the consumers loss standard

22  when the 2nd Circuit has held that that's error.  If the

23  loss amount and the receipt amount are the same, don't you

24  want to phrase that as the receipt amount?  Why do you --

25         MS. EICHEN:  Yes, I guess you could.

1           THE COURT:  So why do you want to propose a

2    measure that the 2nd Circuit's already ruled is erroneous

3    when you have the same amount of money or approximately

4    the same amount of money that you can simply say is the

5    amount that they received.

6           MS. EICHEN:  I'll adopt Your Honor's suggestion.

7    It is the same amount that the defendants received, but

8    that amount would be what the FTC seeks to make consumers

9    whole to restore them to the status quo ante and there's a

10   great many cases that we cite that say that that's the

11   purpose on our request for restitution and a case arising

12   under Section 13b of the FTC act such as this case and

13   numerous false advertising cases that are cited in our

14   papers.  The purpose that we're seeking recovery in this

15   case is for equitable restitution to injured consumers to

16   make them whole, to restore them to the position they were

17   in prior to the fraud.

18           THE COURT:  Does the FTC actually attempt to

19   make any consumers whole?

20           MS. EICHEN:  Absolutely, Your Honor.

21           THE COURT:  How is it going to do that?

22           MS. EICHEN:  As soon as we get the records of

23   the consumer purchasers from the defendants, which we've

24   been requesting from the inception of this case and as

25   recently as our conference, telephone conference with the

1    court on additional discovery, as soon as we get those

2    records, provided that we get the relief that we request,

3    we will set up a redress program for those consumers who

4    purchased Chinese Diet Tea and the Bio-Slim Patch but did

5    not get what they purchased it for, which was a product

6    that would give them rapid and substantial weight loss.

7    That's the reason they purchased these products and that's

8    the reason we want to restore the money that they

9    purchased.

10                  THE COURT:  Okay.

11                  MS. EICHEN:  Okay.  I was going to talk a little

12   bit about the ads.  This product was advertised, as the

13   court recognized in its decision, the court was -- the

14   product was advertised solely for weight loss.

15                  THE COURT:  Right.  Actually before you move on

16   to the ads, could I press you a little bit --

17                  MS. EICHEN:  Certainly, Your Honor.

18                  THE COURT:  -- on the measure.  So you and I are

19   now looking not at losses but at receipts.  How, if at

20   all, is the total receipt number appropriately reduced by

21   any of the suggested reductions the defendants have

22   proposed?

23                  MS. EICHEN:  Well, the initial gross sales,

24   which is what we contend was the defendant's receipts, the

25   same as consumer losses, are appropriately reduced by

1   refunds to consumers and we have a stipulated amount for

2   that.

3             THE COURT:  Right.  Anything else?

4             MS. EICHEN:  No, Your Honor.

5             THE COURT:  What about bounced checks?  Why, if

6   a check bounces, the amount of that check is included in

7   gross receipts but it's never really received by the

8   defendants.

9             MS. EICHEN:  Well, Your Honor, it would be

10  appropriate if the number wasn't so speculative.  The

11  defendants had no evidence to tie those particular checks

12  to the receipts of these particular products.

13            THE COURT:  Okay, fair enough, but let's start

14  with what the FTC concedes are at least theoretically

15  appropriate reductions.  Refunds, bounced checks, credit

16  card chargebacks --

17            MS. EICHEN:  Chargebacks if they were directly

18  referable to the product.

19            THE COURT:  Right, I'm assuming --

20            MS. EICHEN:  Yes, Your Honor.

21            THE COURT:  I'm assuming that for now.  Credit

22  card processing fees?

23            MS. EICHEN:  No, Your Honor.  They are ordinary

24  business expenses and they've never been allowed in any

25  FTC case, or any case that I know of.

 1          There's no reason that consumers whom were

 2     seeking refunds should have to pay the defendant's

 3     ordinary business expense like credit card processing

 4     fees.

 5          THE COURT:  Well, isn't the question whether the

 6     receipts fairly should include amounts that the credit

 7     card company automatically deducts?  In other words, with

 8     a $100 purchase, if the defendants are receiving $97

 9     because the credit card company has taken a three-dollar

10     fee, why should the number be 100 rather than 97?

11          MS. EICHEN:  Well, the defendants received them.

12     I think the testimony of Mrs. Howard showed that the

13     defendants received the money first and then the credit

14     card companies deducted whatever their fees were, so I

15     don't think credit card processing fees are different than

16     any other business expense.

17          THE COURT:  Okay.  Any other permissible

18     deductions in your view?

19          MS. EICHEN:  None that I can think of, Your

20     Honor.

21          THE COURT:  Okay.  All right.  And in your view

22     the burden is on the defendant, defendants, to prove the

23     amount of any permissible deduction and that it is

24     directly correlated to these green tea and Bio-Slim Patch

25     sales?

 1          MS. EICHEN:  Yes, Your Honor, that is our

 2     position.

 3          THE COURT:  Okay.  All right.  Go ahead.  You

 4     were talking about the advertisements.

 5          MS. EICHEN:  Yes, Your Honor.  A review of all

 6     of the Chinese Diet Tea ads that are in the exhibits

 7     before the court show that they are all deceptive.  It's

 8     undisputed that the defendant's version, A, trial Exhibit

 9     4 is the subject of the court's previous decision that

10     thal ad was deceptive and wholly a weight loss ad.

11          THE COURT:  And we also have a stipulation,

12     don't we, that A, B and C, Exhibits 4, 5 and 6, are in

13     fact all equally --

14          MS. EICHEN:  Yes, Your Honor.

15          THE COURT:  -- deceptive?

16          MS. EICHEN:  Yes, Your Honor.  I was going to

17     get to that.

18          THE COURT:  You were also going to tell me that

19     the catalog ad is essentially the same thing.

20          MS. EICHEN:  I would say it's identical except

21     for the box, the order box.

22          THE COURT:  So let's focus on the internet.

23          MS. EICHEN:  Yes, Your Honor, I'll get to that,

24     sure.  The internet ad, although that's Trial Exhibit U,

25     although it's shorter than the magazine and catalog

1    version, contains statements that are similar to the

2    advertisement that the court found to be deceptive and

3    misleading.  Those being you eat your favorite foods but

4    still lose weight fast.  Triple action Chinese Diet Tea

5    helps eliminate the absorption of carbohydrates and helps

6    prevent fat absorption and it increases the metabolic rate

7    to burn calories.

8         It's stipulated that the defendant didn't accept

9    any orders for any products over the internet and that the

10   defendants didn't track the internet ad with DGT

11   identifying numbers as it did with the magazine ads, nor

12   did it track the catalog ad, nor did it track any

13   purchases that may have been made without any DGT number

14   coming from a consumer who had previously seen a magazine

15   ad and didn't have the number, and I think the evidence

16   supports that.  And all of the Chinese Diet Tea ads were

17   placed in the same way, by phone, fax or mail, and that's

18   stipulated to.

19        The dollar amount of Chinese Diet Tea proceeds

20   not attributable to a particular magazine ad via a DGT

21   code is approximately $161,000 and we've stipulated to

22   that.

23        The deceptive advertising was the defendant's

24   sole means of promoting the product.  Because the

25   defendant's marketing campaign was far reaching and

1    extensive, every order of Chinese Diet Tea was tainted

2    with a deception written into all of the advertising.  And

3    I'm citing FTC V.

4         Defendants ran three versions of Chinese Diet

5    Tea magazine ads more than 160 times in more than 40

6    national widely circulated publications, including the

7    Star, the Inquirer, and the First for Women, and sent the

8    catalog ad to all purchasers of Bronson product and some

9    purchasers of product from other companies, and the

10   testimony supports that.  Thus, all the sales proceeds of

11   Chinese Diet Tea certainly are attributable to defendant's

12   deceptive print catalog and internet advertisements.

13        I spoke a little bit about Verity and that we,

14   that the FTC asserts that the correct measure of ethical

15   monetary relief here is defendant's gross revenues for

16   Chinese Diet Tea and the Bio-Slim Patch, less refunds

17   paid.

18        THE COURT:  You know, on summary judgment

19   ruling, I held in effect that the ads here were so

20   blatant, or the ad at issue here was so blatant that there

21   need not be any evidence of consumer reaction to the ad.

22   Is there a need for, with respect to the internet

23   advertisement, is there a need in this case for some

24   evidence of consumer perception of that ad?

25        MS. EICHEN:  We don't believe so, Your Honor.

1    We feel that even in a short form, it's making similar,

2    that ad is making similar claims of rapid weight loss

3    without any qualification that you need to -- or

4    disclaimer that you need to diet or reduce calories or

5    increase exercise.  It says that it's a natural effective

6    weight loss option for men and women of all ages.

7            And the main portion or the most important

8    portion is the bold print that says you eat your favorite

9    foods but still lose weight fast.  I think it's still,

10   that ad still invests Chinese Diet Tea itself has some

11   magical properties that by drinking the tea you'll lose

12   weight fast.

13           Your Honor, defendant's propose offsets for

14   chargebacks, bounced checks and bounced check fees -- I

15   think actually I've addressed this.

16           As for the Bio-Slim Patch -- excuse me, Your

17   Honor -- as for the Bio-Slim Patch, defendants certainly

18   are not entitled to any offsets for monetary relief for

19   any of the costs of deceptively marketing a product that

20   they concede is utterly without value.  And in going up

21   from I think 24.4 percent of the, of any figure that is

22   supposed to be apportioned to Chinese Diet Tea and the

23   Bio-Slim Patch, up to 25.25 percent for the two products,

24   where you're considering expenses for the Bio-Slim Patch,

25   which is totally a valueless product, that the defendants

1    concede that themselves.

2         Nor can the defendants provide any factual or

3    legal basis for deducting the costs of deceptively

4    advertising either of the challenged products.  The only

5    case cited in their brief is a private action, not a

6    government enforcement action, so it's inapplicable.

7         Defendants attempt to deduct the income taxes or

8    postage they paid in 2003 and 2004.  That attempt has no

9    legal basis and is unprecedented.  This court acknowledges

10   in its decision on the FTC's motion to strike affirmative

11   defenses that there was no law, no applicable law that

12   supported that claim.  Again, the only cases that they

13   site on the tax issues are private actions and not

14   government law enforcement actions.

15        And the IRS, not the court, is the proper entity

16   to determine tax liability.  If the defendants or relief

17   defendants wish to reduce their tax liability after paying

18   equitable monetary relief in this case, they should apply

19   to the IRS for a refund.

20        And, further, in their attempt to deduct the

21   percentage of taxes here, they wrongly include taxes paid

22   on their rental income and other non-profit sources, so

23   that figure is not properly applicable to this case.

24        Defendants also are not entitled to any status

25   for postage.  Defendants passed the postage cost of five

1    to six dollars for each order of the challenged products

2    onto consumers, but did not refund shipping and handling

3    costs to consumers who returned the products.  The amounts

4    they assigned to postage for the challenged products is

5    also speculative and not -- and without reasonable basis

6    as shown by the testimony of Sandra Howard today.  If the

7    defendants were permitted to retain the amounts paid for

8    postage, it would truly be a windfall for them.

9         As previously addressed, Verity provides no

10   legal basis for defendants to deduct fulfillment or call

11   center expenses in this case where the defendants received

12   consumer money and then paid the fulfillment and call

13   center companies.  It seems that defendants even attempt

14   to deduct their own employee salaries in 2003 as

15   fulfillment expenses, including those in January and

16   February 2003, before Chinese Diet Tea was even

17   advertised.

18        Exhibits E, Joint Exhibit E shows that Chinese

19   Diet Tea was first advertised on February 28, '03.  This

20   is clearly improper as these expenses of their own

21   employees should be considered nothing more than a

22   non-deductable overhead.

23        Although the defendants argue otherwise,  net

24   profits is not a proper measure of equitable relief in

25   this case.  Even if gross receipts less refunds were not

1    the proper means of measuring equitable monetary relief in

2    this case, net profits is not the appropriate measure in

3    any case.

4            In FTC against Seismic Entertainment

5    Productions, the court ruled the amount of the defendants'

6    net profits from their illegal actions is not the measure

7    of the amount of restitution that may be ordered against

8    them.

9            In FTC against Windward Marketing, the court

10   rejected the defendant's claims that their liability was

11   limited only to profits.

12           The defendants cite many SEC cases in support of

13   their argument that disgorgement should be of profit and

14   not proceeds.  Cases charging securities law violations

15   are distinguishable as a matter of public policy in that

16   victims of stock manipulation schemes are not entitled to

17   recover their transaction costs such as brokers'

18   commissions or losses due to ordinary market risks.

19           Further, even in securities cases, the

20   overwhelming weight of authority hold that securities law

21   violaters may not offset their disgorgement liability with

22   business expenses.  That's SEC against Hughes and other

23   cases.  Courts have held that limiting recovery to

24   defendant's profits would actually vitiate the

25   restitutionary remedy.

```
 1              In Stefanchik, the court reasoned because at FTC

 2    act is designed to protect consumers from economic

 3    injuries, courts have often awarded the full amount lost

 4    by consumers rather than limiting damages to defendant's

 5    profits.

 6              In National Urological, an advertising case, the

 7    court noted that the primary purpose of restitution is to

 8    restore victims to their position prior to the deceptive

 9    sales.  The court ruled that the defendant's argument that

10    restitution should be measured by profit did not comport

11    with the theory behind restitution.

12              In FTC against SlimAmerica, another advertising

13    case, the court reasoned, where the appropriate measure

14    for redress is the aggregate amount paid by consumers less

15    refunds made by the defendants, cost incurred by the

16    defendants in the creation and perpetration of a

17    fraudulent scheme will not be passed onto victims.  It

18    would be manifestly inequitable for the court to assess

19    against consumers the costs incurred in the commission of

20    this fraudulent enterprise.

21              In National Urological Group, the court

22    reasoned, requiring the defendants to return the profits

23    they received rather than the costs incurred by the

24    injured consumer would be the equivalent of making the

25    consumer bear the defendant's expenses.
```

1          The court will not make victimized consumers

2     shoulder such a burden.  Thus, what actual profits the

3     defendants realized from the challenged products is not

4     relevant to the determination of an appropriate sum for

5     equitable monetary relief.  The primary consideration

6     should be to reimburse victimized consumers for the

7     products they purchased from the defendants for weight

8     loss that had no value to them for weight loss and restore

9     them to the status quo ante.

10          Contrary to defendant's argument, defendants are

11    not entitled to an offset for any supposed intrinsic value

12    of Chinese Diet Tea.  The FTC seeks to return money to

13    injured consumers who purchased challenged products as a

14    result of deceptive and misleading advertising but didn't

15    receive what they ordered, a product that with no change

16    in diet or physical activity would result in consumers'

17    rapid and substantial weight loss.

18          The court found the advertisement was almost

19    entirely weight loss product -- weight loss advertisement,

20    and consumers who purchased as a result of the

21    advertisement purchased in order to achieve the advertised

22    effect on weight loss.

23          The court also determined that the claims for

24    Chinese Diet Tea did not have a scientific basis.  Thus,

25    the fact that the tea is also a beverage does not mitigate

1    the harm that the defendants perpetrated against

2    consumers.

3          In FTC against Kuykendall, the court noted that

4    the general rule is that the value of the product

5    deceptively sold should not be taken into account in

6    determining the amount of equitable monetary relief.

7          In FTC against Figgie International, the court

8    noted that where the defendant sold rhinestones as

9    diamonds, recovery was not limited to difference in price

10   between the products.  That's because the defendants'

11   misrepresentations tainted the consumers' purchasing

12   decisions, because the fraud is in the selling but not the

13   thing sold.

14         Consumers who purchased Chinese Diet Tea and the

15   Bio-Slim Patch are entitled to full refunds for the

16   products that are not useful to them for weight loss.

17         Again, contrary to their argument, defendants

18   are not entitled to any offsets from equitable monetary

19   relief based on purported reorders of Chinese Diet Tea.

20   Defendants have not offered any evidence beyond their

21   purported records of reorders that consumers who reordered

22   were satisfied with Chinese Diet Tea.  Consumers may well

23   have reordered because Chinese Diet Tea did not work for

24   weight loss the first time and they hoped it might work on

25   a second purchase.

1          Furthermore, relief -- repeat purchasers were

2    also influenced by the improper ads and are the proper

3    subject for restitution, particularly here where the

4    advertising campaign was widespread and successful.

5    That's in F Craft v. FTC.

6          In National Urological, an advertising case, the

7    court held that where the FTC demonstrated that the

8    defendants made material misrepresentations in their ads,

9    the misrepresentations were widely disseminated as here,

10   and the consumers purchased the product -- the court could

11   presume that repeat purchasers relied on the defendant's

12   ads even when making repeat purchases.

13         The National Urological court required the

14   defendants to introduce evidence to show that repeat

15   customers did not rely on the deceptive ads.  When the

16   defendants failed to do so, the court did not allow any

17   set-offs for repeat purchases.  The defendants here have

18   produced no evidence beyond mere speculation to show that

19   repeat purchasers did not rely on the deceptive ads.  So

20   this set-off should be disallowed.

21         The restitution sought for consumers here is not

22   a penalty.  Defendants incorrectly claim that the monetary

23   relief sought here is a penalty.  The FTC is seeking

24   restitution or recision to make whole consumers who were

25   defrauded by deceptive, defendant's deceptive

advertisements for the challenged products.  Many courts,

such as FTC against Febre, have held that equitable

remedies such as disgorgement are remedial and not

punitive.

Based on the stipulated facts, the FTC's

evidence provides a reasonable estimate of the amount of

equitable monetary relief.  The FTC must make a prima

facie showing that its calculations approximated the

amount of consumers' net losses.

The FTC has done so, using stipulated facts that

the defendant's combined gross revenues less refunds for

the challenged products in 2003 and 2004 are $1.9 million.

Defendants paid only $122,000 in refunds to

purchasers of Chinese Diet Tea and $6,000 to consumers who

purchased the patch.  Defendant's advertisements

themselves and Plaintiff's Trial Exhibit A and Sandra

Howard's testimony all show that defendants did not refund

shipping and handle funds to consumers who purchased

Bronson products.

The FTC also has made met its burden as to the

ads not identified with DGT numbers.  The catalog ad is

identical to the ad the court found to be deceptive, and

was widely disseminated to all purchasers of Bronson

products.  The internet ad made several deceptive weight

loss claims and the deceptive magazine ads were widely

```
 1    disseminated, running 162 times in at least 40

 2    publications.

 3            The burden then shifted to the defendants to

 4    show that the FTC's estimate was inaccurate and what the

 5    proper estimate should be.  Defendant's own poor record

 6    keeping prevents them from meeting the burden of

 7    distinguishing the sales attributable to the catalog ad

 8    from the sales attributable to the internet ad or from

 9    some consumer who previously saw a magazine ad but didn't

10    have a DGT identifying number.

11            THE COURT:  Ms. Eichen, I'm going to ask you to

12    skip ahead to the question of injunctive relief.

13            MS. EICHEN:  All right, Your Honor.

14            THE COURT:  And then I'll hear from the

15    defendants.

16            MS. EICHEN:  Okay.  One moment.

17            (Pause)

18            MS. EICHEN:  Defendants erroneously argue that

19    they should not be subject to injunctive relief because

20    Bronson is no longer active.  In FTC against Think

21    Achievement, the court held that to obtain injunctive

22    relief against defendants, all the FTC needs to show was

23    the likelihood of future violations, noting that past

24    conduct is highly suggestive of future violations.  In

25    Think Achievement, the court ruled that permanent
```

1    injunctive relief was appropriate even where the corporate

2    defendant was defunct.

3            By the way, Your Honor, the case cited by the

4    defendants, Evans Products, dealt with preliminary

5    injunctive relief, not permanent injunctive relief, as we

6    seek here.

7            There's no evidence that Bronson was dissolved.

8    Therefore, Bronson and Martin Howard can start deceptively

9    advertising another product for weight loss tomorrow if

10   not permanently enjoined.

11           We know that Martin Howard and Bronson

12   deceptively sold two products for weight loss in this case

13   using what the court found to be sweeping and farfetched

14   claims and no scientific proof, and they reaped $1.9

15   millions in gross sales net less refunds for those

16   products.

17           In addition, Martin Howard's previous company,

18   Willis General Store, and Bronson were investigated by

19   state and federal agencies for deceptively advertising

20   weight loss products and other health aid products.  Your

21   Honor, the documents that support that were previously

22   submitted to the court on the FTC's motion for preliminary

23   injunction, including some consent decrees with other

24   states, and we ask that the court take judicial notice of

25   these public documents that are in the court's record.

1           Without an order permanently enjoining him from

2    deceptively -- Martin Howard from deceptively advertising

3    the challenged product and other products, he's free to

4    continue defrauding consumers.

5           Indeed, without permanent injunctive relief,

6    there's nothing to stop Martin Howard from using his

7    newest company, Blue Hills Natural, to deceptively

8    advertise and sell weight loss products, and also Bronson,

9    of course, to deceptively advertise and sell weight loss

10   products and other health related products, to again offer

11   consumers just empty promises in tea bags along with a

12   worthless patch.

13          Thank you, Your Honor.

14          THE COURT:  All right, thank you.

15          MR. SHAFFER:  For the record Scott Shaffer.  I

16   represent the defendant and the relief defendants in this

17   case.

18          I think Your Honor correctly identified the case

19   of FTC v. Verity as the controlling authority for the

20   reason why we're here today.  The Federal Trade Commission

21   is seeking to recover from my clients an illegal remedy,

22   full restitution of Bronson remedies less only refunds,

23   but it is disguising its claim by occasionally referring

24   to it as equitable relief.  This court is limited to doing

25   equitable relief here and the FTC is ignoring the

1    distinctions between equitable relief and the illegal

2    remedy of full restitution which I submit to you is not

3    available to the FTC under the FTC act which is the

4    statute under which this case was brought.

5           I think before I really get into discussing the

6    FTC v. International case, I'd just like to step back and

7    say that the Verity case must be viewed in the greater

8    context of the Supreme Court authority which describes the

9    outer limits of equitable restitution.

10          In that case, the Supreme Court set forth these

11   outer limits in the case of Great West Life Annuity

12   Insurance Company v. Knudson, 534 U.S. 204, in which the

13   Supreme Court stated "Restitution belies equity, the

14   action generally must not be seek to impose personal

15   liability on the defendants but restore to the plaintiff

16   particular funds or property in the defendant's

17   possession."  And the 2nd Circuit specifically quoted

18   that, quoted that with emphasis on the words "property"

19   and "in the defendant's possession" in the case of Pereira

20   v. Farace.

21          THE COURT:  And why isn't that measure equal to

22   the receipts that the defendants received for sales of the

23   green tea and Bio-Slim Patch products?

24          MR. SHAFFER:  It's not because under the FTC's

25   calculation in this case, they cut off the second part of

1    the inquiry.  _Verity_, the 2nd Circuit has a burden

2    shifting analysis that has two portions to it.

3              The first, the first part of the inquiry is for

4    the FTC to put forth a reasonable amount of the

5    defendant's monies received, and with -- the FTC posits

6    that this is 1.9 million.  We, as you can see in our trial

7    brief, we dispute portions of that but the FTC will say

8    that -- the FTC basically argues that that ends the

9    inquiry, that once they prove that that we received the

10   money and didn't refund it, then that's what they are

11   entitled to under their theory of recovery.

12             _Verity_ goes a lot further than that and their

13   desired remedy ignores the whole second hand of that which

14   is once they put forth that number, once they put forth a

15   reasonable number, the burden then shifts to the

16   defendants and relief defendants to identify other offsets

17   and other items that should be deducted for that.

18             THE COURT:  And where in _Verity_ does it say

19   that?

20             MR. SHAFFER:  Give me a moment, Your Honor.

21             THE COURT:  I'm looking at _Verity_ where it

22   cites --

23             MR. SHAFFER:  Over -- you speak, I'm sorry.

24             THE COURT:  -- cites the _Febre_ case, as invoking

25   the presumption to hold that the defendants could not

 1   satisfy their burden of proving the inaccuracy of the

 2   FTC's calculations.  Isn't the, isn't the burden-shifting

 3   here that the FTC puts forth evidence of a reasonable

 4   approximation of what it is that the defendants received.

 5   The defendants then have the opportunity in stage two to

 6   show no, no, no, that's not accurate.  In fact, here's the

 7   actual amount received.  We had refunds that we had to pay

 8   in X amount, we had bounced checks, and so the amount that

 9   we actually received is less than the FTC would have you

10   believe.

11            MR. SHAFFER:  Well, that's part of it.  But

12   again --

13            THE COURT:  Show me where there's more than that

14   in Verity.

15            MR. SHAFFER:  Well, Verity speaks over and over

16   again, Verity speaks over and over again on the amount of

17   unjust gains to defendant, not the amount of receipts.

18            THE COURT:  Exactly.  It says gains, it does not

19   say profits.

20            MR. SHAFFER:  And it says -- well, they put --

21   it says unjust gains and I urge you not to leave that, you

22   know, just out.

23            THE COURT:  Well, isn't the unjustness the fact

24   that the receipts or the gains from the victims are unjust

25   because they resulted from fraud.  That's what makes them

1    unjust.

2           MR. SHAFFER:  I started my discussion by

3    pointing to the Supreme Court authority in the Great West

4    case which defines what equitable restitution is.

5           THE COURT:  Right.

6           MR. SHAFFER:  And I would suggest to you that

7    the reading, that reading of -- that reading would be

8    inconsistent with Supreme Court authority.  I don't

9    understand the Verity case to say in that way and to

10   interpret in that way I think would run afoul of the

11   Supreme Court's ruling.

12          I think that the -- I have a quote here.  The

13   District Court -- "On remand, the District Court, we

14   direct the District Court to revise its composition to

15   focus on the different unjust gains obtained by the

16   defendants rather than the losses of consumers and to

17   entertain only reasonable approximations of the unjust

18   gains rather than their overall gains."  That's in the

19   Verity case.

20          So I submit to you that under the 2nd Circuit's

21   ruling, you are not to award overall gains or gains or

22   receipts but, rather, unjust --

23          THE COURT:  Well, if all of the receipts for

24   green tea are fraudulent because they are received in

25   response to fraudulent ads, then why isn't, why isn't that

1    the measure of unjust receipts, whereas receipts for other

2    products that were not the subject of fraudulent ads the

3    portion of the receipts that are not unjust?

4              MR. SHAFFER:  I'm sorry, could you repeat the

5    question?

6              THE COURT:  Bronson had total receipts and then

7    it had a subset of that was the receipts from these two

8    products.

9              MR. SHAFFER:  Correct.

10             THE COURT:  That subset resulted from fraudulent

11   advertising.  So the FTC is not seeking all receipts that

12   Bronson received; it's only seeking the unjust portion

13   which is the portion related to the fraudulent

14   advertising.

15             MR. SHAFFER:  Well, if I understand your

16   question right, 75 percent of their receipts came from

17   sales of other products.

18             THE COURT:  Exactly, and so those are not

19   unjust.  Those are not unjust.

20             MR. SHAFFER:  That shouldn't even be in play.

21             THE COURT:  Exactly.  Isn't that what the 2nd

22   Circuit is saying?  That's not in play.

23             MR. SHAFFER:  That's not what the 2nd Circuit is

24   saying, Your Honor.

25             THE COURT:  What's it saying?

```
 1              MR. SHAFFER:  Well --

 2              THE COURT:  What portion of receipts received as

 3      a result of fraudulent advertising is just?

 4              MR. SHAFFER:  Well, I think it's -- I would

 5      suggest to you that it's the profits.  It's the amounts

 6      that -- admittedly, the burden shifts to defendants --

 7      well --

 8              THE COURT:  Where in Verity is the word "profit"

 9      used?

10              MR. SHAFFER:  They use the word "unjust gains."

11              THE COURT:  Exactly.

12              MR. SHAFFER:  I would submit to you, I would

13      acknowledge that once the FTC has shown what the receipts

14      to a defendant are, I will acknowledge that the burden

15      then shifts to the defendant to show that there should be

16      further deductions.

17              THE COURT:  Let me try this.  Are you familiar

18      with the Restatement Third, Restitution in Unjust

19      Enrichment, Tentative Draft, Count through May 2009.  Have

20      you looked at that?

21              MR. SHAFFER:  I have not looked at --

22              THE COURT:  Let me suggest to you that Tentative

23      Draft Number 5 indicates that with respect to a wrongdoer,

24      that is a person unjustly enriched as a result of, among

25      other things, fraud, there are two potential measures, and
```

```
 1    the restitution amount is the greater of those two.  The
 2    first is the unjust enrichment of a wrongdoer are not less
 3    than the market value of the benefits wrongfully obtained.
 4    And unless that, that section imposes a greater liability,
 5    the unjust enrichment is the net profit attributable to
 6    the underlying wrong.
 7              So, in other words, net profit, if it's greater
 8    than receipts, is the measure, but when it's less than
 9    receipts, is not the measure.
10              MR. SHAFFER:  How can profits be greater than
11    receipts, Your Honor?
12              THE COURT:  Well, if I wrongfully obtain a
13    painting from you, and I sell that painting for
14    $8 million, I've gained a profit of $8 million.  And so,
15    to the extent that the market value at the time I obtained
16    the painting was only $4 million, as the wrongdoer I don't
17    get to keep that extra $4 million.  I have to give back,
18    restore to the victim the full $8 million that I obtained.
19    Whereas if I obtained a picture worth $4 million and then
20    I sell it for $2 million, I still have to give back
21    $4 million.
22              MR. SHAFFER:  Well, your first example is
23    certainly not the case before us.  Again, I would, I
24    would, I would urge you to stick to the reading of Verity,
25    to read Verity closely, and I think if --
```

1           THE COURT:  I've read Verity very closely.  Let

2   me ask you this.  Why is the term "gain" in Verity, why

3   does that not mean the receipts from the sales of green

4   tea and Bio-Slim Patch?

5           MR. SHAFFER:  Well, we cited other cases and

6   we've cited other cases that allow certain offsets, and I

7   think, again, if you go back to the principle of equitable

8   restitution, certainly that would indicate that, the most

9   obvious example to me is the cost of the tea would be an

10  offset, would be a offset to that.

11          THE COURT:  Here's the problem.  Here's the

12  problem with your theory.  If profits are less than

13  receipts, then the victims are paying the price for the

14  defendants being bad business people.  I would suggest to

15  you that the law is that the wrongdoer has to give back

16  the greater of what was taken or the profits made from

17  what was taken.

18          MR. SHAFFER:  I think, Your Honor, while that

19  might not be the result you would like, I think that that

20  is not consistent with the principles of equitable

21  restitution.  And I think in FTC v verity, there was -- in

22  one of the two periods, there was money received by, in

23  effect, an intermediary, and --

24          THE COURT:  Right.

25          MR. SHAFFER:  And --

1          THE COURT:  What they did with those two periods

2     is they made the restitution amount equal to what the

3     defendants received, actually received, in each period.

4     In one period that amount was less than the loss to

5     consumers because there were middlemen who took out their

6     cut.  In the second period, there was no middleman and so

7     the full amount received by the defendants, which was

8     closer to the amount lost by the consumers, was the amount

9     of restitution.

10          In both cases, both periods, the amount of

11     restitution was equal to the amount actually received by

12     the defendants.  There was no suggestion that there was a

13     profit made or not made.  It was how much did they

14     receive.

15          MR. SHAFFER:  You're setting up -- Your Honor, I

16     think, to follow that through, you're setting up a very

17     arbitrary, very arbitrary scheme of recovery because in

18     that case, the entire recovery in any FTC case will just

19     totally depend on the order, on the flow of the funds

20     rather than the net result of the funds.

21          For example, in this case, you know, our

22     position is that with the credit card fees, we never had

23     access to that, that this money, although it may appear,

24     it appears on the bank statements but it was immediately

25     taken, deducted by the credit card companies from the bank

1    account and we never had access to that.  The FTC has a

2    different interpretation of it and, I think, appear to

3    think since it was in the account, that it's a receipt to

4    us.

5              THE COURT:  That's a closer call, but help me

6    out on --

7              MR. SHAFFER:  But I'm suggesting that it would

8    not be -- it's not a good system, it's a completely

9    arbitrary system to say that if the money went from A to B

10   to defendant, or A to defendant to B, just the

11   fortuitousness of the timing of the payments or the

12   structure or the flow of the payments, that's not a very

13   just or fair or workable system to have.

14             THE COURT:  Isn't that the system that Verity

15   sets up?

16             MR. SHAFFER:  I don't think so.

17             THE COURT:  And how do I distinguish the AT&T

18   period from the Sprint period if that's not the system

19   that Verity sets up?

20             MR. SHAFFER:  Okay, let me just get the case

21   so -- I discussed this yesterday.

22             (Pause)

23             MR. SHAFFER:  That portion of the, I think we

24   can agree that there is a two, a two step analysis here.

25   There's the FTC initial burden and then there's the

defendants' secondary burden.  The portion that you were

referring to is under the section misidentifying the

restitutionary baseline, the section you were discussing,

and I think if you're referring, I believe you were

referring to page 68 of the Verity decision, where they

discuss the two different, the two different periods of

the way the money flowed.  That's under the section

misidentifying the restitutionary baseline, and I would

suggest to you that if, if we have received the money,

then that is part of -- I will concede to you that that is

part of the restitutionary baseline, that then we must, we

must present evidence and I will concede that.  However, I

will not concede and do not think it's appropriate that

the inquiry just ends there and that once we receive the

funds, that's it.  Because, again, as I said, I think that

leads to a very -- a wholly arbitrary, a wholly arbitrary

recovery scheme of how, of how the payments flow which,

you know, doesn't seem to me to be a very just way to

rule.

          And the case then goes on to talk about -- the

case then goes on to talk about the burden shifting to the

defendants and, you know, it says -- I'd just like to read

this.  "Here, because some fraction of consumers who paid

the bills incurred through the defendant's accounting

billing system actually used or authorized others to use

1    the services, does not mean the defendant acquired unjust

2    gains but only a fraction of the amount of their overall

3    gains from the billing system.  A reasonable approximation

4    of the unjust gains must take this into account."

5           And I urge you to take these types of things --

6    this isn't exactly, the facts aren't exactly the same, but

7    the offsets we've, we've requested here, I urge you to

8    take these things into account.  And as I said,

9    admittedly, you know, this burden is shifted to us on

10   these issues but I don't think, I don't think that it is

11   foreclosed from consideration and I will submit to you

12   that --

13          THE COURT:  The distinction being made there is

14   a distinction between AT&T customers who authorized the

15   charges and those who didn't authorize the charges.  Isn't

16   it?

17          MR. SHAFFER:  I'm sorry, I looked down at my

18   notes.

19          THE COURT:  You're looking at the section called

20   prematurely shifting the burden of proof to the

21   defendant's appellates.

22          MR. SHAFFER:  Correct.

23          THE COURT:  And what the court is saying there,

24   some fraction of consumers who paid the bills incurred

25   actually used or authorized others to use the services at

 1    issue.  Okay?  So some people authorized it, right?  In
 2    other words, some people -- in that case it was a
 3    pornographic download product.  Some people actually
 4    wanted that product, and they bought that product and they
 5    authorized AT&T to charge their account for that product.
 6    There's nothing unjust about that.  That's like the other
 7    three quarters of the Bronson products.  People actually
 8    wanted them, they actually paid for them.
 9              MR. SHAFFER:  But those products aren't --
10              THE COURT:  The amount of the unjust gains is
11    only a fraction of the amount of overall gains from the
12    billing system.  In other words, the unjust gains are the
13    gains from customers who did not authorize the download.
14    Somebody got hold of their account information and billed
15    the pornographic download to somebody else's telephone
16    number.  So that's the amount.
17              And so what the court is saying is, okay, you've
18    shown, FTC, you've shown the total amount of billing
19    through the system.  Now, the defendants get to come back
20    and say, wait a minute, this percentage of those bills
21    were people who actually wanted this product and wanted to
22    pay for this product.  And so the only amount that is
23    unjust is the fraudulent amount.  Well, here, the full
24    amount is fraudulent because all of it comes from
25    fraudulent ads.

```
 1            MR. SHAFFER:  Well -- one second, Your Honor.

 2            (Pause)

 3            MR. SHAFFER:  Sheldon Lustigman raises the

 4   point, and it's well taken, that what you're suggesting,

 5   once there's a receipt by a defendant, you know, under

 6   your suggestion the inquiry would be over and, and a

 7   refund wouldn't -- as I understand what you're saying, a

 8   refund wouldn't even be creditable because the defendants

 9   would have received that money, so you're saying

10   essentially what they do with the money after they receive

11   it --

12            THE COURT:  No.

13            MR. SHAFFER:  -- is of no moment.

14            THE COURT:  No.  You have the opportunity to

15   come in and prove, as I think you have tried to do, that

16   you actually received a smaller amount than the full gross

17   receipts.  And you have suggested refunds and chargebacks

18   and so forth.  That's a legitimate effort to shape the

19   amount of the unjust receipts.  I don't see anything in

20   Verity that says you then go further and deduct some cost

21   of creating a product that resulted in unjust gains.  I

22   don't see that.

23            MR. SHAFFER:  I would suggest, Your Honor, that

24   the Verity decision, over and over again, I can't imagine

25   it's just a happenstance or coincidence, they use the term
```

1    "unjust gains," not undisputed receipts.  You know, you're

2    suggesting, you're suggesting an undisputed receipts

3    standard --

4         THE COURT:  No, I'm not.  I'm saying that when

5    the benefit received by a defendant is in the form of

6    cash, then you can call it a gain or you can call it a

7    receipt.  When the form of benefit is something other than

8    cash, you call it a gain.  You could unjustly obtain the

9    services of someone.  What you do then is you say what's

10   the market value of those services?  It's a gain, it's not

11   a receipt.

12        In this case the gains are all receipts.  No one

13   has suggested a type of gain other than cash.  We don't

14   have a market valuation problem.  We don't have a -- any

15   of those calculation problems.  We can say what did the

16   defendants unjustly receive?  They unjustly received

17   money.  What's the value of that money?  The value of the

18   money is the value of that money.  So the gains that they

19   received in this case happen to be equal to the receipts

20   that they received.  So I'm asking you why that isn't the

21   rule of Verity.

22        MR. SHAFFER:  Okay, and again, you know, at the

23   risk of going in circles here, I'll just say one more

24   time, the 2nd Circuit instructed the District Court to

25   focus on benefits unjustly obtained by the defendants

```
 1    rather than the losses of consumers.

 2              THE COURT:  Right.

 3              MR. SHAFFER:  And to entertain only reasonable

 4    approximations of the unjust gains.  You are suggesting --

 5              THE COURT:  Let me just focus you, while you're

 6    thinking on that point, on the statement Ms. Eichen

 7    pointed to, which is the beginning of page 68, where

 8    you're talking about a direct relationship between the

 9    defendant and the consumer.  And the court says,

10    "Undeniably in many cases in which the FTC seeks

11    restitution, the defendant's gain will be equal to the

12    consumers' loss because the consumer buys goods or

13    services directly from the defendant.  Thus, in these

14    cases it is not inaccurate to say that the restitution is

15    measured by the consumers' loss.  It's simply incorrect to

16    generalize this shortening to apply as a principle in

17    cases where the two amounts differ."

18              So, in this case, how -- with that in mind, the

19    court is talking about the gain equaling the loss in a

20    direct sales situation.  Why isn't that clear that the

21    gain being talked about is receipts?

22              MR. SHAFFER:  That's a fair question but -- the

23    case, those -- Verity says, for example, when a middleman

24    takes some portion of the funds --

25              THE COURT:  Right.
```

```
1          MR. SHAFFER:  -- that, for example, is the FTC's
2     attempting to convert that into a rule of law by saying
3     that there must be a middleman taking some portion.
4          THE COURT:  No.
5          MR. SHAFFER:  There's not --
6          THE COURT:  If you can show any reason why the
7     gain is different than the loss, why the gain was
8     different than the gross receipts, then you can.  But it's
9     gain in the sense of what benefit was obtained, it's not
10    what profit was obtained.  In other words, you can't avoid
11    restitution because you're a lousy businessman.
12          (Pause)
13          THE COURT:  Right?
14          MR. SHAFFER:  By the same token, you should not
15    be able to, you know, just -- I mean if that's the rule,
16    then, you know, every defendant from, every potential
17    defendant is going to structure their business so that you
18    know, everybody gets, the people get paid upfront and they
19    just receive the profits at the end.  I would submit to
20    you that's not an appropriate or beneficial standard.
21          In this case, what we have, if you're talking
22    about what the receipts are, certainly Martin Howard
23    received only a fraction of 1.9 million.  I think there
24    was testimony from the accountant that attributable to the
25    products he got, I have in my notes here $79,000.  I think
```

1    that was testified to.  So if that is the standard, then

2    certainly a much lower amount is recoverable from Martin

3    Howard because that's what he received at the end of the

4    day.  He, you know -- if you want to funnel through

5    everybody who takes money off the top and the defendant

6    just pays what he is left, what he gets at the end, that's

7    what Martin Howard got after the money went through

8    Bronson to H&H to Martin Howard.  If that's the standard,

9    I submit to you that's what he gets.

10           I don't think that's the appropriate standard

11   under what Verity says though.  I think the appropriate

12   standard under Verity is, is that the defendants have to

13   show that they did not retain, did not unjustly retain

14   consumer payments.

15           THE COURT:  Did not unjustly retain?

16           MR. SHAFFER:  Yes.

17           THE COURT:  As opposed to unjustly obtain?

18           MR. SHAFFER:  Yes.

19           THE COURT:  And where do you see that in Verity?

20           MR. SHAFFER:  Neither one, neither the FTC's

21   position nor our position is explicitly stated in the

22   Verity case.  I think if you, if you read the way the 2nd

23   Circuit over and over again talks about unjust gain and

24   shifting the burden to the defendants, I think it's -- I

25   think that is the proper reading of it.  It does not, it

1   does not specifically -- there's not a quotation that we

2   have provided you obviously.  There's a quotation --

3         THE COURT:  Okay, but help me understand where

4   Verity says anything other than the two-step process is to

5   figure out the actual amount of unjust benefit obtained as

6   opposed to the amount of offsets from or expenses incurred

7   by the defendant in wrongfully obtaining the money.  Is

8   there anything in Verity that says if it was really

9   expensive to run your fraud, then you don't have to pay

10  any money back?

11        MR. SHAFFER:  Again, I would say that this must

12  be viewed in -- I think you need to go back to the Supreme

13  Court Great West case.

14        THE COURT:  I've got it right here so cite me

15  something in there.

16        (Pause)

17        MR. SHAFFER:  "As we explained in the Mertens

18  case, equitable relief must mean something less than all

19  relief.  In Mertens we rejected a reading of the statute

20  that would extend the relief obtainable to whatever relief

21  a court of equity is empowered to provide in a particular

22  case at issue."  Skip the parenthetical.  "Which could

23  include legal remedies that would otherwise be beyond the

24  scope of the equity of the court's authority.  Such a

25  reading we said would limit the relief not at all and

1   render the modifier equitably superfluous.  Instead --"

2        THE COURT:  What page are you on?

3        MR. SHAFFER:  I am at page -- to the end of page

4   534 U.S., the end of page 209 going to 210.  Further on

5   page 214.  Page 213, the end of 213.

6        THE COURT:  But that's discussing the scope of

7   the ERISA remedy.

8        MR. SHAFFER:  But they are speaking about -- if

9   I can read one more thing.  You know, at the end of 213

10  says, "In contrast, a plaintiff could seek restitution in

11  equity, ordinarily in the form of constructive or

12  equitable relief, where money or property identified as

13  belonging to in good conscience to the plaintiff could be

14  clearly be traced to a particular fund or property in the

15  defendant's possession, the court of equity could then

16  order a defendant to transfer title or give a security

17  interest to a plaintiff who was the true -- in the eyes of

18  equity is the true owner, or where the property sought to

19  be recovered or its proceeds have been dissipated so that

20  no product remains, the plaintiff's claim is only that of

21  a general creditor and the plaintiff cannot enforce a

22  constructive trust of or an equitable ruling upon other

23  property of the defendant.  Thus, for a restitution to lie

24  in equity, the action generally must seek to not impose

25  personal liability on the defendant but to restore the

1    plaintiff, restore to the plaintiff particular funds or

2    property in the defendant's possession."

3            THE COURT:  Right.  Why isn't this case,

4    consistent with that quotation, an effort to restore to

5    the consumers particular funds, i.e. the funds that they

6    paid to the defendants for green tea and Bio-Slim Patch?

7            MR. SHAFFER:  This case is an effort to do that.

8    However, if you don't allow the offsets that we're

9    seeking, you have exceeded that because the particular

10   funds are no longer in defendant's possession.

11           THE COURT:  So, your point is if you spend the

12   fraudulently obtained money quickly enough, you can get

13   away with the fraud under equitable restitution.  All you

14   have to do is make sure you spend it quickly enough and

15   it's gone.  Is that right?

16           MR. LUSTIGMAN:  No --

17           MR. SHAFFER:  I'm not saying that.

18           THE COURT:  That's what you have just said.

19           MR. SHAFFER:  No, it's not.

20           THE COURT:  All right, help me out.  What are

21   you saying?

22           MR. SHAFFER:  Well, first of all, to -- the FTC

23   is not entitled, the FTC act limits the FTC only to

24   certain types of relief which I think we all agree is

25   equitable restitution.

```
 1            THE COURT:  Right.

 2            MR. SHAFFER:  So to the extent that you're

 3    suggesting that if you spend the money fast enough, you

 4    don't have to pay for it, that is due to the limitations

 5    of the FTC ads.  You know --

 6            THE COURT:  So your view is you're agreeing with

 7    me.  As long as you spend the fraudulently obtained money

 8    quickly enough --

 9            MR. SHAFFER:  Your Honor --

10            THE COURT:  -- the FTC cannot obtain it back.

11            MR. SHAFFER:  In this case, Your Honor, I've

12    worked very hard to limit our claims here only to

13    reasonable expenses.  We worked very hard with the FTC and

14    revised our theories a couple of times to come up with

15    stipulated numbers for expenses.  I think, I know we have

16    not put in for anything unreasonable.

17            For example, we have not made a claim for the

18    cost of the Bio-Slim Patch, although we have made a claim

19    for the cost of the Chinese Diet Tea because the diet tea

20    is a product that was consumed and had independent value.

21    We have not sought expenses -- for the money we've spent,

22    we have gone to great pains to limit that to -- of course

23    it can't be down to the penny but we have gone to great

24    pains to really put fair estimates in of expenses

25    attributable only to the two products at issue.  So, for
```

```
1    example --
2            THE COURT:  What evidence is there in the record
3    that the monies that were spent on, let's take
4    advertising, for example, were monies that were sent to
5    Bronson by the victims rather than Bronson's own monies,
6    right?  In your theory it's got to be traceable, so how do
7    you trace the funds that were used to pay the expenses
8    that you wanted to deduct to, directly to the monies
9    received from the plaintiffs?
10           MR. SHAFFER:  Well, Bronson's source of income
11   was sales of the products, except for the loan we heard
12   about.  I mean that's where they get their money, from
13   selling products.
14           THE COURT:  No, we heard they got money from
15   H&H.
16           MR. SHAFFER:  Except for the loan, yes.  Again,
17   I'm trying to be reasonable here, so if I can trace back
18   an expenditure to the loan, I'm not -- we haven't put in a
19   claim saying the loan money, the loan money paid the
20   fulfillment house, you know, therefore, you shouldn't get
21   any of it.  You know, we've said these are the expenses of
22   the fulfillment house and we think 25.25 percent is fairly
23   attributable to the -- I mean, at some point, Your Honor,
24   unless you want to have a month-long trial, we have to use
25   reasonable estimates.
```

 1          So, you know, I don't think we've done anything

 2   unreasonable.  We haven't put in, you know, claims for

 3   general overhead.  We haven't put in any claims for salary

 4   to the Howards.

 5          THE COURT:  Your theory under Great Western is

 6   that if the monies are dissipated, then too bad, there's

 7   no equitable relief.  Don't you bear the burden of

 8   demonstrating that the money has been dissipated?

 9          MR. SHAFFER:  Admittedly -- I think under Verity

10   I think we do bear the burden of these offsets.  I think

11   we do bear the burden of that.  I think that's a fair

12   statement.  I think we bear the burden of showing --

13          THE COURT:  Verity doesn't say you can simply

14   show that the entity had expenses, does it?  It says, read

15   together with Great Western, you have to show that the

16   money, the property has been dissipated.

17          (Pause)

18          MR. SHAFFER:  We received money from the sale of

19   products.  We used that money to pay these expenses.  You

20   know, whether there's a dispute on, you know -- of course

21   we're -- we haven't done it down to the penny but it's

22   clear, you know, Bronson earned money by selling products.

23   That was their source of income.  That's where the money

24   came from.  That's -- that's who paid those expenses.

25   So --

1          THE COURT:  Three quarters of Bronson's products

2    were not subject of this suit and they made a lot of money

3    on those or they brought in a lot of money on those

4    products.  And, for all I know, it's that money that was

5    used to buy the advertising and the green tea and

6    everything else.  You haven't shown --

7          MR. SHAFFER:  Well, there's no basis for that

8    though.

9          THE COURT:  Isn't it your burden to show --

10   that's the point, there's no basis.

11         MR. SHAFFER:  Okay, well -- there are two

12   separate components here.  There is the issue of whether

13   these costs are -- there's the issue of whether, there's

14   the legal issue of whether we're entitled to these offsets

15   and there's the factual issue of whether we've sustained

16   our burden on them.  Your Honor is the trier of fact, so

17   to the extent you're saying we haven't sustained our

18   burden, we can talk about the facts here.  The discussion

19   started off as a legal discussion and so I would submit to

20   you that, again, you are constrained by the limits of

21   equitable restitution as defined in the Great West case.

22         And to, and, you know, I don't -- I don't want

23   anything I say to be interpreted as I'm saying, yeah, go

24   ahead for us to spend the money and we're off the hook.

25   But to the extent that you are frustrated with the result,

1     those are the limits of the FTC act and equitable

2     restitution and, you know, there may be other remedies

3     available but that's not what was charged with here.  The

4     FTC can seek equitable restitution.  You know, I attempted

5     to illustrate what the definition of that is and I think

6     it's a valid definition.

7              THE COURT:  Read Footnote 10 in Verity.

8              MR. SHAFFER:  I'm sorry?

9              THE COURT:  Read Footnote 10 in the Verity

10    decision.  Or I'll read it to you, how about that.

11              "We emphasize that equitable restitution is not

12    limited to an award of the very funds that unjustly

13    enriched the defendant and are still in defendant's

14    possession.  Rather, tracing principles apply to allow a

15    plaintiff to follow unjustly obtained funds into their

16    product in the defendant's possession."  Which would

17    suggest that the receipts that the defendants obtained,

18    even if they are dissipated -- they bought a house, they

19    bought a car, they bought jewelry, whatever -- the money

20    is not there anymore; yet the product is in the

21    defendant's possession.  To the extent the defendants have

22    assets that were obtained through these funds, they are

23    subject, aren't they, to restitution under Verity?

24              MR. SHAFFER:  I think it would suggest that, I

25    think it would suggest that what you posited is -- I think

1    it would suggest that to the extent that we use money from

2    the sale of products not at issue to this case and possess

3    those monies, you know, I think that's what that applies

4    to.  To the extent that we paid -- to the extent that we

5    have this money and money is fungible and we have, you

6    know, we have $8 million coming in and a certain amount

7    going out and, yes, some of the funds aren't exactly

8    traceable but we know they were coming from the sale of

9    products, I think that's what that applies to.

10            And so, if I could, if I could show you what we

11   have spent, if I showed you that we spent all the profits,

12   you know, that we spent all the profits from the tea and

13   the Bio-Slim Patch and only kept the money from the other

14   products, I think then that's where this footnote would

15   come in and would hurt us, but that's not what we're

16   claiming here.  We're claiming that these are reasonable

17   and legitimate offsets and I think principles of

18   restitution mean, you know, there's counter restitution,

19   and that's where, for example, the cost of the product,

20   you know, if you order -- the court in equity ordering

21   restitution would also have to have the plaintiff pay back

22   the value that it received from the defendant, which in

23   this case one of those, you know, the primary example of

24   that would be the cost of the tea.  And I think that --

25            THE COURT:  Did the victims here unjustly obtain

1    a benefit from the defendants?

2          MR. SHAFFER:  Did the victims unjustly obtain --

3    no.

4          THE COURT:  You're saying.

5          MR. SHAFFER:  No.

6          THE COURT:  So how can there be counter

7    restitution if they didn't unjustly obtain the tea?

8          MR. SHAFFER:  Well, this --

9          THE COURT:  How can you obtain restitution for

10   the value of the tea?

11         MR. SHAFFER:  Because under principles of

12   restitution, if they -- they are -- they received the tea.

13   It is a product that is not snake oil, that they consumed,

14   and it is appropriate that that be an offset because that

15   is a value they received.  I think the values might be

16   higher but we don't put in for the cost of it.

17         THE COURT:  And what supports that view?  If you

18   sell, if you sell somebody a diamond and it's really a

19   rhinestone, do you get the value of the rhinestone back?

20         MR. SHAFFER:  I did cite a case -- admittedly

21   there are cases going both ways but there are cases that

22   go both ways, I mean -- if you give me a moment, Your

23   Honor.

24         (Pause)

25         I apologize.

```
 1          (Pause)
 2          MR. SHAFFER:  The 2nd Circuit had a case, Amy
 3     Travel, where they deducted the amount of payments from
 4     customers who used vacations even though the vacations
 5     were improperly marketed.
 6          The case of FTC v. QT is a 2nd Circuit case
 7     which says the appropriate remedy in this court here is
 8     profits.
 9          The FTC v. Security Rare Coin and Bullion
10     Corporation deducted the value of, current value of coins
11     from the damages owed by the defendants who falsely made
12     false representations to sell them.
13          There are the two, the cases I was just
14     referring to a moment ago, FTC v. Wetherill, which
15     cosmetics, perfume and "cheap jewelry," cheap jewelry in
16     quotes, were -- the value of that was credited as an
17     offset to defendants.
18          FTC v. Kuykendall which is a case that
19     Ms. Eichen mentioned, said that a defendant's gross
20     receipts merely are a baseline to establish a restitution
21     amount and that satisfied consumers, such amount may be
22     offset where consumers were satisfied with their purchase.
23          There's a couple other cases too and I'm not
24     disputing there are cases on both sides of it, but your
25     question to me was are there cases that say this and the
```

1   answer is yes, there are cases and they've been cited in

2   our brief.

3        THE COURT:  Okay.  Do you want to comment on the

4   question of injunctive relief?

5        MR. SHAFFER:  One moment, Your Honor.

6        (Pause)

7        MR. SHAFFER:  Your Honor asked the FTC earlier

8   about the possibility of consumers obtaining refunds.  The

9   FTC -- do you want to speak on this or -- okay.

10       MR. LUSTIGMAN:  I'll speak on it.

11       MR. SHAFFER:  Go ahead.

12       MR. LUSTIGMAN:  Just this one point, Judge.

13  With respect to the issue of identifying the consumers in

14  order to send them back funds, my understanding is that

15  the company does not have accurate records reflecting the

16  identity of the purchasers, that the FTC knows that, that

17  the records were from their fulfillment house, BMI, that

18  was out of business and they do not have these anymore.

19  They did have them at one time.  They gave the FTC what

20  they had at the time.  And there was an email that was

21  given to the FTC in January of 2009 which says William B.

22  Meyer performed fulfillment services, including storage,

23  packing and shipping from Bronson from October 2004 to

24  2005.  Our warehouse management system was housed on BMI

25  AS 400 server, they tracked the shipment records for all

1    transactions during this period.

2           In 2006, we performed a major migration from our

3    old AS 400 to the new more powerful AS 400 machine.

4    During the migration the data libraries of the former

5    customers, including Bronson Partners, were not

6    transferred to the new system.  The old AS 400 machine has

7    since been cleansed and recycled so we advised the FTC of

8    this.  The company just does not have those records and I

9    can put that on the record if Your Honor wants, but that's

10   what we were advised by William B. Meyer from the

11   fulfillment house.

12           THE COURT:  Okay.

13           MS. EICHEN:  Your Honor, may I speak to that,

14   that one question?

15           THE COURT:  Sure.

16           MS. EICHEN:  Your Honor, I maintain that the FTC

17   has been asking for, since the inception of this case,

18   asking for records of consumers and consumer complaints

19   and has never gotten an answer from the defendants.  And

20   this came up in the -- this email which is part of the

21   supplementary answers to interrogatories, Plaintiff's

22   Trial Exhibit Number 2, came in the context of us asking

23   for the sales figures of Chinese Diet Tea for 2005.

24   Doesn't say that the prior company, which was BMI, which

25   had most of the defendant's sales, do not have records of,

1    of the sales of Chinese Diet Tea or Bio-Slim Patch to

2    consumers.  And if that is so, then it's the first time

3    that the FTC is finding that out is today.

4              And, furthermore, that should not allow the

5    defendants to destroy or fail to maintain the records of

6    consumer losses that were requested since the very first

7    discovery in this case and profit by that wrongdoing, to

8    make it impossible for consumers get their money back and

9    profit by that.

10             If indeed it is impossible to provide direct

11   restitution to consumers, case law abundantly provides

12   that it's not a penalty and it is equitable for those

13   funds to be disgorged to the United States Treasury.

14             THE COURT:  Okay.  Thank you.

15             MR. LUSTIGMAN:  Just one other comment, Judge.

16   My understanding is that BMI, who was the fulfillment

17   company, transferred the records to William Meyer and it's

18   William Meyer who then subsequently purged the system.  We

19   don't have them.  We didn't destroy anything.  We didn't

20   get rid of a record.  We just didn't have it.

21             THE COURT:  Okay.

22             MR. LUSTIGMAN:  That's my understanding.

23             THE COURT:  All right.  Mr. Shaffer, did you

24   want to comment on the request for injunctive relief?

25             MR. SHAFFER:  Yes.  I think injunctive relief is

```
 1    unnecessary in this case.  First of all, it's my
 2    understanding that they are no longer -- the company's no
 3    longer doing business.  Second of all, I think any fencing
 4    in is inappropriate and to the extent that Your Honor is
 5    going to issue injunctive relief, that it should not go
 6    beyond the accused products.
 7              THE COURT:  Okay.  Anything further?
 8              MS. EICHEN:  No, Your Honor.
 9              MR. HAQ:  No, Your Honor.
10              THE COURT:  All right, thank you all.  I will be
11    writing a decision and I will get it to you as quickly as
12    I can.  It's not too late to settle the case.  I urge you
13    to do that before, before -- I'll urge you to do it again,
14    as I always do.  But I have everything I need to write a
15    decision and I'm not going to await any further report on
16    settlement before issuing a decision.
17              Anything further either, anybody wants to say
18    before we adjourn?
19              MS. EICHEN:  No, Your Honor.
20              MR. HAQ:  No.
21              MS. EICHEN:  Thank you, Your Honor.
22              MR. LUSTIGMAN:  Thank you, sir.
23              THE COURT:  You may want to speak to your
24    client.
25              MR. HOWARD:  I want to say something.
```

1              MR. SHAFFER:  Can you give us a minute before we

2    stand in recess?

3              THE COURT:  Sure.

4              (Pause)

5              MR. LUSTIGMAN:  Thank you, Your Honor.

6              THE COURT:  All right, we'll stand adjourned.

7              (Whereupon the above matter was adjourned at 4:35

8    o'clock, p. m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761