## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

BRONSON PARTNERS, LLC, MARTIN
HOWARD, H & H MARKETING, LLC, and
SANDRA HOWARD,

    Defendants.

CIVIL ACTION NO.
3:04cv1866 (SRU)

## RULING AND ORDER

The Federal Trade Commission ("Commission") brought this enforcement action

challenging as false advertising the claims that the defendants, Bronson Partners, LLC

("Bronson") and Martin Howard (collectively "defendants") made in their advertisements for two

products: Chinese Diet Tea ("Diet Tea") and the Bio-Slim Patch ("Patch").  On July 10, 2008, I

granted the Commission's motion for summary judgment with regard to liability.  I held that: (1)

the subject Diet Tea advertisement made claims about weight loss expressly, or by such strong

implication as to constitute the functional equivalent of express claims; (2) the claims were

misleading; and (3) the claims were material.[1]

    On June 2, 2009, I held a hearing on damages.  At that hearing, I heard argument

concerning four questions that are now before me: (1) what is the proper baseline amount of the

defendants' unjust gains; (2) what reductions, if any, are appropriate when calculating the

defendants' ultimate liability and the proper amount of equitable restitution; (3) to what extent

are the relief defendants, H & H Marketing, LLC ("H&H") and Sandra Howard (collectively

---

[1] Defendants conceded liability with respect to the Patch.

"relief defendants"), jointly and severally liable with the defendants; and (4) is any injunctive relief appropriate, along with the order of equitable restitution?  The following represents my findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

I.      Background

I assume familiarity with the facts and procedural background of this case.  For a detailed discussion of that history, including the factual and legal bases for the defendants' liability, see *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119 (D. Conn. 2008).

II.     Restitution Under the FTC Act

Section 13(b) of the Federal Trade Commission Act states that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  Many circuits have held that the Commission may also seek ancillary equitable relief under Section 13(b), even though it is not expressly provided for under the Act.  *See FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir. 1989) ("the granting of permanent injunctive power 'also gave the district court the authority to grant ancillary relief necessary to accomplish complete justice. . . .'" quoting *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020 (7th Cir. 1988));  *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1102 (9th Cir. 1994), *cert. denied,* 514 U.S. 1083 (1995); *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 468-69 (11th Cir. 1996); *FTC v. Freecom Communications, Inc.,* 401 F.3d 1192 (10th Cir. 2005) ("Although [Section] 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), [Section] 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress.").  In *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006), *cert. denied,* 549

U.S. 1278 (2007) ("*Verity*"), the Second Circuit assumed without deciding that restitution is available as ancillary equitable relief under Section 13(b) of the FTC Act and held that the availability of ancillary equitable relief under Section 13(b) derives from the district court's equitable jurisdiction.  In light of *Verity* and the decisions of other circuits, I conclude that equitable restitution is an available remedy under Section 13(b) of the FTC Act.

Defendants and the Commission disagree about the proper amount of restitution as well as the conceptual framework for calculating restitution.  The Commission argues that, in fashioning an award for consumer restitution, I should impose a remedy that would make consumers whole – that is, restitution should be set at the full amount that consumers paid for products that were falsely advertised.  The defendants argue that the proper equitable restitution remedy consists of the amount of undeserved profit that they garnered, and should not include money spent on certain operating expenses, including the cost of the tea, federal income taxes, postage fees, credit card processing fees, advertising costs, and fulfillment fees.  Anything more than the amount the defendants unjustly profited through their advertising, they argue, is impermissibly punitive in nature

As a general matter, equitable restitution is the appropriate remedy when funds identified as belonging in good conscience to the consumer are traceable to funds in the defendants' possession.  *See Verity*, 443 F.3d at 67; *see also Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212 (2002).  In *Verity*, the Court indicated that, although "in many cases in which the Commission seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant. . . "  restitution is measured by the defendants' unjust gain, rather than the plaintiff's loss.  *Verity*, 443 F.3d. at 68

(quoting *Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005)).  In *Pereira*, the Court, applying

the principles articulated in *Great-West*, held that restitution must not impose personal liability

that is punitive in nature, but should restore to the plaintiff funds in the defendant's possession

rightly belonging to the plaintiff.

The Commission, relying on *FTC v. National Urological Group, Inc.*, 645 F. Supp. 2d

1167, 1213 (N.D. Ga. 2008), argues that restitution is measured "by the amount of loss suffered

by the victim."  That formulation is not binding on this court and directly conflicts with the

holdings of *Great-West* and *Verity*.  The Second Circuit clearly set forth that restitution is

measured by the amount of the defendant's unjust gain.  *Verity*, 443 F.3d at 67.  The core

principle of restitution is to "prevent the defendant's unjust enrichment by recapturing the gains

the defendant secured in the transaction." 1 D. Dobbs, *Law of Remedies* § 4.1(1) at 552.  The

consumer's property, *received* by the defendant, is an appropriate measure of restitution;

therefore, I must calculate a restitution award measured by the defendants' unjust gains.  *Id.* at

556.

In their brief, defendants argue that a restitution award measured by the amount they

received from consumers has the net effect of a punitive damages award because defendants are

no longer in the beneficial possession of those funds.  In support of their position, defendants

point to the court's remand in *Verity* to argue that "the proper procedure in remedies for

restitution/unjust enrichment is for the Commission to seek profits but not proceeds, and for a

defendant to disgorge, a net amount rather than a gross amount." (Def. Tr. Br. 5.)  They argue

that the *Verity* Court's distinction between "unjust gains" and "overall gains" is a distinction

between profits and proceeds, and that it supports an award based on principles of disgorgement,

not restitution.  *Verity*, 443 F.3d at 70; (Def. Tr. Br. 6.)  Defendants misapply the holding of *Verity* and overlook the Second Circuit's conclusion that, in the context of an FTC action, it does not matter whether a remedy is characterized as "consumer redress" or "disgorgement," each remedy is restituionary in nature and does not alter the core principle that restitution is measured by a defendant's unjust gain.  *See Verity*, 443 F.3d at 67.  The *Verity* Court uses the term "gains" to mean receipts, not profits.  *Id.* at 68.

In *Verity,* the Court distinguished between two scenarios, one where the defendant was a direct seller and received funds directly from consumers and then paid various third-parties, and one where consumer funds went through various third-parties, who were paid before funds reached the defendant.  The difference between the two scenarios is whether consumer funds flowed directly to the defendant, or whether a third-party middleman took its payment before the funds reached the defendant.  In transactions where the defendant sells directly to the consumer without the use of a middleman receiving any part of the payment, the defendant's unjust gains are equivalent to the consumer's loss.  *See Verity,* 443 F.3d at 67-68; *see also FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 324 (S.D.N.Y. 2008) ("*Medical Billers*").  If the funds flow directly to the defendant, the defendant is in receipt of the whole amount and thus liable in restitution for the whole amount, i.e., its gain, but if the funds flow through an intermediary who passes only a portion of the funds on to the defendant, the defendant has not unjustly received the whole amount.  *Verity*, 443 F.3d at 67-68.  Here, where there is no middleman, the proper measure of restitution is the full amount of consumer funds paid to the defendants.

With respect to defendants' reliance on the distinction between unjust gains and overall

gains or consumer losses, however, the defendants misunderstand the *Verity* Court's holding and its purpose in remanding that case. *Verity* involved the practice of billing telephone customers for internet access to pornographers' web sites, regardless whether that access was undertaken or approved by the telephone customer. The defendants' overall gain equaled the amount received directly by the defendants for all access to the sites at issue. *Verity*, 443 F.3d at 68. Because some of the internet access actually was undertaken or authorized by the telephone customers, billing for that access was not unjust. *Verity*, 443 F.3d at 69. Thus, the Second Circuit remanded the case for a calculation of the "unjust gain," i.e., the overall gains (total pertinent receipts) less amounts billed for authorized use; only the receipts from unauthorized internet access represented "unjust gains." *Id.*

The problem for the defendants in this case is that there is no evidence that any portion of the defendants' overall gains were just gains. There is no evidence that any subset of Diet Tea or the Patch purchasers actually experienced rapid weight loss as a result of using defendants' product. Thus, in this case, "overall gains" equal "unjust gains." Applying the framework established by the *Verity* Court, I will measure restitution by the consumer dollars *received* by the defendants for sales of Diet Tea and the Patch.

A.     Restituionary Baseline

To determine the proper amount of restitution, I am to utilize a "two-step burden-shifting framework for calculating the size of disgorgement relief. This framework requires the Commission to first show that its calculations reasonably approximated the amount of the defendants' unjust gains, after which the burden shifts to the defendants to show that those figures were inaccurate." *Verity,* 443 F.3d at 68. The initial approximation depends on the

information available to the Commission and all relevant information is considered in arriving at

an estimate.   I recognize that the reasonable estimation will vary with the degree of precision

possible based on the information available to the Commission.  *Id.* at 69; *see also Medical*

*Billers*, 543 F. Supp. 2d. at 325.  In this case, the information available to the Commission is

sparse because the defendants failed to keep standard types of records, including customer lists,

orders, and returns.  (Damages Hr'g. Tr. 198, June 2, 2009.)

The defendants sold Diet Tea and the Patch from early 2003 through 2004.  (Joint Tr.

Mem. 17)  Sales of Diet Tea and the Patch account for 25.25% of defendants' total revenue.  (Tr.

Mem. 20.)  The parties agree that the defendants sold Diet Tea to consumers for $24.95 per box,

plus $5 for shipping and handling, for a total of $29.95.  (Tr. Mem. 18).  The defendants filled

57,177 orders for the Diet Tea between January 1, 2003 and December 31, 2004, resulting in

sales of $2,001,494 of Diet Tea.  (Tr. Mem. 18).   During the same time period, defendants

issued $122, 454 in check refunds to consumers who purchased Diet Tea.  (Tr. Mem. 18).  The

defendants sold the Patch to consumers for $24.95 plus $5-6 in shipping and handling.  (Tr.

Mem. 18).  The defendants filled 1,990 orders for the Patch resulting in sales of $69,763.  (Tr.

Mem. 18).   During the same time period, the defendants issued $6,478 in check refunds to

consumers who purchased the Patch.  (Tr. Mem. 18).  The parties agree that the total amount of

gross revenues to the defendants from sales of Diet Tea and the Patch minus check refunds was

$1,942,325.  (Tr. Mem. 18).

The Commission's restitutionary baseline calculation ends here and it claims defendants'

unjust gain is $1,942,325.   Because the Commission, based on the information available to it,

met its burden of making a reasonable approximation of defendants' unjust gains, the burden

shifts to the defendants to show that the estimation is inaccurate.  Defendants argue that the

Commissions's calculation fails to account for all customer refunds, including those in the form

of chargebacks (credit card refunds) and bounced checks.  Generally, defendants are entitled to

offset the amount of their unjust enrichment by the amount of customer refunds issued.

Defendants concede that they cannot trace chargebacks and bounced checks to orders of Diet Tea

and the Patch rather than to other products sold by the defendants.  (Hr'g. Tr. 23-25).  Defendants

ask the court to accept their approximation that, because 25.25% of their gross revenue for the

years 2003-2004 derived from sales of Diet Tea and the Patch, 25.25% of all chargebacks and

bounced checks during the same period are attributable to Diet Tea and Patch.  For the period

2003-2004, defendants issued $42,488.75 in chargeback refunds for all products sold.  They

argue that $10,728.40 of that amount should be deemed attributable to sales of Diet Tea and the

Patch.  Likewise, defendants presented evidence of $49,813.83 in bounced checks attributable to

all products over the same time period.  They argue that $12,577.99 should be deemed

attributable to sales of Diet Tea and the Patch.

 I reject this approach.  Defendants offer no evidence tracing a single chargeback or

bounced check to sales of Diet Tea or the Patch.  It is entirely possible that the amount of

chargebacks and bounced check fees attributable to Diet Tea or the Patch exceed 25.25% of total

chargebacks and bounced checks.  It is also entirely possible that defendants issued few, if any,

chargeback refunds and received few bounced checks for Diet Tea and the Patch.  When

defendants' lack of record keeping renders it impossible to distinguish between just and unjust

gains, the risk of the uncertainty falls on the wrongdoer.  *See FTC v. Febre*, 128 F.3d 530, 535

(7th Cir. 1997).

If defendants could trace any refunded amount directly to customers of Diet Tea and the Patch, they would be entitled to offset that amount against the amount of restitution.  Here, however, defendants cannot trace any of the bounced checks or chargebacks to orders of Diet Tea and Patch, and the proffered 25.25% therefore amounts to mere speculation.  Accordingly, I find that the restitutionary baseline of defendants' unjust gains is $1,942,325.

III.    Claimed Offsets for Operating Costs, Reorders, and Internet Sales of Diet Tea

The defendants argue that an award of $1,942,325 fails to account for defendants' actual profit and effectively penalizes the defendants.  Essentially, they argue that their unjust gain is their actual profit and that they are entitled to deductions for operating costs such as the cost of the tea, advertising expenses, credit card fees, fulfillment costs, postage fees, and income taxes.[2] Defendants calculate those offsets using the same speculative 25.25% number I rejected above. Defendants also claim entitlement to additional offsets for sales attributable to re-orders from "satisfied customers" and sales generated by internet advertisements.  The Commission filed four motions *in limine* on these issues: (1) to preclude the introduction at trial of evidence relating to the liability of defendants Bronson Partners, LLC and Martin Howard with respect to the advertisements of Diet Tea and the Patch (doc. # 179); (2) to preclude the introduction at trial of evidence relating to payments, charges, fees, debits, or deductions defendant Bronson made after consumer payments Diet Tea and the Patch were deposited in its bank accounts (doc. # 175); (3) to rule that all advertisements of Diet Tea are equally deceptive to the version of the advertisement attached to the Amended Complaint as Exhibit A and to rule that all revenue for

---

[2] Defendants' suggested reductions, including an offset for Diet Tea sales attributable to the internet advertisement results in credit to them in the amount of $204,922.58.

Diet Tea is attributable to the deceptive advertising (doc. # 183); and (4) to preclude defendants

and relief defendants from introducing at trial evidence of re-orders to prove consumer

satisfaction as an offset to equitable relief (doc. # 187).

A.     **Operating Costs**

On the issue of offsets for operating costs, the Commission filed a motion *in limine* to

preclude the defendants from introducing evidence relating to payments, charges, fees, debits, or

deductions made after consumer payments for Diet Tea and the Patch were deposited in the

defendants' account.  (doc. # 175).   In their brief, the defendants argue for a narrow reading of

the Court's holding in *Great-West*, claiming that equitable relief *must* be something less than the

full amount the defendants received from their misconduct.  *See Great-West,* 534 U.S. at 209

("'[e]quitable' relief must mean *something* less than *all* relief") (emphasis in the original).  In this

case, because the amount of unjust gain is equal to the amount of consumer loss, defendants

maintain that I must reduce the award to comply with the language in *Great-West*.  They argue

that the award must reflect only what is in their possession and if consumer dollars were

expended by defendants while carrying out the fraud, defendants are no longer in beneficial

possession of those funds, which are no longer subject to restitution.  Accordingly, defendants

ask that I fashion a restitution award crediting them for the cost of green tea, monies spent on

advertising, credit card fees, fulfillment and shipping fees, and income taxes paid to the federal

government.  The total amount of these operating expense deductions sought by defendants is

$1,986,119.58 including $1,217,862.60 in costs for advertising Diet Tea.

The defendants' interpretation of *Great-West* is unsupported by the text of that decision

and the Second Circuit's application of *Great-West* in *Pereira*.  *See Great-West*, 534 U.S. at 209-

11; *see also Pereira*, 413 F.3d at 341.  In *Great-West*, the Court applied the holding of *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251 (1993), to a claim for specific performance under ERISA and held that, in the context of Congressionally sanctioned remedies, the term "equitable relief" is a modifier limiting the types of relief to those traditionally available in equity, such as mandamus, injunction or restitution.  *Great-West*, 534 U.S. at 209-11 ("As we explained in *Mertens* '[e]quitable relief must mean *something* less than *all* relief.' . . . Thus, in *Mertens* we rejected a reading of the statute that would extend the relief obtainable under §502(a)(3) to whatever relief a court of equity is empowered to provide in the particular case at issue (which could include legal remedies that would otherwise be beyond the scope of the equity court's authority).  Such a reading, we said, would 'limit the relief *not at all*' and 'render the modifier ["equitable"] superfluous.'  Instead, we held that the term 'equitable relief' in § 502(a)(3) must refer to 'those categories of relief that were *typically* available in equity. . . .'") (internal citations omitted, emphasis in the original).  Thus, the remedies available to a court in equity are something less than all remedies, that is, the court is limited only to equitable remedies, and cannot award legal remedies.  Nothing in *Great-West* supports defendants' assertion that I must reduce the award because the restitution award happens to reflect the full amount of consumer losses.

    First, defendants' request for an offset for postage and income taxes paid to the federal government rests on the argument that postage and taxes are monies already in the hands of the federal government.  This argument is meritless.  The award of restitution for acts of deceptive advertising does not compensate the government.  The court looks to restore the victims, here, the consumers, to their position prior to the deceptive sale.  *FTC v. Figgie International Inc.*, 994 F.2d 595, 606 (9th Cir. 1993).  To the extent that the Commission is incapable of returning any

portion of this award to the consumer, it is because the defendants have failed repeatedly to supply the Commission with customer records.  Under these circumstances, where repayment is not feasible, the remainder of the award may be paid to the United States Treasury.  *See Febre*, 128 F.3d at 537.

Turning to the other offsets, as I previously stated, the proper measure of restitution is the "benefit unjustly received by the defendants," *Verity*, 443 F.3d at 67, *not* the total amount of the defendants' profit.  *See FTC v. SlimAmerica*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999).  In this case, as "in many cases in which the Commission seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant."  *Verity*, 443 F.3d at 67-68.  Costs incurred by the defendants in perpetrating their fraud are not passed on to the victims.  *SlimAmerica*, 77 F. Supp. 2d at 1276.  The amount of actual profit that the defendants may realize is not relevant, and if the defendants lose money engaging in prohibited conduct there is no bar to restitution.  *See Febre*, 128 F.3d at 536; *see generally SEC v. Druffner*, 517 F. Supp. 2d 502, 511-12 (D. Mass. 2007), *aff'd. sub nom, SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008).

Payments the defendants made to third parties are not allowable offsets as a matter of law, nor are net profits the appropriate measure of restitution.  *See generally Verity*, 443 F.3d at 67-68; *FTC. v. Seismic Entertainment Productions*, 441 F. Supp. 2d 349 (D.N.H. 2006).  The formula for calculating redress for consumer injury is straightforward: "(1) calculate the gross receipts received from all consumers subjected to the contumacious acts of the defendants, (2) offset gross receipts to the extent the defendants prove that consumers either received refunds or were satisfied with their purchases, [and] (3) order the liable defendants to pay the resulting

amount. . . ." *Kuykendall*, 371 F.3d 745, 767 (10th Cir. 2004).  The defendants argue they did not

"receive" the $1,942,325 from the consumers because operating costs they later paid out account

for a significant portion of those funds.

Again, the Second Circuit's holding in *Verity* is instructional here.  The *Verity* defendants

were liable for unauthorized charges arising out of access to adult-content websites.  At issue in

*Verity* were two time periods, each with a different billing structure.  During the first billing

period, called the "AT&T period," the charges were billed directly to consumers by AT&T who

would then collect the payment from the consumers and then pay itself and another entity that

facilitated the calls.  The second entity would then pay the defendants.  Therefore, the *Verity*

defendants did not receive the entire amount charged and paid to AT&T, they only received a

portion of that amount.  The second billing period, called the "Sprint period," began after AT&T

terminated the *Verity* defendants' contract.  During the Sprint period the defendants utilized a

third-party billing service called "Ebillit."  Ebillit handled billing and collection of payments.

During the Sprint period, all of the collected payments were forwarded from Ebillit to the

defendants.  The defendants then paid Sprint and other third parties.  Thus, during the Sprint

period the defendants received all of the consumer funds.  Because the district court had

calculated the restitution award to include the full amount of customer payments for both periods,

the Second Circuit remanded the case with orders for the district court to determine the actual

amount received by the defendants during the AT&T period.  The Second Circuit distinguished

between the two periods, noting that the cascading payment structure "during the AT&T period

indicates that AT&T [and others] received some fraction of the money paid by consumers before

any payments were made to the defendants-appellants."  *Verity*, 443 F.3d. at 68.  The Court noted

that in this payment structure "[o]nly the remaining fraction of total billings unjustly enriched the defendants-appellants and may be the basis for a disgorgement remedy." *Id.* For funds received during the Sprint period, defendants were ordered to disgorge all revenues received from Ebillit. *Id.* The lesson from *Verity*, as noted above, is that where no middleman takes a portion of the consumer dollars, the full amount of those proceeds, even if they are equivalent to the consumers' losses, may be the subject of an award of equitable relief. *Id.* at 67-68; *see also Medical Billers*, 543 F. Supp. 2d at 324.

In this case, the defendants were direct sellers and received all of the consumer dollars spent on sales of Diet Tea and the Patch. To order Diet Tea and the Patch, consumers called a toll-free number or sent in a mail-order form. (Tr. Mem. 18). Consumers paid for the products with check, credit card or money order. *Id.* The defendants utilized a third-party call center, Taction, to handle the telephone and fax orders. *Id.* Taction accepted credit card orders and provided customer service through late 2004. *Id.* Defendants used BMI Fulfillment Services ("BMI") from April 2003 through September 2004, and later William B. Meyer, Inc. ("Meyer") from October 2004 on to receive and process mail orders, ship the products and process refunds. *Id.* BMI and Meyer deposited all of the funds paid by consumers directly into defendants' bank accounts at Hudson United Bank. *Id.* Credit card payments went one account, checks and money orders to another. Refunds were issued from a third account. *Id.* Defendants paid BMI, Meyer and Taction monthly for the services performed. *Id.*

Bronson did not track the flow of the sales proceeds of either Diet Tea or the Patch once it received full payment for those products from BMI and Meyer. (Tr. Mem. 20). BMI and Meyer kept physical inventory of the product. (Hr'g. Tr. 15.) BMI, Meyer and the unnamed

credit card processing company collected the funds for Diet Tea and the Patch and deposited them into Bronson's accounts. (Hr'g. Tr. 19.) None of the companies deducted fees for their services from the deposits. *Id.* The companies billed Bronson for the services. *Id.* Sandra Howard testified at the hearing that Bronson paid BMI and Meyer before they incurred shipping costs, but only after those monies were first deposited in Bronson's account. (Hr'g. Tr. 19-21.) Similarly, credit card fees were paid by the defendants to the credit card companies. Defendants argue that credit card fees were pre-authorized on credit card transactions and paid directly from their account at Hudson United Bank; for that reason, defendants argue they never received those fees in the sense that they did not have beneficial access to the funds. (Hr'g. Tr. 23- 25.) Defendants, however, did receive the full amount of credit card payments. (Hr'g. Tr. 25.)

It is clear that defendants acted as direct sellers. The use of third parties Taction, BMI and Meyer to facilitate the transactions does not change that fact. Defendants received 100% of the consumer dollars including shipping and handling fees from the sales of Diet Tea and the Patch. (Hr'g. Tr. 21.) Like the *Verity* defendants during the Sprint period, only after they received the entire amount did defendants allocate receipts to third parties. The defendants' claimed offsets are essentially operational costs. Because "[t]he appropriate measure for redress is the aggregate amount paid by consumers, less refunds made by the defendants. . . . [C]osts incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims." *SlimAmerica,* 77 F.Supp. 2d at 1276. Accordingly, I will not credit the defendants for operating costs including shipping fees, income taxes, advertising costs, fulfillment costs, and credit card fees.

Defendants also maintain that they are entitled to a deduction for the cost of Diet Tea

itself because customers actually received green tea packets and benefitted from the nutritional value of drinking green tea.[3]  The Commission argues that the defendants are not entitled to an offset for any value the consumer received, because consumers of Diet Tea thought they were purchasing a weight loss aide, not a beverage.  In cases of deceptive advertising, the primary purpose of restitution is to restore the victims to their position prior to the deceptive sale.  *See Nat'l Urological*, 645 F. Supp. 2d at 1212-13.  "The fraud in the selling, not the value of the thing sold, is what entitles consumers . . . to full refunds." *Figgie Int'l*, 994 F.2d at 606.  In *Figgi*e customers had purchased rhinestones sold as diamonds, and the court held that the defendants could not reduce their restitution order by the value of the rhinestones.  Here, the buyers were purchasing Diet Tea for the purpose of miracle weight loss.  Even though the tea may have provided some intrinsic value itself, it was sold for weight loss purposes not for refreshment purposes and I will not deduct any value the consumer received. *Figgie Int'l*, 994 F.2d at 606; *see also Nat'l Urological*, 645 F. Supp. 2d at 1213.  Accordingly, the defendants are not entitled to any offset for the inventory cost of the Diet Tea.

The Commission's motion *in limine* (doc. # 175) is denied as moot in light of the above rulings on the treatment of operating costs.

## B.    Reorders

The Commission filed a motion *in limine* to preclude evidence of reorders from satisfied customers as the basis for an offset.  (doc. # 187).  The motion is denied as moot because defendants failed to introduce any evidence at trial about what influenced the customers' decisions to reorder and what percentage of revenue is attributable to reorders.  In their Brief in

---

[3] Defendants do not seek a reduction for the cost of the Patch.

Opposition to the Commission's Motion, defendants argue that 8% of the Diet Tea revenue was generated by reorders. The law permits defendants to offset against the restitutionary baseline purchases by consumers who were "wholly satisfied" with their purchases. *Kuykendall*, 371 F.3d at 767. Consumers who reordered Diet Tea and the Patch may have done so because they were satisfied with the products, or they may have done so because they had not yet achieved the results promised in the deceptive advertising. The Commission demonstrated, and I found, that the defendants' misrepresentations were material, and widely disseminated, therefore I may presume, absent evidence to the contrary, that Bronson's customers relied upon the deceptive advertisements when placing reorders for Diet Tea and the Patch. *See Figgie Int'l*, 994 F.2d at 605-06; *see also Nat'l Urological*, 645 F. Supp. 2d at 1213. The burden is on the defendants to introduce evidence that the repeat customers did not rely on the deceptive advertising in placing their orders but instead on their own satisfaction with the product. Nothing in the record supports that proposition and defendants failed to provide the court with anything more than speculation that reorders are evidence of consumer satisfaction. Defendants are not entitled to any offset for re-orders placed by satisfied customers.

C. **Internet Sales of Diet Tea**

Defendants seek a reduction of the restitutionary baseline for sales not attributable to the advertisements forming the primary bases of the Commission's false advertising action. The magazine ads were coded and Diet Tea purchases are directly traceable to the ads. Untraced purchases, defendants argue, stem from allegedly less deceptive internet and catalog advertising. The Commission filed two motions *in limine* concerning those advertisements. The motion to Preclude the Introduction at Trial of Evidence Relating to the Liability of Defendants Bronson

-17-

Partners, LLC and Martin Howard with Respect to the Advertisements of Chinese Diet Tea and the Bio-Slim Patch (doc. # 179) is denied as moot because the defendants did not offer at the hearing any evidence refuting the liability of Bronson or Martin Howard.  With respect to the Commission's motion *in limine* to Rule That All Advertisements of Chinese Diet Are Tea Equally Deceptive to the Version of the Advertisement Attached to the Amended Complaint as Exhibit A and to Rule That All Revenue for Chinese Diet Tea Is Attributable to the Deceptive Advertising (doc. # 183), I grant the motion for the reasons set forth below.

Defendants first advertised Diet Tea through magazine advertisements.  (Tr. Mem. 19.) There were three versions of that advertisement, Version A (Tr. Ex. 4), Version B (Tr. Ex. 5), and Version C (Tr. Ex. 6).  (Tr. Mem. 19.)  For advertisements published in magazines, the defendants utilized an identification number beginning with the prefix DGT to trace the revenues from specific advertisements.  *Id*.  Defendants also advertised Diet Tea on the defendants' website and through a catalog.  (Tr. Mem. 19-20.)  Orders placed from Version E on the website (doc. #184, Ex. 6 ) and Version D from the catalog (Tr. Ex. 7) were phoned, faxed or mailed in and those purchases were not tracked with a DGT number. (Tr. Mem. 19-20.)  It is undisputed that defendants gross revenue from the sales of Diet Tea is $2,001,494.   (Tr. Mem. 18.) Defendants yielded gross revenues of $1,806,124.66 attributable to sales from Version A, $12,129.60 from Version B, and $22,090.61 from Version C.  (Tr. Mem. 19-20.)  The traceable sales from magazine advertisements total $1,840,344.87 or 91% of total revenue from Diet Tea. Diet Tea revenues of $161,148 are not traceable through DGT tracking codes.  (Tr. Mem. 20.)

In my ruling on the Commission's Motion for Summary Judgment, I found Version A to be materially misleading and deceptive.  *Bronson*, 564 F. Supp. 2d at 124-36.  Version A

contained the following statements that I found to be deceptive and misleading:

a. **POWERFUL GREEN DIET TEA Chinese Diet Tea  SHEDS POUND AFTER POUND OF FAT - FAST!**

b. Let this powerful Chinese Green Diet Tea help you lose those unwanted pounds. Can you imagine losing weight by simply drinking a cup of refreshing tea?  Well, that is all you now have to do to lose weight with one of the "easiest" and most effective diets ever discovered.

c . **4 Week Course, You'll lose up to 25 lbs, $24.95**
   **8 Week Course, You'll lose up to 50 lbs, $39.95**
   **       Save $16.00**
   **12 Week Course, You'll lose up to 75 lbs, $49.95**

d. "I have been on the program for 6 weeks and have not religiously followed the schedule of a cup of tea after every meal.  However, I have gone from 240 lbs down to 210 lbs.  I feel better."  Gerald G.

e. "We (my husband and I) have lost 45 lbs. so far.  Send extra order forms for friends."  Doris T.

f. **WARNING:** Doctors recommend that weight loss must be achieved gradually over an extended 8-12 week period.  We therefore recommend that you do not lose weight too suddenly.  If very rapid weight loss occurs, stop taking Chinese Green Diet Tea for 10-14 days and consult your doctor.  (Tr. Ex. 4).

In addition, Version B contains the following statements which are similar to the

statements I found deceptive and misleading in Version A:

a. **GUARANTEED! Chinese Green Diet Tea** has been clinically trialed [sic].  All participants lost weight.  We guarantee to refund your purchase price in full (less sh/h) no questions asked.  **REMEMBER,** the more **Chinese Green Diet Tea** you drink, the more weight you may lose . . .

b. **Lose Lots of Weight in 10 Weeks!** "After 10 weeks my weight was down to 104 lbs.  I lost weight so fast my doctor ordered me to slow down."

c. **You eat your favorite foods - but STILL lose weight.**
   • **Reduces sugar absorption**.
   • **Helps prevent fat absorption.**
   • **Doubles your metabolic rate to burn calories fast.**
   • **Powerful herbal formula helps you stop snacking.**

d. **The Chinese Green Diet Tea's secret herbal ingredients act in four ways to help you lose weight.**
   1. Reduces sugar absorption.  This means you can eat sweet buns and chocolate without putting on so much weight.
   2. Reduces absorption of animal fats and dairy products.  This controls the fattening effects of butter, cheese, pate, sausages and fatty meats.

3.      Speeds digestion of food in the Intestine.  This prevents food laying in your stomach for 24 hours or more and contributing to that "pot belly" look.  The faster digestion of food means fewer calories are absorbed into the body.

4.      Acts as an effective appetite suppressant to reduce snacking.

e.      Researchers found that those who drank Chinese Diet Green Tea burned additional calories every week with no change in diet or physical activity!  (Tr. Ex. 5.)

Version C contains the following statements, which are similar to the statements I found to be deceptive and misleading in Version A:

a.      **Lose Lots of Weight in 10 Weeks!** "After 10 weeks my weight was down to 104 lbs.  I lost weight so fast my doctor ordered me to slow down."

b.      **GUARANTEED! Chinese Green Diet Tea** has been clinically trialed [sic] on 163 patients.  All participants lost between 18 lbs. and 75 lbs. over the 12 week trial period.  If you do not lose similar amounts of weight, we guarantee to refund your purchase price in full (less s/h).  **REMEMBER** the more Chinese Green Diet Tea you drink, the more weight you may lose!

c.      You eat your favorite foods - but STILL lose weight!
- Eliminates an amazing 91% of absorbed sugars.
- Prevents 83% of fat absorption.
- Doubles your metabolic rate to burn calories fast.
- Powerful herbal formula helps you stop snacking.

d.      **The Chinese Green Diet Tea's secret herbal ingredients act in four ways to help you lose weight.**

1.      Reduces sugar absorption by an amazing 91%.  This means you can eat sweet buns and chocolate without putting on so much weight . . .

2.      Reduces absorption of animal fats and dairy products by 83%.  This controls the fattening effect of butter, cheese, pate, sausages and fatty meats.

3.      Doubles digestion of food in the intestine.  This prevents food laying in your stomach for 24 hours for more and contributing to that "pot belly" look.  The faster digestion of food means fewer calories are absorbed into the body.

4.      Acts as an effective appetite suppressant to reduce snacking.

e.      Researchers found that those who drank Chinese Diet Tea burned an additional 500 calories per week, with no change in diet or physical activity!  (Tr. Ex. 6.)

Version D, the catalog version, is substantially the same as Version A with respect the claims made regarding weight loss.  The only noticeable difference between version A and

-20-

Version D is the order box.  (Tr. Ex. 7.)  Version D offers only a toll-free telephone number

ordering option.   There is no discernable difference between the claims made in Versions A, B,

C, and D.

      Version E, the internet advertisement (doc. #184, Ex. 6) makes the following claims:

    a.      You Eat Your Favorite Foods - But Still Lose Weight Fast!
    b.      Triple action Chinese Diet Tea helps eliminate the absorption of carbohydrates
        and helps prevent fat absorption.  It increases metabolic rate to burn calories and
        is a natural, effective weight loss option for men and women of all ages.  You may
        lose weight and benefit from the natural healthy benefits of green tea.  Each cup
        contains approximately 20 mg of caffeine

      Version E noticeably lacks the more outrageous claims of the other four versions.  In

versions A, B, C and D, "the advertisement statements are so clear, repetitive, and unambiguous

that they constitute the functional equivalent of express claims."  *Bronson*, 564 F. Supp. 2d at

128.  Version E does not contain the same repetitive language concerning rapid weight loss, fat

blocking properties of Diet Tea, and its ability to increase metabolic rate, however, it does

represent that Diet Tea is a weight loss facilitating drink.  Furthermore, nothing in Version E

would lead a consumer to believe they were ordering Diet Tea for any other purpose than to lose

weight.  Each of these advertisements make the same core claim that consumers who drink Diet

Tea will experience rapid weight loss.  Moreover, although Version E is less deceptive than the

print ads, there is no evidence that any consumer purchased Diet Tea through the internet.

Accordingly, I find that all advertising of Diet Tea was materially deceptive and that all sales of

Diet Tea are traceable to the false and deceptive advertising.

      The defendants fail to show entitlement to any offset.  I find that the Commission's

calculation reasonably approximated the defendants' unjust gains and the defendants have failed

-21-

to demonstrate that the calculation is inaccurate.  Using defendant's gross receipts minus refunds

to consumers as the proper restitutionary baseline, I order the defendants to pay $1,942,325 in

equitable restitution.

IV.    Apportioning Liability Among the Defendants and Relief Defendants

I now turn to the allocation of liability among the defendants and relief defendants.

Bronson and Martin Howard are defendants in this case; H&H and Sandra Howard are relief

defendants.  During the hearing on damages the Commission made an oral motion (doc. # 212)

pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend the complaint to

conform to the evidence and treat H&H as a full defendant on the ground that H&H is an alter

ego of Martin Howard or, in the alternative, engaged in a common enterprise with Bronson.

(Hr'g. Tr. 142-43.)  The Commission argues that H&H operates as a mere alter ego of Martin

Howard, and that the Howards used H&H solely for tax and accounting purposes (and as their

personal bank account).  In the Commission's view, H&H should be a full defendant in this case

and held jointly and severally liable for the entire amount of restitution.  Alternatively, the

Commission argues that H&H is engaged in a common enterprise with Bronson and should

therefore be a full defendant in this case and held jointly and severally liable for the entire award.

The Commission also argues that Sandra Howard fails to demonstrate a legitimate claim

to any funds she was paid by H&H on behalf of Bronson.  Defendants argue that H&H performed

valuable consulting services for Bronson and was legitimately compensated for those services.

Defendants also argue that Sandra Howard, as an employee of H&H, provided Bronson with

valuable consulting services and received legitimate compensation for those services.  Therefore,

they claim, the Commission should not recover from either H&H or Sandra Howard.  Before I

apportion liability, I must first rule on the Commission's motion to amend the complaint to include H&H as a full defendant.

### A.      H&H

Generally, a party can amend its pleadings at trial to conform to the evidence produced at trial.  *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000).  A motion for such an amendment should be granted only if the opposing party will not be prejudiced by the amendment.  *Id.*  Here the Commission seeks to add H&H as a full defendant in light of evidence produced during the damages hearing.  Defendants opposed the Commission's motion, arguing that defendants did not consent to the admission of evidence concerning H&H's position as an alter ego of Martin Howard or as engaged in a common enterprise with Bronson.  Additionally, defendants argue that the Commission is procedurally barred from raising this issue at this stage of the action.

Defendants' argument that the alter ego and common enterprise issues were not tried by consent fails.  The Commission raised both issues in its pre-hearing brief.  In the section of the Commission's brief titled "H&H is Jointly and Severally Liable for the Full Amount of Restitution with Bronson and Martin Howard Because it is Either an Alter Ego of Martin Howard or Engaged in a Common Enterprise with Bronson" the Commission addressed and briefed these issues.  Defendants were served a copy of the brief on May 27, 2009 (doc. # 200).  Thus, defendants were on notice that the Commission raised these issues.  More importantly, at no point during the hearing did the defendants object to Sandra Howard's testimony about the corporate structure of H&H.

When a motion is made during trial, to conform the complaint to the evidence, "it may be

granted if the party against whom the amendment is offered will not be prejudiced by the amendment, and it should be granted in the absence of prejudice if the interests of justice so require." *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986). The defendants cannot argue prejudice when they had actual notice because the Commission briefed these issues in their pre-hearing filings and they failed to object to the evidence at trial. Defendants fail to demonstrate prejudice by an amendment at this stage of the litigation.

       1.   <u>Alter Ego</u>

H&H is a limited liability company formed under Texas law. The alter ego doctrine applies, under Texas law, "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *SEC v. Resource Development Intern., LLC*, 487 F.3d 295, 302 (5th Cir. 2007). Alter ego status is demonstrated by the total dealings of the corporation and the individual, including the degree to which corporate formalities are practiced and the extent that corporate and individual property are maintained separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Id.*

During the hearing on damages, the Commission produced evidence to support the arguments made in its brief. H&H is a Texas limited liability company and owned in equal shares by Martin and Sandra Howard. (Hr'g. Tr. 38.) The record reflects that H&H was formed on the advice of the Howards' accountant in order to pay the Howards' personal expenses. (Supp. Interrogatory Answers Relief Def. 9, Hr'g. Tr. 39-40.) This is consistent with Sandra Howard's testimony at the hearing that H&H was formed to pay the personal expenses of the

-24-

Howards.  H&H paid the Howards' mortgage, medical expenses, household expenses and Sandra

Howard testified that she could take extra money out of H&H as needed.  (Hr'g. Tr. 45-46.)  In

his deposition, Martin Howard, provided further support for the finding that the Howards'

monies were indistinguishable from H&H's monies.  He testified that H&H received $787,940

from Bronson during the 2003 and 2004 tax years.  Those monies were evenly split between

Martin and Sandra Howard and were used for mortgage payments, real estate taxes, income

taxes, household expenses, medical expenses, retirement savings, and to pay off a mortgage.  (M.

Howard Dep. 34.)  The Howards used the H&H bank accounts to pay those personal expenses.

(Hrg. Tr. 39-40.)

      The total dealings of H&H and the Martin Howard are inextricably intertwined.  The

Howards were the only employees of H&H and H&H's location was wherever the Howards

happened to be.  (Hrg. Tr. 42, 52-54.)  Other than the filing of formation papers, Martin Howard

did little to operate H&H as a company.  The evidence at the hearing showed that H&H ignored

the corporate form and did not hold membership meetings.  (Hrg. Tr. 60-61.)  Additionally,

Sandra Howard acknowledged that it did not matter if the money came from Bronson or H&H,

the money belonged to the Howards, not H&H.  Overwhelming evidence shows that Martin

Howard maintained full control over H&H.  Accordingly, I find that H&H is an alter ego of

Martin Howard and **grant** the Commission's motion to name H&H a full defendant in light of

the evidence at trial (**doc. #212**).  Because I find that H&H is an alter ego of Martin Howard, I do

not need to decide if H&H is engaged in a common enterprise with Bronson.

    **B.**     **Liability of Defendants**

      With respect to the liability of the three defendants, Bronson, H&H and Martin Howard,

it is within the court's discretion to find joint and several liability when multiple defendants collaborated in the prohibited conduct. *See SEC v. Opulentica*, *LLC*, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007) (citing *SEC v. Cavanagh*, No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *29 (S.D.N.Y. July 16, 2004)); *see also SEC v. AbsoluteFuture.com*, 393 F.3d 94, 97 (2d Cir. 2004) (joint and several liability is warranted "for combined profits on collaborating or closely related parties" so long as the total disgorgement amount does not exceed the defendants' combined profits). Courts have found joint-and-several liability appropriate where two or more individuals or entities collaborate in the prohibited conduct. *See SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997)). Martin Howard, Bronson, and H&H collaborated in the deceptive advertising scheme and are jointly and severally liable for the full restitution amount of $1,942,325.

### C.    Sandra Howard

Sandra Howard is a relief defendant in this case. The Commission argues that Sandra Howard does not have a legitimate claim to the monies she received from H&H. Defendants maintain that Sandra Howard performed legitimate duties for H&H, on behalf of Bronson, and is therefore not liable for any portion of the restitution. Under Second Circuit precedent, a court can grant relief against a "relief defendant" who, though not engaging in any wrongdoing, possesses ill-gotten gains derived from the unlawful acts or practices of the liable defendants, and has no legitimate claim to the property. *SEC v. Cavanaugh*, 155 F.3d 129, 136 (2d Cir. 1998); *see also FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ill. 2000). The ill-gotten gains must be linked to the unlawful practices of the liable defendants. A relief defendant can

show a legitimate claim to the funds received by showing that some services were performed in consideration for the monies. *FTC v. Direct Mktg. Concepts*, 569 F. Supp. 2d 285, 311-12 (D. Mass. 2008). The burden rests with the Commission to show that the funds in the possession of Sandra Howard are ill-gotten. *See id*. at 312.

At the hearing Sandra Howard testified that, as an employee of H&H, she worked with Bronson's fulfillment centers and Taction. (Hr'g. Tr. 67-68.) She managed inventory, monitored orders, implemented refund and re-ship policy, and oversaw other shipping and delivery matters. (Hr'g. Tr. 65-69.) Bronson paid her a net income of $680 a month for her services. (Hr'g. Tr. 46.) Sandra Howard collected about $4000 per month from H&H totalling $88,500 for the 2003-2004 period. (Hr'g. Tr. 45.) Sandra Howard testified that she communicated with Taction and the fulfillment houses, monitored inventory and orders, and communicated the policy regarding refunds, reships, back orders and insufficient addresses. (Hr'g. Tr. 65-69) Specifically she stated "I basically ran the Bronson – operations for Bronson through H&H." (Hr'g. Tr. 65) She testified that she implemented the use of a call center, improved shipping procedures, outsourced fulfillment, monitored orders, and generally oversaw operations. (Hr'g. Tr. 65-69).

Sandra Howard is not accused of any wrongdoing and there is no evidence in the record reflecting any involvement on her part with the deceptive advertising practices. I find that the Commission has failed to meet its burden of showing that Sandra Howard does not have a legitimate claim to the funds in her possession. The monies Sandra Howard received from H&H for services performed on behalf of Bronson were legitimately paid in consideration for her services. Accordingly, Sandra Howard is not liable for any portion of the restitution award.

V.      Injunctive Relief

    In addition to restitution, the Commission seeks a permanent injunction which includes

"fencing-in" relief and compliance monitoring.  Defendants contend that injunctive relief is

unnecessary in this case because they have ceased selling any weight loss products, including

Diet Tea and the Patch.  District courts have "sound discretion" to consider the "necessities of

the public interest" when fashioning injunctive relief.  *See United States v. Oakland Cannabis*

*Buyers' Co-op*, 532 U.S. 483, 496 (2001); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329

(1944).  In determining whether to issue a permanent injunction, I must balance the interests of

the parties who might be affected by the decision.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305,

312 (1982).  That decision depends on the circumstances of each case and the terms of the

injunction can be molded to meet the needs of each action.  *Hecht Co.*, 321 U.S. at 329.

Injunctive relief looks to future harm and is designed to deter the conduct rather than punish.  *See*

*generally Dombrowski v. Pfister*, 380 U.S. 479 (1965).

    I recognize that defendants represent that they are no longer selling and advertising Diet

Tea and the Patch.  I find there is good cause, however, to believe that the defendants have

engaged in, and are likely to engage in acts and practices that violate Sections 5(a) and 12 of the

Federal Trade Commission Act, as amended, 15 U.S.C. §§ 45(a), and 52.  Under Section 13(b) of

the FTC Act, the Commission may seek, and I may grant, a permanent injunction to prevent

future violations of "any provisions of law enforced by the FTC."  *See* 15 U.S.C. § 53(b).

Generally the fact that illegal conduct has ceased does not foreclose injunctive relief, and

permanent injunctive relief may be appropriate if the Commission demonstrates that there is a

cognizable danger of a recurrent violation.  *See FTC v. Citigroup Inc.*, 239 F. Supp. 2d 1302,

1306 (N.D. Ga. 2001); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

In this case, I find that the Commission is entitled to a permanent injunction against the defendants.  The evidence clearly demonstrates that defendants' previous violations of the FTC Act were obvious and widespread.   They did not engage in a harmless advertising scheme limited to a single instance of deception, defendants duped consumers into spending in excess of $1.9 million for fraudulent weight loss products.  The advertising for Diet Tea and the Patch was false, misleading, and contained numerous wildly unsubstantiated claims and was distributed through multiple media means including magazines, catalogs and a website.  Despite the defendants' representation that they no longer advertise or sell Diet Tea or the Patch, they provide no indication that Martin Howard's newest endeavor, Blue Hills Natural, will not engage in similar deceptive advertising practices.  I find that, if the defendants renewed their deceptive advertising practices, the harm to consumers in search of miracle weight loss products is certain and serious.  Future violations of a similar nature would surely result in financial harm to consumers, and possible physical harm if consumers engage in risky weight-loss techniques in reliance on defendants' misleading representations.  If defendants have indeed discontinued selling weight loss products and engaging in false advertising, then enjoining them from doing so causes no harm or inconvenience.  Accordingly, I find that a permanent injunction is proper under these circumstances.

To the extent that the Commission seeks to enjoin the defendants from engaging in future sales and advertisements of weight loss products, I grant their request for a permanent injunction incorporating terms I - III, and VI - XI from the preliminary injunction ordered on February 24, 2005 (doc. # 36).  The final judgment in this case shall set forth in detail the conduct enjoined.

VI.    Conclusion

    The Commission has met its burden to show that equitable restitution and injunctive remedies are appropriate in this case.  Because I find that H&H is an alter ego of Martin Howard, I **grant** the Commission's motion to enter H&H as a full defendant (**doc. # 212**).  The defendants, jointly and severally, are ordered to pay $1,942,325 in restitution to the Commission.  A permanent injunction will issue as set forth in this ruling.  Defendants are ordered to comply with the Commission's efforts to identify affected consumers so that restitution can be made to the victims of defendants' deceptive advertising scheme.  Relief defendant Sandra Howard met her burden of demonstrating that she provided a legitimate service in exchange for monies paid to her by defendants.  Accordingly, Sandra Howard is not liable for any portion of the restitution award.[4]

    It is so ordered.

    Dated at Bridgeport, Connecticut, this 4th day of December, 2009.

                  /s/ Stefan R. Underhill
                  Stefan R. Underhill
                  United States District Judge

---

[4] The Commission's motions *in limine* (**docs. # 175, 179, and 187**) are **denied as moot** in light of this ruling.  Because I found that all advertisements of Diet Tea are equally deceptive, the Commission's motion *in limine* (**doc. # 183**) is **granted**.